# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LOST LAKE HOLDINGS LLC, a domestic
limited liability company; MISHCONOS
MAZAH LLC, a domestic limited liability
company; RABBI MORDECHAI
HALBERSTAM; and ROSE HALBERSTAM,

        Plaintiffs,

    vs.

THE TOWN OF FORESTBURGH; THE
FORESTBURGH TOWN BOARD;
FORESTBURGH ZONING BOARD OF
APPEALS; DANIEL S. HOGUE, JR., in his
personal capacity; STEVE BUDOFSKY, in his
personal capacity; SUSAN PARKS-LANDIS, in
her personal capacity; KAREN ELLSWEIG, in
her personal capacity; VINCENT GALLIGAN,
in his personal capacity; RICHARD ROBBINS,
in his personal capacity; and GLENN A.
GABBARD, in his personal capacity and his
official capacity as Building Inspector of the
Town of Forestburgh,

        Defendants.

Civ. Action No. 7:22-cv-10656-VB

**FIRST AMENDED COMPLAINT**

---

      Plaintiffs LOST LAKE HOLDINGS LLC ("LLH"), MISHCONOS MAZAH LLC

("Mazah"), RABBI MORDECHAI HALBERSTAM, and ROSE HALBERSTAM (hereinafter

collectively, "Plaintiffs"), by and through their undersigned counsel, Storzer & Associates, P.C.

and Sive, Paget & Riesel, P.C., respectfully allege as follows:

1

## INTRODUCTION AND NATURE OF THE ACTION

1.      Plaintiffs file this action to redress violations of their constitutionally and statutorily protected federal civil rights, property rights, and due process rights, as well as to address claims that arise under New York State law.

2.      The principals of LLH and Mazah (collectively, the "Developer Plaintiffs") are Hasidic Orthodox Jews.

3.      Rabbi Mordechai Halberstam is the principal of Mazah, and Rose Halberstam is his wife (collectively, the "Halberstam Plaintiffs").

4.      In June 2020, the Developer Plaintiffs purchased a previously approved "shovel-ready" large-scale mixed-use development in the Town of Forestburgh (the "Town") known as the "Lost Lake Resort" ("Lost Lake" or the "Project").  The seller, Lost Lake Resort, Inc. (which did business as Double Diamond, Inc.) had obtained the Project approvals from the Town and was an entity whose principals were not Jewish.

5.      In November 2020, the Town Building Inspector issued a building permit to the Developer Plaintiffs' contractor to allow them to construct one single-family home within Phase 1 of the seven-phase Project.  After November 2020, all additional building permit applications filed on behalf of the Developer Plaintiffs for construction of single-family homes in the Project were denied by the Town Building Inspector and such denials were affirmed by the Town of Forestburgh Zoning Board of Appeals (the "ZBA").

6.      The grounds articulated by the Town Building Inspector and the ZBA for the denial of the single-family home building permit applications are discriminatory, have neither a legitimate basis in fact or law, and are pretextual.  The building permit applications were denied because the Defendants believed that the homes the Developer Plaintiffs would erect would be

2

purchased by Hasidic Orthodox Jewish homebuyers and Defendants acted to prevent that from occurring.  The building permit application denials violate the Fair Housing Act, 42 U.S.C. § 3604 ("FHA"), the First and Fourteenth Amendments to the United States Constitution, analogous provisions of the New York State Constitution, and New York statutory law.

7.      The denial of building permit applications is one of a series of violations of Plaintiffs' constitutional rights and actions targeting Hasidic Orthodox Jews, all of which were committed in order to prevent the Developer Plaintiffs from ever developing Lost Lake and selling homes to Hasidic Orthodox Jewish buyers, including the Halberstam Plaintiffs.  In addition to the blatantly discriminatory reason for the denial of the building permits described above, the following are some of the more egregious unconstitutional acts challenged herein:

a.  Multiple Defendants caused the Developer Plaintiffs' appeal to the ZBA to be a sham, whose upholding of the building permit application denials was preordained. After the first building permit application was granted as a routine matter by Glenn Gabbard, the Town Building Inspector, based on the recommendation of the Town Supervisor (the "Town Supervisor" or "Hogue") and the Town Planning Board Chair (the "Planning Board Chair" or "Robbins"), the Forestburgh Town Board (the "Town Board") retained Javid Afzali, Esq. ("Afzali") of the law firm Harris Beach PLLC ("Harris Beach") as special outside counsel for all matters pertaining to the Project.  On behalf of the Town Board, Hogue, and Robbins, Afzali orchestrated through the Town Building Inspector the denial of the subsequent building permit applications.  Then, when the Developer Plaintiffs appealed those denials to the ZBA, the Town Board displaced the regular attorney for the ZBA and substituted Afzali.  The Town Board also designated Harris Beach to represent the

Town and the Town Building Inspector before the ZBA, causing lawyers from that firm to both advocate before the ZBA and counsel the supposedly impartial ZBA. In addition, the ZBA refused to subpoena any evidence or compel the testimony of the outside consultant whose report had ostensibly been the basis for the denial of the building permits. The ZBA never discussed in any meeting the merits of the Developer Plaintiffs' appeal, never directed Afzali to prepare a resolution denying the appeal, and simply rubber-stamped the denial resolution authored by Afzali without discussion. In addition, the ZBA excluded from its appeal record many of the Developer Plaintiffs' exhibits and documents which were directed to the lack of due process and fundamental fairness of the process. These, as well as other acts detailed *infra*, deprived the Developer Plaintiffs of procedural due process of law.

b. By unlawfully denying all subsequent building permit applications for construction of homes, multiple Defendants have deprived the Developer Plaintiffs of their vested rights in the Project's approvals in violation of Plaintiffs' substantive due process rights. In addition, the denial of building permit applications precludes all economically productive use of the Project and constitutes a "taking" of the Developer Plaintiffs' property for which payment of just compensation is required.

c. Hogue and the Town Building Inspector, in the pre-dawn darkness on Election Day when all Town offices were closed, illegally and without prior notice entered and searched the land on which the Project is located (the "Project Site"), in violation of the Developer Plaintiffs' constitutional right to be protected against warrantless searches.

d. The Town Assessor ("Ketcham" or the "Assessor") caused the Project Site's

taxable value to be over-assessed, forcing the Developer Plaintiffs to pay millions of dollars in additional real property taxes.  Similarly, the Town Board adopted a local law imposing a 1000% increase in the Town's parkland fees (from $200 per lot to $2,000 per lot) that would drive up the Developer Plaintiffs' cost to develop the future phases of the Project by almost four million dollars. These acts were undertaken to attempt to force the Developer Plaintiffs to abandon the Project and to abandon their vested rights in the Project's approvals.

8.      Furthermore, after this action was originally filed, the Town took various retaliatory and unfounded actions against the Developer Plaintiffs, including the issuance of a baseless Notice of Violation and Stop Work Order and filing a baseless lawsuit against the Developer Plaintiffs in New York state court, both of which assert violations of Town Code provisions that do not exist.

9.      The Town has also recently issued a "positive declaration" through a Resolution–based on the Building Inspector and ZBA's determination that the homes would be purchased by Hasidic Orthodox Jews–which would require the Developer Plaintiffs to unnecessarily restart the lengthy environmental review process under the New York State Environmental Quality Review Act ("SEQRA"), and then sent a notice of the same to various County, Federal and State agencies to prevent the Lost Lake Project from moving forward.

10.     These new actions prevent the Developer Plaintiffs from performing any work on the Project, including necessary infrastructure work that is unrelated to the building permit issue, and would unnecessarily delay the Project by years, causing significant harm to the Plaintiffs.

11.     Defendants' actions were motivated by anti-Semitic religious and racial animus from Town officials and pressure from local residents to whom such officials were responsive. They feared that Hasidic Orthodox Jews would purchase homes and reside in the Project.  This

religious and racial animus predated even the Developer Plaintiffs' purchase of the Project, has continued since, and has impeded the ability of Hasidic Orthodox Jews to move to the Town. Defendants have intentionally discriminated against Hasidic Orthodox Jews by prohibiting the development of housing within the Town.

12.     Defendants' actions have also deprived Plaintiffs of the equal protection of the laws, prevented LLH and Mazah from building badly needed homes on the basis of the perception of who would live in those homes, damaged Plaintiffs, and prevented the Halberstams from obtaining housing in the Project.

13.     Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages for the Defendants' willful violation of their civil and constitutional rights.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 3604, which confers original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the FHA, as well as under 42 U.S.C. § 1983, which confers jurisdiction over Plaintiffs' Equal Protection, Due Process, Taking, and other federal constitutional claims.  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur in this District.

## PARTIES

16.     Plaintiff LLH is a limited liability company organized under the laws of the State of New York.

17.     Plaintiff Mazah is a limited liability company organized under the laws of the State

of New York.

18.     Plaintiff Rabbi Mordechai Halberstam is a principal of Mazah, and resides at 258 Penn Street, Brooklyn, New York 11211.

19.     Plaintiff Rose Halberstam is Rabbi Halberstam's wife and resides at 258 Penn Street, Brooklyn, New York 11211.

20.     Defendant Town of Forestburgh is a duly and lawfully existing township under the laws of the State of New York, located in Sullivan County, and having its offices at 332 King Road, Forestburgh, New York 12777.

21.     Defendant Forestburgh Town Board is the duly elected town board of the Town of Forestburgh having its offices at 332 King Road, Forestburgh, New York 12777.

22.     Defendant Town of Forestburgh Zoning Board of Appeals is the duly appointed zoning board of appeals of the Town having its offices at 332 King Road, Forestburgh, New York 12777.

23.     Defendant Daniel S. Hogue, Jr. is the duly elected Town Supervisor of the Town.

24.     Steve Budofsky is a member of the Forestburgh Town Board.

25.     Susan Parks-Landis is a member of the Forestburgh Town Board

26.     Karen Ellsweig is a member of the Forestburgh Town Board.

27.     Vincent Galligan is a member of the Forestburgh Town Board.

28.     Glenn Gabbard is the duly appointed building inspector and code enforcement officer of the Town.

29.     Richard Robbins is the duly appointed Chair of the Planning Board of the Town of Forestburgh (the "Planning Board").

## FACTUAL ALLEGATIONS

30.     The Town is located in Sullivan County, is approximately 56.31 square miles in size, and has the lowest population of any town in the County.  The Town has a total population of 808 persons according to the 2020 U.S. Decennial Census, had a total population of 819 persons according to the 2010 U.S. Decennial Census, and had a total population of 833 persons according to the 2000 U.S. Decennial Census.

### History of Hasidic Orthodox Jewish Presence in Sullivan and Nearby Counties

31.     Prior to approximately 1915, Jews were not welcome in Sullivan County, as documented by John Conway, the official Sullivan County Historian.  At or about that time, due to the effects of the tuberculosis epidemic, hotels and other properties in Sullivan County were sold at low prices and were purchased by Jewish entrepreneurs who developed the hotels and bungalow colonies that would ultimately become known as the "Borscht Belt."[1]  These hotels and bungalow colonies were full-service, kosher, and catered to the Jewish community that would come to Sullivan County during the summers.  In 1939, the George Washington Bridge opened, significantly facilitating automobile access to Sullivan County from New York City.  By the end of World War II, there were hundreds of hotels throughout the Catskills, many in Sullivan County, the vast majority of which catered to the Jewish community, as well as thousands of bungalow units in hundreds of summer bungalow colonies, many of which catered to and were occupied by the Hasidic Orthodox Jewish community.

32.     As a summer retreat for the entire Jewish community, Sullivan County reached its peak of popularity in the twenty years following the end of World War II.  Although the Borscht

---

[1] Borscht is beet soup and was a traditional food of Eastern European Jews who emigrated to the United States.

Belt hotels faded away beginning in the late 1960s, the Hasidic Orthodox community continued unabated to travel to Sullivan County during the summers, staying principally at bungalow colonies.  To this day, approximately 300,000 Hasidic Orthodox Jewish people typically travel to the Catskills each summer, staying at religious retreat bungalow colonies where children receive the same religious education as they do during the non-summer months.

33.      In the 1950s, led in part by Brooklyn Rabbi Yaakov Yosef Twersky, certain groups of the Hasidic Orthodox community began to settle year-round in Monsey and New Square in Rockland County.  In 1974, led by Brooklyn Hasidic Grand Rebbe Joel Teitelbaum, land was purchased and permanently settled further north in the Town of Monroe in Orange County, in what would ultimately become the incorporated Village of Kiryas Joel.  As Monsey, New Square, and Kiryas Joel grew with increasing numbers of year-round homes and residents in the latter part of the 20th Century, the demand for housing for the Hasidic Orthodox Jewish community increased.

34.      For at least the past 15 years, as attempts to provide land for and develop year-round and summertime housing for the Hasidic Orthodox Jewish community intensified, and applications for expansion of Hasidic Orthodox Jewish summer religious retreats increased, both were strongly resisted in multiple locations in Rockland, Orange, Ulster, and Sullivan Counties.  Thus, for approximately the past fifteen years, proposed annexations of territory, new residential developments, and expansions of summer religious retreats were stridently opposed in the Villages of Kiryas Joel, Pomona, Chestnut Ridge, South Blooming Grove, Wesley Hills, and Bloomingburg, and in the Towns of Monroe, Woodbury, Blooming Grove, Mamakating, Thompson, Chester, and Wawarsing.  For example, one proposed annexation of territory into the Village of Kiryas Joel by Hasidic Orthodox Jewish property owners was vigorously opposed by multiple units of local government and anti-Semitic locals who unsuccessfully conspired to derail

the proposed annexation.  *See Commandeer Realty Associates, Inc. v. Allegro*, 49 Misc. 3d 891
(Sup. Ct. Orange Co. 2015).

35.     Even though for more than 75 years there has been a significant Hasidic Orthodox
Jewish seasonal and year-round presence in and around Monticello and in the Town of Thompson,
within no more than a five-minute drive from the Town's border, there has never been any
significant sized Hasidic Orthodox Jewish population in the Town.  The Town's Comprehensive
Plan makes no mention of any bungalow colonies, hotels, or other seasonal or year-round
communities with any significant Jewish population of any kind.

36.     The Hasidic Orthodox Jewish population is characterized by very distinctive dress,
specific religious customs and practices, and special religious educational needs, among other
attributes.

37.     As discussed in greater detail *infra*, there is significant long-standing anti-Semitic
animus in the Town.  For example, in a July 30, 2000 Times Herald-Record article, the elected
Town Supervisor was quoted as saying about Hasidic Orthodox Jews, "They are not the visitors
we need to attract . . . There are visions of Sullivan County becoming larger than Kiryas Joel."

38.     With the growth of Hasidic Orthodox Jewish communities in Rockland, Orange,
and Sullivan Counties, and as the families in those communities have children, there has been and
continues to be an increasing need for additional housing for the Hasidic Orthodox Jewish
community in Sullivan County.

39.     It is precisely the development of that type of housing that the Defendants have
unconstitutionally and unlawfully obstructed.

40.     Many nearby communities have experienced a significant growth of Hasidic
Orthodox Jewish residents, including in Monticello, Kiamesha Lake, South Fallsburg, Liberty, and

Bloomingburg.

41.    Specific developments near the Project Site that have attracted large numbers of Orthodox Jews include the Birchwood Estates, Waverly Gardens, Venetian Villas, Alpine Acres, The Grove Estates, Garden Terrace, and Laurel Estates developments.

## The Town Board's Approval of the Lost Lake Project and Infrastructure Installation

42.    In 2008, Double Diamond, Inc. ("Double Diamond" or the "Original Developer") purchased the Project Site which measures approximately 3.3 square miles, and consists of tax map parcels: 3.-1-1.1, 3.-1-2.1, 3.-1-3, 4.-1-7, 4.-1-10.2, 7.-1-1, 8.-1-1.2, 8.-1-2, 20.A-1-1, and 20.B-1-1.

43.    As proposed, Lost Lake would be built in seven phases with no outer time limit as to when the Project would need to be completed.

44.    On September 9, 2008, the Town Board granted sketch plan approval for Lost Lake, as required by the Town Code for major subdivisions.

45.    Thereafter, Double Diamond applied to the Town Board for the Project Site to be rezoned to a Planned Development District ("PDD") pursuant to Chapter 85 (the "Zoning Law") of the Town of Forestburgh Town Code (the "Town Code"), as that Chapter of the Town Code then provided.

46.    The purpose of the PDD provisions in the Zoning Law were "to provide a recognized and innovative zoning and planning technique for potential new development of relatively large areas located in the RR-1 and RC zoning districts within the Town that are specifically chosen by property owners or developers for well-designed projects that incorporate a mixture of compatible uses, open space, economies of scale, environmental and community

11

sensitivity, and creative architectural or planning concepts that are in accordance with the Town's economic and land use policies and goals."

47.     Pursuant to the SEQRA, the Town Board designated itself and served as lead agency for the environmental review of the proposed Project, including the proposed PDD rezoning, as well as subdivision and site plan approvals.

48.     The Town Board issued a positive declaration requiring Double Diamond to prepare an environmental impact statement.

49.     Double Diamond prepared and the Town Board reviewed a draft environmental impact statement (the "DEIS").

50.     Thereafter, following review and comment on the DEIS and a public hearing, Double Diamond prepared, and on April 7, 2011, the Town Board accepted, the Project's Final Environmental Impact Statement ("FEIS"), as well as an addendum to the FEIS which was accepted by the Town Board on April 20, 2011.

51.     As required by SEQRA, on May 18, 2011, and prior to voting on the proposed PDD rezoning, the Town Board adopted its SEQRA Findings Statement (the "Findings Statement").

52.     In the section of the Findings Statement entitled "Description of the Proposed Action," the Town Board stated: "The project developer has established the design theme and sustainable design and construction philosophy for Lost Lake Resort in its Design Guidelines which are included in the DEIS (Appendix E2)."

53.     In the same section of the Findings Statement, the Town Board stated: "Each lot owner that elects to build a home on a lot will need to do so in full accordance with Design Guidelines that will be set forth in the Offering Plan and [Property Owners Association] bylaws, so that the Lost Lake Resort community will maintain its quality, look and aesthetic appeal."

54.     The form of the "Declaration of Exceptions, Reservations, Covenants, Restrictions and Conditions for The Lost Lake Resort and Development" appended to the DEIS as Appendix E1 (the "Declaration of Covenants and Restrictions") contains, *inter alia,* the following provisions:

    a.  On page 2, following the Recitals: "Declarant reserves the continuing, unqualified and exclusive right to alter, modify or amend any of this Declaration when in its sole opinion it is proper and necessary to do so."

    b.  On page 4: "The Committee and/or Declarant shall establish guidelines and design standards for contemporary and/or modern construction and may alter, amend, or modify the same when in their sole opinion it is proper or necessary to do so."

55.     The design guidelines, appended to the DEIS as Appendix E2 (the "Design Guidelines"), provide as follows: "In accordance with the requirements of the Lost Lake Covenants, Conditions, and Restrictions (CC&Rs), this document sets forth the Architectural, Site Planning, and Landscape Guidelines that shall define the general design theme of all single-family, whole-ownership lots within Lost Lake.   This document also describes specific design requirements and the general construction procedures.  This document may be amended from time to time by the Lost Lake Design Review Board but will continue to meet or exceed any similar guidelines set by the Town of Forestburgh."  The Design Guidelines further provide that the Design Review Board "will evaluate all development proposals in accordance with Design Guidelines, as amended from time to time," and that the Design Review Board is responsible for enforcement and "for amending the Guidelines from time to time."

56.     The Town Board has never adopted any architectural or design requirements for construction of single-family homes in the Town.

57.     In the section of the Findings Statement entitled "Conclusions," the Town Board

13

concluded that the Project would not have the potential to generate any significant unmitigated adverse environmental impacts and avoids or minimizes significant adverse environmental impacts to the maximum extent practicable.

58.     Based upon the explicit reserved right of the Project developer to amend the Declaration of Covenants and Restrictions and the Design Guidelines as set forth in the DEIS appendices accepted by the Town Board in its capacity as SEQRA lead agency, the Findings Statement states as follows in Section 6.12 entitled "Visual Resources": "The Lead Agency finds, upon due consideration of the Draft and Final EIS, that the proposed project will not have a significant adverse impact upon visual resources . . . ."

59.     In Findings Statement Section 6.10.6 entitled "Recreation," the Town Board stated: "The Applicant will pay to the Town a fee of $200 per lot in lieu of providing any additional recreation land or parkland due to the recreational amenities provided in the revised Master Plan."

60.     In Findings Statement Section 6.6 entitled "Zoning, Land Use and Public Policy," the Town Board stated: "The proposed action conforms to relevant policies contained in the Town of Forestburgh and Sullivan County comprehensive plans."

61.     Following the adoption of the Findings Statement, on July 7, 2011, the Town Board amended the Town Zoning Law to vest itself with exclusive review and approval jurisdiction over subdivision and site plan applications for the Project.

62.     Thereafter, on August 4, 2011, the Town Board unanimously granted approval of the proposed PDD rezoning of the Project Site ("PDD Approval").

63.     The effect of the Town Board's action was to amend the Town's Zoning Map to designate the Project Site as a PDD and to approve the Project's Site Master Plan, Open Space Plan, and Phasing Plan.

64.     In the Town Board Resolution, the approved Project consisted of the following: "a resort and residential community of 2,557 single-family residential lots, 30 single-family cottages, and 40 multi-family townhouse-style condominium dwellings for a total of 2,627 residential units, resort amenities, and associated infrastructure."

65.     In the PDD Approval, the Town Board determined that Lost Lake is compatible with the surrounding land uses in the vicinity of the project area.

66.     The PDD Approval required, *inter alia*, that the "Applicant shall comply with the mitigation measures set forth in the SEQRA Findings Statement, . . . ."

67.     The SEQRA Findings Statement stated in its "Description of the Proposed Action" section and not the "Summary of Impacts and Mitigation Measures" section that Lost Lake Resort, Inc. would require "strict adherence to [Lost Lake Resort Inc.]'s Design Guidelines for Single Family Homes in Lost Lake Resort (Design Guidelines) that are binding on all lot owners" and "subject to a declaration of exceptions, reservations, covenants, restrictions and conditions for the Lost Lake Resort (Declaration) [the "CC&Rs"]").

68.     The SEQRA Findings Statement did not require "strict adherence to" any particular version of the Design Guidelines and Declaration of Covenants and Restrictions, without any possibility of amendment of those documents, nor did the Town Board adopt any Town-mandated architectural or design requirements.

69.     Thereafter, subdivision and site plan approval were sought from the Town Board for Phase 1 of the Project.  Phase 1 consists of 400 single-family residential lots and the first nine holes of the Project's eighteen-hole golf course.

70.     On February 28, 2012, the Town Board granted preliminary site plan and subdivision plat approval for Phase 1.

15

71.     On December 17, 2012, the Town Board granted conditional final site plan and subdivision plat approval for Phase 1.

72.     The Original Developer obtained all required permits, approvals, and authorizations from governmental agencies and the Phase 1 Project final subdivision plat was signed on behalf of the Town on June 25, 2013.

73.     On September 23, 2013, the Original Developer adopted the same Declaration of Covenants and Restrictions as was appended to the DEIS as Exhibit E1.

74.     On October 7, 2013, the Declaration of Covenants and Restrictions was recorded in the office of the Sullivan County Clerk.

75.     No litigation was filed by the Town or any other party challenging the Declaration of Covenants and Restrictions, including the reserved right to amend the covenants and restrictions, including its design guidelines.

76.     One of the conditions of final site plan and subdivision plat approval for Phase 1 was that all required permits, approvals, and authorizations required from New York State and other governmental agencies be obtained before the Town Supervisor could sign the final subdivision plat.

**Town Support for Double Diamond's Development**

77.     Throughout its review of the proposed Project and PDD rezoning, the Town Board strongly supported Lost Lake, describing it as a "wonderful project" which will "ensure [the Town's] future to keep the town whole."

78.     Two previous Town Supervisors, James Galligan and Bill Sipos, supported the Lost Lake Project.

79.     The Town celebrated the beginning of work by the Original Developer in 2014 at

a ribbon-cutting ceremony.

80.     The Original Developer was also honored by being nominated for a "Pride of Sullivan County" award.

81.     A Sullivan County Post article about the proposed development, including the nearly 2,700 new homes and proposed amenities, generated only positive comments online.

82.     In reliance on the Town Board's approval of the PDD Rezoning and the Phase 1 subdivision and site plan approvals, as well as the governmental approvals and permits issued by other governmental bodies and agencies, the Original Developer installed millions of dollars of Project infrastructure for both the Project as a whole and Phase 1.  This infrastructure included paved roads, miles of graded road sub-bases, miles of water and sewer lines, miles of stormwater collection and management systems and networks, a sales building, and a security building.

83.     One of the marketing tools created by the Original Developer for its sister project called "Eagle Rock Resort," which the Original Developer modeled the Lost Lake Project after, was a video which described the Project and its future amenities and stressed that buying into the Project was very attractive and desirable because the sales prices were affordable.  The single word "Affordable" was placed on the video in very large type and very prominently emphasized in the Original Developer's sales and promotional video.

**Anti-Semitic Animus During the
Town Board's Project Review and After Its Approval**

84.     Throughout the Town Board's review of the PDD rezoning and other approvals sought by the Original Developer, anti-Semitic fears about the Project were voiced at Town Board meetings, even though the Project was not being developed by Hasidic Orthodox Jews or being marketed to Hasidic Orthodox Jewish homebuyers.

85.     At the May 5, 2011 Town Board meeting, Dan Scott (a Town resident), equating Hasidic Orthodox Jews with beavers, stated that, "With the way the economy is going, I think this project may go through and then fail. Are these approvals on these lots permanent? Let's say they sell it to somebody else, just a mile away from here are people who just love to pack themselves into a house like beavers, . . . ."

86.     At the May 18, 2011 Town Board meeting, Mr. Scott offered further concerns about the development, including, "I am not being anti-Semitic, but they tend to take everything off the tax rolls and that I'm not big on that."

87.     Upon information and belief, Mr. Scott is currently a member of the Town's Zoning Review Committee, on which he serves with members of the Town Council and Town Planning Board.

88.     Town officials and residents feared that a Hasidic Orthodox Jewish developer would purchase the Project and that such ownership would "wreck[]" the town.

89.     As infrastructure was being installed by the Original Developer, Town officials and residents increasingly expressed fears that the Original Developer would not complete the Project and that it would be purchased by Hasidic Orthodox Jewish developers.

90.     Upon information and belief, Defendants and others in the Town were aware of the influx of Orthodox Jewish families purchasing homes in other towns and villages in Sullivan County, as well as in Orange and Rockland Counties.

91.     Hogue was elected Town Supervisor and took office in January 2016.  He currently is the elected Town Supervisor.

92.     Robbins was appointed in February 2016 as Planning Board Chair, and currently holds that appointive office.

93.     In June 2016, the Town Board established a Comprehensive Plan Review committee to update the Town's Comprehensive Plan.  Robbins was appointed as one of its members, as was Justin Evans ("Evans"), among others.

94.     Evans was and is a prominent citizen in the Town.  Evans has also been and currently is a board member of the Hartwood Club, a private hunting club in Forestburgh on whose lands are approximately 30 single-family homes.

95.     On or about August 16, 2016, soon after the Comprehensive Plan Review committee was appointed, Evans emailed Hogue, Robbins, other Planning Board members, the Chair of the ZBA at that time, and Town Tax Assessor Dennis Ketchum expressing concerns about a "religious group" buying up the distressed project, forming a "religious voting block community," and that subsequently "[t]he community is wrecked forever."

96.     Upon information and belief, the religious group Evans was referring to was Hasidic Orthodox Jews.

97.     Evans stated that a "worst-case thesis" of his "Hartwood friends" included the possibility that a "Religious group buys up hundreds of homes/parcels, . . . ."

98.     Upon information and belief, the religious group Evans and his "Hartwood Friends" were referring to was Hasidic Orthodox Jews.

99.     On March 2, 2017, the Town Board passed Resolution 11, which designated the existing Comprehensive Plan Review committee members as a "Comprehensive Plan Special Board" for the purposes of amending the Comprehensive Plan, retroactive to June 2, 2016 and on an ongoing basis.

100.    By contrast to his animus toward the Hasidic Orthodox Jewish community and years before the Project would be sold to the Developer Plaintiffs, at a March 28, 2017 Joint

19

Meeting of the Town Planning Board and the Comprehensive Plan Special Board, Evans praised the Project approvals issued to the Original Developer stating that "Lost Lake is a good example of the town trying to establish that balance of keeping Forestburgh forested (serene) while increasing the tax base."

101.    At the Town Board's August 3, 2017 meeting, Councilwoman Katherine Barnhart stated: "the thing that really concerns us is that we know the project is up for sale.  So we are wondering how that is going to impact what is down here."

102.    The formation of the Comprehensive Plan Special Board was the first in a series of actions and legislation targeted at the Project and, once the Developer Plaintiffs took title, specifically aimed at the Developer Plaintiffs being able to construct the Project.

103.    On October 4, 2018, the Town Board adopted Local Law No. 4 of 2018, which imposed a six-month moratorium on the approval of, or issuance of, any permits, including building permits, related to major subdivisions in the Town.

104.    The purported reason for the enactment of Local Law No. 4 of 2018 was to update the Town's Comprehensive Plan related to major subdivisions.

105.    On August 1, 2019, the Town Board adopted Local Law #4 of 2019, which imposed a moratorium on the processing of applications for and the issuance of any approvals or permits for planned development districts in the Town.

106.    On January 9, 2020, the Town Board voted to repeal the existing Planned Development District law in its entirety.  This repeal was adopted to prejudice any future purchaser of the Project, which the Town Board feared would be someone who is Hasidic Orthodox Jewish.

107.    When the Original Developer placed the Project and Project Site for sale, there was immediate fearful speculation and even threats by a competing potential buyer that the purchase

would be made by someone from the Hasidic Orthodox Jewish community.

108.    A Sullivan County Democrat article dated May 7, 2019 reporting that Lost Lake was "back on the market" attracted comments such as the following on Facebook

        A.     "The Hasidics will buy it and destroy it"

        B.     "Oh boy guess who's going to buy it"

109.    Upon information and belief, Town officials, including multiple Defendants, are members of Facebook groups which include discussions about Hasidic Orthodox Jews and the Project.

110.    Upon information and belief, Town officials, including multiple Defendants, frequent the on-line sites where these statements were made.

111.    At the June 27, 2019 Planning Board meeting, the Town Supervisor's mother, Millie Hogue, stated that she had attended a recent Town Board meeting where a non-Jewish interested potential Project purchaser and his broker indicated that a "religious group" would purchase the Property, which upset her.  On information and belief, the "religious group" referred to was the Hasidic Orthodox Jewish community.

112.    There was further discussion at the Town Planning Board meeting by Evans and Robbins about whether a religious building could be built within the Project.

113.    Upon information and belief, the religious building referred to was a Hasidic Orthodox Jewish *shul*, or place of worship.

### The Sale of the Project and Project Site to the Developer Plaintiffs and Animus Toward Hasidic Orthodox Jews After the Purchase

114.    Although the Original Developer had sold some lots in Phase 1 of the Project to individual buyers, by 2019 the vast majority of the Phase 1 lots were unsold.  No building permit

applications had been filed for construction of any single-family homes in the Project.

115.    The Developer Plaintiffs became aware that the Project and Project Site were for sale.  They undertook due diligence and confirmed that the Project's environmental review had been completed, the Project's rezoning had been approved, and Phase 1 of the Project had received subdivision and site plan approvals.  On the basis of these facts and additional due diligence, the Develop Plaintiffs determined that Phase 1 of the Project was shovel-ready and that all that was needed to begin construction of single-family homes in that Phase was issuance of building permits.

116.    In July 2020, the Developer Plaintiffs closed on the purchase of the Project and the Project Site from the Original Developer.  The sale of the Project and the Project Site included, but was not limited to:  (a) conveyance of the entire Project Site with the exception of those lots in Phase 1 that had been sold to third parties; (b) transfer of all Project development rights, including all rights in and to the Town Board's approvals of the PDD rezoning, Lost Lake Master Plan Approval, Open Space Plan, and Phasing Plan; (c) transfer of all rights in and to the final Phase 1 subdivision and site plan approvals issued by the Town Board; (d) transfer of all rights in and to all federal, state, county, and other permits, approvals and authorizations for the Project; and (e) transfer of ownership of all infrastructure installed in and on the Project Site by the Original Developer.

117.    Public comments in response to a Times Herald-Record article about the Developer Plaintiffs' purchase of the Project were full of targeted and anti-Semitic statements including the following:

> A.  "Dirty money, endless money, amazon scammers, jewish [sic] mafia"
>
> B.  "2600 homes.. 3.3 sq miles? Hmmm wonder who that is"

C. "There's [sic] building a new city in kj .. while the rest of us can barely afford $5 a gallon milk price ? And you wonder why Germans did what they say they did .. smh"

D. "A group of rabbis"

E. "Thanks Gov Como [sic]. We all know this group has you in their back pocket. Como [sic] lets them do whatever they want as long as he gets all their votes. What a train wreck."

F. "Jewish Camps"

G. "It already smells like sewage. In [sic] Sullivan from putting up the first round of condos for the hissidics [sic] and accidents everyday. Out of Control."

H. "The takeover continues"

118.    Upon information and belief, several of these comments were made by individuals who reside in Sullivan County.

119.    A similar Sullivan County Post article about the purchase sparked similar comments on Facebook, including:

A. "Will become another dump! Just look at the bungalows and village street were the houses were bought on Nelshore,Starr,Hammong Thorton and so on."

B. "They call them developers… i call them tax evaders"

C. "How wonderful, continued decimation of Sullivan county….."

D. "And here comes the beginning of the local Schools loosing [sic] funding, garbage everywhere and continue land purchases that will out

23

all locals and devalue property!!"

    E.  "Another Kiryas Joel"

    F.  "Kiryas Joel Part 2"

    G.  "Bringing Brooklyn to Sullivan county."

120.    Upon information and belief, several of these comments were made by individuals who reside in Sullivan County.

121.    Upon information and belief, the Sullivan County Post's Facebook page is one of the most popular Facebook pages, if not the most popular, focused on issues relating to the County. It has approximately 33,000 members and is a well-known source for news, events and information about the County.

122.    Upon information and belief, Sullivan County's population was 78,624 as of the 2020 Census.

123.    Upon information and belief, many Town officials are members of the "Sullivan County Post" Facebook group, including Town Supervisor Hogue, Town Board member Susan Parks-Landis, Town Board Member Vincent Galligan, Town Clerk Joanne Nagoda, Planning Board Member Tony Cardoso, Planning Board Member Alan Devlin, Planning Board Member Susan Hawvermale, Planning Board Member Katherine Barnhart, Zoning Board of Appeals Member James Steinberg, Comprehensive Plan Review Committee Member Dana Taylor, and Comprehensive Plan Review Committee Member Gillian Kaiser.

124.    Upon information and belief, many non-Orthodox residents in Sullivan County harbored and still harbor anti-Semitic views about the Hasidic Orthodox Jewish families who live there.

125.    Soon after the Developer Plaintiffs closed on their purchase of the Project and

Project Site, at the August 6, 2020 Town Board meeting, the Town Supervisor stated: "There will be much more oversight than Lost Lake had."  (Emphasis added.)

126.    The very next month, in September 2020, the Planning Board reported to the Town Board that it was anticipating an application from the Developer Plaintiffs for modification to Phase 1 of the Project.

127.    The Developer Plaintiffs never proposed any amendment to the Phase 1 subdivision and site plan approvals.

128.    Upon information and belief, in or about the same month, the private organization "Rise Up Ocean County" scheduled a meeting with Town community representatives to discuss the Project becoming a Hasidic "Enclave."

129.    Rise Up Ocean County is a New Jersey-based organization that opposes Orthodox Jewish development within Ocean County, New Jersey, monitors what it perceives to be Orthodox Jewish communities and development outside of New Jersey, and regularly circulates anti-Semitic speech and memes on its so-called "closed" Facebook groups.

130.    Under the Sullivan County tab of Rise Up Ocean County's website, there is an April 21, 2022 post about the Project entitled "2,600 Home High End Resort Now An 'Affordable' Hasidic Enclave."

131.    Rise Up Ocean County maintained a page on Facebook, which, upon information and belief, was removed from Facebook in February 2020.  This removal followed a letter from the New Jersey Director of Civil Rights to Facebook expressing concerns about Rise Up Ocean County.  In a Joint Statement from New Jersey Governor Phil Murphy and New Jersey Attorney General Gurbir Grewal in January 2020, they indicated they "had serious concerns with racist and anti-Semitic statements on the page, including an explicit goal of preventing Orthodox Jews from

25

moving to Ocean County," New Jersey.

132.    In October 2020, the Developer Plaintiffs applied for a building permit for Lot 301 (the "First Application").  That Application was reviewed by the Town Building Inspector without any outside consultant or attorney input and was granted approximately two weeks after the First Application's filing (the "First Building Permit").  The review process undertaken by the Town Building Inspector prior to granting the First Building Permit was typical of the review undertaken when a building permit application for construction of a single-family home was filed with the Town.

133.    After it received the First Building Permit, the Developer Plaintiffs constructed a single-family home on Lot 301, which is now nearly complete.  Neither the Town Building Inspector nor any other Town board, agency, or official had issued a stop work order or any other notice of any violation of any Town law or any of the Town Board approvals issued for the Project prior to this action being filed.

**Town Board Preemptively Retains**
**Special Litigation Counsel and an Outside Consultant**

134.    In October 2020, Town Supervisor Hogue stated at a Town Board meeting that the Town should hire a "consultant" to oversee the Project, with the cost of that consultant to be paid out of an escrow fund previously established for payment of consultant fees incurred for review of the PDD rezoning application (the "Lost Lake Escrow").

135.    As part of the PDD rezoning review process, the Original Developer was required to place monies into the Lost Lake Escrow "for the sole purpose of paying the costs and fees of consultant(s) retained for review of the PDD Proposal."

136.    At the November 2020 Town Board meeting, the Town Supervisor designated

Chuck Voss ("Voss"), a land planner with a private firm, as the Town's "point person" on the Project.

137.    The Town Supervisor reported that he and Planning Board Chair Robbins previously met with Voss and that Robbins had separately met with other consultants who worked on the PDD rezoning and other Project approvals.

138.    Planning Board Chair Robbins took these actions on behalf of the Town and the Town Board despite never being formally authorized to do so and despite such actions being outside the scope of his role as the Planning Board Chair.

139.    The Town began to prepare itself for litigation against the Developer Plaintiffs long before there was ever a basis to do so.

140.    Later at the same meeting, Evans stated that legal advice was as important as a consultant and stated that the Town Board needed attorneys versed in land development and density.  Evans and Robbins pressured the Town Board to hire a law firm to provide "real litigation advice" and pay for that advice from the Lost Lake Escrow.

141.    Special outside counsel was to be retained despite the fact that the First Building Permit had been issued routinely, no building permit applications were pending, and no litigation had been threatened by or on behalf of the Developer Plaintiffs.

142.    Although the Town typically posts the Minutes of its Town Board meetings online, it has never posted the Minutes of the November 2020 Town Board meeting.

143.    Upon information and belief, the Town's actions in hiring a consultant and litigation counsel were motivated by bias against Hasidic Orthodox Jews in an effort to prevent the Developer Plaintiffs from constructing homes in the Project.

144.    At the December 3, 2020 Town Board meeting, after going into Executive Session

with Planning Board Chair Robbins and the Town Attorney, the Town Board voted to retain Mr. Voss through the firm at which he was employed, Barton & Loguidice, and to meet with Harris Beach "to discuss a fee schedule and scope of work related to the Lost Lake project."

145.   There was no basis under New York law for the Town Board to meet in Executive Session, as there was no pending or threatened litigation or other statutory basis to do so, and no lawful basis to include Robbins as he is not a Town Board member.

146.   Subsequently, at a Special Meeting of the Town Board held on February 4, 2021, the Board passed Resolution #2, which stated, *inter alia*, that "the Town of Forestburgh . . . is in need of special counsel for legal services regarding legislative, planning and zoning matters related to the Lost Lake Resort project" and resolved to retain the services of Harris Beach.

147.   In addition to subjecting the Developer Plaintiffs to increased oversight beyond that given to the Original Developer, the Town Board committed itself to a scheme in which the Town Board engaged professionals to provide, *inter alia*, litigation advice and project oversight at a higher rate to the Developer Plaintiffs than to the Town.

148.   The Town Board agreed to pay Harris Beach at "a fee schedule of $350 per hour for matters that are to be paid by applicant or from project escrow and $225 per hour for matters that would be invoiced to the Town" with a cap of fees invoiced to the Town at $20,500.

149.   The Town Board hired Mr. Voss's firm and Harris Beach despite the fact that no applications were then pending, and the Developer Plaintiffs had not filed any application to change the scope of the Project.

150.   Harris Beach's primary attorney working on matters pertaining to the Project has been Javid Afzali, Esq ("Afzali").

151.   The CEO of Harris Beach is Christopher Jagel, the Chairman of the Membership

Committee and the Chief Legal Officer of the Merriewold Club, a private club and residential[2] development that borders the Project Site.

152.    Robbins is a member of the Merriewold Club, and his wife Nancy Orr is a former president.

153.    Upon information and belief, the bifurcated fee schedule for Harris Beach to charge the Developer Plaintiffs a higher rate than the Town is part of the Town Board's ongoing attempt to substantially increase the cost of development of the Project.

154.    Upon information and belief, such an attempt to substantially increase the Developer Plaintiffs' costs of development is motivated by bias against Hasidic Orthodox Jews in in an effort to prevent them from completing the Project.

## Preemptive Indemnification of Town Officials

155.    The Town Board took action to preemptively indemnify its officials who were frustrating and would continue to frustrate the Developer Plaintiffs' efforts to develop the Project.

156.    At the February 11, 2021 Town Board meeting, the Town Board passed a resolution "establishing the defense and indemnification of employees and officers [and] the Town will be liable for acts or omissions of employees or officers during their official employment or duties . . . ."

157.    Upon information and belief, the indemnification resolution was established to protect Town officials and employees from civil rights claims brought against them resulting from their discriminatory treatment of Plaintiffs and other Hasidic Orthodox Jews.

---

[2] Merriewold controls the ownership of homes through the exercise of rights of first refusals, which it holds for every lot.  Each potential purchaser of a home is required to sign a right of first refusal before the home can be purchased.

**Targeted 1000% increase in "Parks & Playground" fees**

158.    At the May 25, 2021 Planning Board Meeting, Robbins raised the matter of increasing the Town's Parks & Playground fee, which is applicable only to major subdivisions.

159.    Upon information and belief, the only major subdivision in the Town to which an increase in the fee applies would be all future phases of the Project.

160.    At that time and previously, when the Project was approved, the Parks & Playground fee had been $200 per lot.

161.    Planning Chair Robbins opined that the Parks and Playground fee was too low and should be raised.

162.    The Project was discussed at the Planning Board meeting in connection with increasing the Parks and Playground fee, specifically that the lower fee had been paid for Phase 1, but that the fee would be applicable to all future phases.

163.    Subsequently, the Town Board voted to raise the per-lot Parks & Playground fee, from $200 to $2,000 on July 2, 2021.

164.    This change was made with little to no discussion by the Town Board.

165.    This increase in the Parks and Playground fee would increase the cost of developing future phases of the Project by close to $4 million.

166.    Since the Project is the only "Major Subdivision" in the Town to which the fee increase could and did apply, upon information and belief the increase in the Parks and Playground fee was motivated by a bias against Hasidic Orthodox Jews in an effort to prevent the Developer Plaintiffs from constructing the Project.

## Additional Anti-Semitic Animus Against
## the Hasidic Orthodox Jewish Community

167.    On or about January 20, 2021, an employee of the Developer Plaintiffs telephoned Evans and other nearby property owners to ask if they would allow a geological study to be conducted on nearby properties to determine if underground water could be found for the Project.

168.    Evans told the Developer Plaintiffs' employee that neither seeking access to his land nor that of another nearby landowner named Garigliono would be the Developer Plaintiffs' least expensive or easiest option for anything they would desire for the Project.

169.    During that phone call, Evans repeatedly asked the Developer Plaintiffs' employee what their plans were for the Project.  When told that the Developer Plaintiffs intended to build the entire Project per the approvals obtained by the Original Developer, Evans repeatedly stated that they were going to make the Project a Hasidic community.

170.    Evans asked the Developer Plaintiffs' employee how it would be possible that single Jewish mothers of eight could afford $400,000 to $500,000 homes.

171.    Evans elaborated stating that the mothers were "single" because Hasidic people are never legally married, are only married religiously, and that most of them are on welfare and abusing the system.

172.    Upon information and belief, these are commonly held anti-Semitic beliefs in the Town and Sullivan County.

173.    Evans further stated that Kiryas Joel is the second dirtiest town in the State, and also referenced Lakewood, New Jersey as being a place that has garbage everywhere.

174.    Lakewood, New Jersey is a town with a large Orthodox Jewish population.

175.    In August 2021, at the end of the summer, Comprehensive Plan Special Board and ZBA member Steinberg's son posted on Facebook: "And just like that we have our county

31

back!!!!!"

176.    Upon information and belief, such comment referred to Hasidic Orthodox Jewish summer residents leaving Sullivan County.

177.    In response to a question mark on that post, the younger Steinberg responded, "our summer residents are gone!!!"

178.    Further responses to that post included, "No it's that holiday. Rusha-homa," a reference to Rosh Hashana, the High Holy day which is the Jewish New Year that typically falls in September.

179.    Another resident responded, "not where I am . . . 😭"   The emoji included in the post was of a person crying.

180.    Further responses included "Hip hip hooray!," accompanied by a photo of a large group of men in Hasidic Orthodox Jewish dress running down a street, and "Thank god it's so nice.  Just a few that are lost.  I will let them know they are lost also!!!"

181.    As recently as September 2022, a Forestburgh Fire Department official told the Developer Plaintiffs' representative that most Town residents have a "fear" of the "bloc vote" controlling the Town, comparing the Town to Kiryas Joel and other developments where homes are owned by Hasidic Orthodox Jews.

182.    According to the official, this was local residents' perception based on the Developer Plaintiffs' principals wearing a yarmulke (skull cap) like other Hasidic Orthodox Jews in other, otherwise unrelated, developments.

183.    As the Developer Plaintiffs prepared to begin work on the Project Site, the Town continued to anticipate litigation against them and created more oversight than the Original Developer had been subjected to.

32

184.    Upon information and belief, such actions were motivated by the Town's bias against Hasidic Orthodox Jews.

## The Developer Plaintiffs' Applications for Permits to Build are Obstructed, Delayed and Denied

185.    By the time the summer of 2021 arrived, the Town Board and Town officials had put in place the system to obstruct and prevent the Developer Plaintiffs' construction of homes.

186.    Upon information and belief, Hogue and the Town Board had agreed that Robbins would be the person who would coordinate the activities of Afzali and Voss, who had been retained by the Town Board to create as many obstacles as possible to the issuance of building permits.

187.    The official communications to the Developer Plaintiffs and their representatives would be made through Gabbard, the Town Building Inspector, but the contents were crafted by Afzali and/or Voss with Robbins' coordination and Hogue's knowledge.

188.    They all conspired to assure that no building permits for construction of single-family homes in the Project would be issued to the Developer Plaintiffs or their contractor.

189.    A second application for a building permit was submitted to Gabbard, but it was for the wrong lot.  So the Developer Plaintiffs had Gabbard put that second application on hold. On or about June 22, 2021, the Developer Plaintiffs submitted a third application for a building permit for Lot 303 (the "Third Application").

190.    When the Third Application was received by the Town, Gabbard had apparently not been made aware of the plan to derail the Developer Plaintiffs' building permit applications, and he stated that they would receive their building permit within approximately a week.

191.    Since the Third Application did not materially differ from the First Application, Gabbard's communication confirmed that he would be processing the Third Application as he did the First Application and issue it routinely without need of any outside consultant input or review.

192.   The Town Code mandates review of building permit applications by the Code Enforcement Officer.

193.   The Town Code mandates approval and issuance of a building permit if the applications are in compliance with the New York Uniform Fire Prevention and Building Code (the "Uniform Code") and the New York State Energy Code (the "Energy Code").

194.   Section 68-4(F) of the Town of Forestburgh Code, entitled "Issuance of building permits, provides: "An application for a building permit shall be examined to ascertain whether the proposed work is in compliance with the applicable requirements of the Uniform Code and Energy Code. The Code Enforcement Officer shall issue a building permit if the proposed work is in compliance with the applicable requirements of the Uniform Code and Energy Code." (Emphasis added.)

195.   On or about June 24, 2021, the Developer Plaintiffs' representative was in Town Hall and Town Clerk Joanne Nagoda told him to pick up the Third Application and that a letter would be coming in the mail to explain why.

196.   On June 25, 2021, Gabbard emailed Plaintiffs stating in part: "It has been brought to my attention that additional permits from other regulatory agencies are required to be in place prior to issuance of any construction permits for the [Project] . . . ."

197.   In the same email, Gabbard stated that building permits would not be issued until the allegedly outstanding permits from other agencies had been received.

198.   In the same email, Gabbard referenced conditions on the grant of preliminary site plan approval, even though Lost Lake had already received its final subdivision and site plan approvals for Phase 1.

199.   Plaintiffs later learned from a Harris Beach invoice produced in response to a New

York Freedom of Information Law ("FOIL") request that Town officials met with Afzali for hours prior to this reply from Gabbard being generated.

200.    The Developer Plaintiffs were instructed to pick up their filed Third Application package even though the Town Code requires that an application must be granted or denied, not simply "picked up."

201.    Robbins subsequently sent a text message and email to the Developer Plaintiffs' representative referencing the June 25, 2021 email from Gabbard to Plaintiffs.

202.    The Developer Plaintiffs subsequently resubmitted the Third Application.

203.    Within three weeks after the resubmittal, the Developer Plaintiffs' contractor called Gabbard to ask for an update about the processing of the Third Application.

204.    During that call, Gabbard told Plaintiffs' representative that he should speak directly with the Town Supervisor.

205.    Gabbard also confirmed that others in the Town government were reviewing the Third Application and determining whether a building permit could be issued.

206.    In additional meetings between the Developer Plaintiffs' contractor and the Town, Gabbard confirmed that the review was out of his hands and the real review of the Third Application was being undertaken and directed by Robbins and the Town's counsel, referring to Afzali.

207.    In an attempt to move forward with the processing of the Third Application, Plaintiffs' counsel Steven Barshov ("Barshov") reached out to the Town Supervisor.

208.    Hogue told Plaintiffs' counsel that he would be joined at a scheduled meeting with Afzali.

209.    Plaintiffs' counsel Barshov then had a phone call with Afzali.

210.    During the telephone conference, Barshov confirmed that the Developer Plaintiffs would not seek to modify Phase 1 of the Project, and that all non-Town outside governmental agency approvals had been obtained for Phase 1 of the Project.

211.    Within a week of the phone call between Barshov and Afzali, the Developer Plaintiffs submitted to the Town copies of all of the aforementioned non-Town outside governmental agency approvals that had been previously issued for the Project.

212.    None of this information had been requested in connection with the First Application.

213.    The Developer Plaintiffs' contractor called Hogue to discuss the Third Application.

214.    Hogue told the Developer Plaintiffs' representative that the Town would designate a point person for Plaintiffs to contact about the Third Application within a week.  The point person identified was Robbins.

215.    After two or three attempts at contact, the Developer Plaintiffs' representative received a text message and an email from Robbins.

216.    In the above-referenced text message and email Robbins again told the Developer Plaintiffs that they would need to meet the conditions of preliminary approval, even though all the conditions of approval necessary for issuance of the building permits had been satisfied.

217.    After receiving this text message, the Developer Plaintiffs' representative reached out to Robbins on or about August 16, 2021, asking for a meeting to discuss the issues related to the Third Application.

218.    Robbins responded that he would meet with the representative and "the attorney" and would call back, but never did.

219.    At an informal meeting with the Developer Plaintiffs' representatives, on or about

August 6, 2021, Hogue urged Plaintiffs to consider redesigning the entire sewer system and to connect to the nearby "Melody Lake" Development, as well as to change the location and size of the water tanks.

220.    Upon information and belief, Town Supervisor Hogue's suggestion was made in bad faith in order to cause the Developer Plaintiffs to propose modifications to the Project which would require amendment of the Project approvals issued by the Town Board, and would trigger the Town Board's power to re-open the Project's environmental review under SEQRA and enable the Town Board to require the preparation of a supplemental environmental impact statement that would delay the Project by years.

221.    Town Supervisor Hogue said that he anticipated that the permits or a list of what was missing would be issued within a week.

222.    Instead of issuing the building permits or a list of missing information, Voss came to inspect the Project Site.

223.    Subsequently, a meeting with Hogue and Gabbard was canceled.

224.    Town Supervisor Hogue and Gabbard then avoided meeting with Plaintiffs' representatives, despite multiple attempts to reschedule this meeting.

225.    Around this time, incidents of vandalism began to occur at the Project Site.

226.    Between July and December 2021, three incidents of theft and vandalism occurred at the Project Site, including the theft of a drill pump, damage to construction equipment, and the destruction of the entry sign to the Project Site.

227.    On August 17, 2021, Plaintiffs' counsel wrote a letter to Gabbard requesting that he act on the Third Application.

228.    On August 18, 2021, Gabbard responded in a letter stating that the Third

Application was incomplete.

229.    Gabbard wrote that the Third Application was incomplete due to an unpaid application fee and alleged missing Design Review Board/Architectural Control Committee review pursuant to the recorded Declaration of Covenants and Restrictions and the Design Guidelines.   In addition, the Town sought additional information regarding the status of construction of infrastructure improvements and utility facilities, as well as a copy of the deed to the Project Site.  Upon information and belief, this letter was "ghost-written" by Afzali.

230.    The Developer Plaintiffs immediately paid the outstanding application fee.

231.    None of the additional information requested in the August 18, 2021 letter had been requested in connection with the First Application.

232.    On September 13, 2021, Plaintiffs' counsel Barshov responded by letter to Gabbard's August 18, 2021 letter addressing each of the items listed in that correspondence.

233.    No response was issued to Barshov's September 13, 2021 letter.

234.    Upon information and belief, this pattern of delays, requests for further information, and avoidance of the Developer Plaintiffs was motivated by a bias against Hasidic Orthodox Jews in an effort to obstruct and prevent Plaintiffs from constructing the Project.

235.    The Town continued to fail to follow its Town Code and past practices by refusing to issue the building permit for which the Developer Plaintiffs had applied.

236.    On September 20, 2021, Barshov wrote another letter to Gabbard clarifying that it was inappropriate for the Code Enforcement Officer/Building Inspector to review plans for compliance with the Lost Lake Declaration of Covenants and Restrictions and Design Guidelines, since the role of Code Enforcement Officer/Building Inspector was limited to review of plans for compliance with the Uniform Code and the Town has no enforcement powers regarding

compliance with restrictive covenants.

237.    At a September 20, 2021 Town Board Emergency Meeting, the Town Board voted to go into an Executive Session "for the purpose of legal strategy," despite the fact that no litigation was then pending.

238.    As it had previously, the Town Board brought Planning Board Chair Robbins into the Executive Session.

239.    The Town responded to Barshov's September 20, 2021 letter with its own letter on September 30, 2021.

240.    The Town's letter of September 30, 2021 was signed by Mr. Gabbard.

241.    Upon information and belief, the September 30, 2021 letter was not written by Mr. Gabbard, but again was "ghost-written" by Afzali.

242.    On October 1, 2021, Plaintiffs' counsel Barshov responded to the September 30, 2021 letter.

243.    In his October 1, 2021 letter, Barshov responded to each of the four points raised in the Town's September 30, 2021 letter, and demanded that the Third Application be deemed complete, and a building permit issued.

244.    There has never been any contention by Gabbard or any other Town official or consultant that the Third Application failed to meet any provision of the Uniform Code or Energy Code.

245.    Gabbard did not respond directly to the October 1, 2021 letter.

246.    The wrongful pattern of delay of the review of the Third Application included review by a third-party consultant, which represented a significant departure from the normal building permit application process.  Asking an outside consultant such as Mr. Voss to review a

building permit application is a deviation from the normal review procedure for a building permit application.

247.    On October 5, 2021, nearly four months after the Third Application was filed, Voss issued an eight-page letter memorandum reviewing various "information associated with the residential building permit application submitted on behalf of Lost Lake Holdings, LLC ('Applicant')."

248.    Voss's October 5, 2021 letter memorandum contained many inaccuracies and comments that far exceeded scope of any permissible inquiry under Section 68-4(F) of the Town of Forestburgh Code.

249.    Voss's October 5, 2021 letter memorandum stated that "all site infrastructure improvement for Phase I (and all subsequent phases) are to be completed, inspected, approved, and deemed operational by the Town prior to issuance of any building permits," which is impossible because future phases of the Lost Lake development had not yet been approved.

250.    Voss's October 5, 2021 memorandum meant that no home construction could begin until electric lines, water lines, sewage disposal infrastructure, and all roads for all seven phases of the Project were completed, inspected and operational.  No Town Code provision or state statute authorizes imposition of such a requirement on the issuance of a building permit.

251.    On October 7, 2021, Gabbard wrote a letter to Plaintiffs' counsel Barshov indicating (1) that the Third Application would not be deemed complete without an additional seventeen categories of information and (2) that the building permit would not be deemed complete without such information as a landscaping plan.

252.    The October 7, 2021 letter sought architectural drawings, but these had been submitted with the Third Application.

40

253.    The requirement of a landscaping plan is not within the scope of the Uniform Code or the Energy Code, and is not required by the Town Code.

254.    The items set forth in Mr. Voss's October 5, 2022 letter memorandum in connection with a building permit application were a deviation from the normal procedure and scope for review of  such an application.

255.    Mr. Gabbard's requirement that all of the areas stated within the October 5, 2022 letter memorandum be addressed before the Third Application be deemed complete is a deviation from the normal procedure for such an application.

256.    The Developer Plaintiffs' contractor subsequently spoke with Gabbard about the issues, but Gabbard acknowledged that the decision to approve or disapprove the Third Application was out of his hands.

257.    The Developer Plaintiffs' representatives unsuccessfully sought to meet with Town officials on numerous occasions, but were put off, causing yet more delays.

258.    The Developer Plaintiffs' contractor scheduled a meeting with Town Supervisor Hogue and Gabbard to discuss the installation of infrastructure, which was confirmed, but then Hogue later stated that he had to reschedule.

259.    Hogue subsequently ignored the Developer Plaintiffs' attempts to reschedule.

260.    On October 28, 2021, Plaintiffs' attorney again wrote to Gabbard and one of the Town's attorneys to assert that the Town's treatment of the Third Application was inappropriate and requested that the Town grant the Third Application and promptly issue the building permits.

261.    In the October 28, 2021 letter, Plaintiffs' attorney mentioned, *inter alia*, that there was a significant unmet demand for housing for Hasidic Orthodox Jewish families, and that the Project would offer "reasonably priced and affordable units" that would assist in meeting such

demand.

262.    When the Developer Plaintiffs' engineer reached out to the Town Engineer regarding the installation of infrastructure, Planning Board Chair Robbins told the Town Engineer to tell Plaintiffs that they "may want to hold off" on the installation of utilities "until [Mr. Voss's former firm, Barton & Loguidice] is on board."

263.    On November 23, 2021, the Third Application was denied in a letter from Gabbard (the "Denial Letter").

264.    The reason stated in the Denial Letter for the denial of the Third Application was: "Instead of the project . . . approved in 2013, your attorney represented in his October 28, 2021 letter that Applicant's intent is to build 'reasonably priced and affordable [housing] units' with no indication regarding whether other project components will remain the same or whether anticipated impacts of an affordable housing community were contemplated or reviewed prior to the 2013 approval."  Thus, the Denial Letter concluded that the Third Application "is inconsistent with the 2013 project approval documents."

265.    The denial of the Third Application did not mention any noncompliance with either the Uniform Code or the Energy Code.

266.    Pursuant to Section 68-4 of the Town Code, a building permit shall be issued "if the proposed work is in compliance with the applicable requirements of the Uniform Code and Energy Code."

267.    The Town believed or purported to believe that the Developer Plaintiffs intended to amend the terms of the 2013 project approval documents to accommodate Hasidic Orthodox Jewish families.

268.    Plaintiffs had never sought any modification of the 2013 project approval

42

documents and had confirmed the same to the Town and its representatives numerous times.

269.    On January 6, 2022, the Developer Plaintiffs filed building permit applications with the Town for Lots 293, 295, 297, 298, 300, 389, 392, 393, 394, 395, 396, 397, 398 and 399 in Phase 1 of the Project (the "Fourth Application").

270.    On January 14, 2022, Gabbard sent a letter to the Developer Plaintiffs stating that the Fourth Application would not be accepted or reviewed because it shared the same purported defect as the Third Application.

271.    The rejection of the Fourth Application again did not cite any noncompliance with either the Uniform Code or the Energy Code.

272.    Because it was clear that the Developer Plaintiffs could not obtain approvals of building permits for homes in Phase 1 of the Project, they timely filed an appeal of the Third and Fourth Application denials to the ZBA.

**<ins>Anti-Semitic Animus in Reaction to the Denial Letter</ins>**

273.    A columnist for the Sullivan County Post posted the Denial Letter on Facebook, and comments to this post included:

A.    "The big money people of the sect buy these houses and rent to section eight people so the taxpayers wind up paying off the houses and make the rich richer while the 'poor' section either renters bleed every dollar possible from social services . . . "

B.    "And then the homes will become parsonage?"

C.    "they knew what they were buying, no? There were certain items that were pre-approved and mandated, no? But now they want to slide in and

43

change it? That is bait and switch in my book. It happened the same way in other locals. [sic] It hate what is happening to the landscape with many of the cluster high density housing. We came here for the environment not for it to become so heavily populated with quads and long houses that frankly look like concentration camps. One acre zoning needs to be held in rural areas or the environment and landscape will be ruined."

D.  "they were approved for what was on the original application. Now they want low income housing and not fulfill their obligation. Also, hasidics would move in, with 0 dollars going into the town or services. It would bring home values down."

E.  "Come on people wake up you know they're doing to win you will neer stop him when they want to build 300 units the town knowns them down up they pay the right price and somebody's pockets are lined then they get approved but they will be approved you can't beat these people I'm Native Am3an and I have less rights in my own country and this group they destroy the woods they take over our parks because they want to build every inch of space they have and not create their own parks so they use our town parks and filthy them up clutter them with hundreds of kids then we can enjoy our parks all they want to do is build"

F.  "Finally getting it right!"

G.  "Coming soon to a new town near everyone in upstate NY. Million dollar buildings to live in while we the tax payers pay their taxes and

pay to feed their families. Unreal!"

274.    Upon information and belief, several of these comments were made by individuals who reside in the Town and/or Sullivan County.

275.    These posts were not the only time that such beliefs were expressed.

276.    On February 10, 2022, the Developer Plaintiffs' representative spoke with the Town Clerk Nagoda, who told him that the community had concerns regarding the development, including the major concern that Plaintiffs would make one of the amenity buildings a yeshiva (a Jewish school) and use that to remove the entire development from the tax rolls.

277.    Another community "concern" stated by the Town Clerk was that the Developer Plaintiffs would not develop the golf course included in the Project.

278.    The Developer Plaintiffs have never indicated they do not intend to build the golf course.

279.    The Developer Plaintiffs' representative confirmed that they would build the golf course, to which the Town Clerk responded that she had never seen Hasids play golf.

280.    The Town Clerk also told the Developer Plaintiffs' representative that town residents frequently asked her if they paid property taxes, reflecting a widespread anti-Semitic accusation that Hasidic Orthodox Jews engage in deception to avoid property taxes.

**Misuse of Escrow Funds to Obstruct Plaintiffs**

281.    The Original Developer deposited approximately $250,000 into the Lost Lake Escrow to fund review of the proposed PDD rezoning and other elements of the Project by the Town.  The Original Developer also agreed with the Town to allow Lost Lake Escrow to be used to cover the cost of certain Town inspections of infrastructure installation.  At the time of the Project's purchase by the Developer Plaintiffs, there were unexpended funds in the Lost Lake

Escrow.

282.    Unbeknownst to Plaintiffs initially, the Town Board intended to and did misuse the Lost Lake Escrow to pay for consultant and outside legal expenses incurred in connection with the review of a building permit application, which was not authorized in the original PDD law and by using them without limitation and for purposes unrelated to any reasonable oversight of the construction of the Project.

283.    Upon information and belief, the Town also misused the Lost Lake Escrow to research the Town's ability to block the Developer Plaintiffs' construction of the Project.

284.    The Plaintiffs had suspicions that the Town Board was illegally using the Lost Lake Escrow to pay Afzali's and Voss's fees.

285.    At the Town Board's November 4, 2021 meeting, Plaintiffs' representative asked about the source of compensation for the consultants who had been hired to oversee the Lost Lake Project after the Developer Plaintiffs purchased it.

286.    Town Supervisor Hogue did not provide a clear answer and mentioned something about escrows.

287.    Board Member Budofsky then insisted that no further discussion be allowed due to potential litigation.

288.    The next week, Plaintiffs' attorney Barshov sent a letter to the Town alleging that the Town had illegitimately used the Lost Lake Escrow.

289.    The Town has never responded to that letter.

290.    Instead, the Town Board took steps to enhance its ability to force the Developer Plaintiffs to fund the Town's costs in impeding and obstructing the Project, including amending the Town Code to rewrite its escrow law.

291.    At the February 3, 2022 Town Board meeting, the Town Board introduced Local

Law #1 of 2022.

292.     Local Law #1 was "a Temporary Land Use Moratorium on Accepting, Reviewing and Approving Building and Land Use Approval Applications Requiring Escrows within the Town of Forestburgh."

293.     Although the Minutes of that meeting reflect that the Town Board passed Local Law #1 of 2022, they differ significantly from the Town's usual practice, which is to create much more detailed Minutes.  The February 3, 2022 Minutes only include the names of those who spoke, and a brief summation of the remarks of the only person who spoke in favor of the Moratorium.

294.     Town Supervisor Hogue stated that the Town Board "had to pass" Local Law #1 of 2022 "to allow time to update our code pertaining to escrows."

295.     Local Law #1 was targeted to prevent the Developer Plaintiffs from proceeding with the Project.

296.     Local Law #1 was passed unanimously at this meeting without any comment or discussion.

297.     An article about the passage of Local Law #1 by the Sullivan County Democrat resulted in more anti-Semitic comments:

> A.     "I'm not anti semitic but I am anti hasidic because they are just buying off political figures left and right doesn't matter democrat or republican they are buying them off the game this will never stop till they owner everything in NY might as well can BY New Hasidim York"
>
> B.     "no I have no respect for people who steal and cheat that's most of the Hasidic population most Jewish people think they are a cult"

298.     Upon information and belief, certain of these comments were made by individuals

who reside in the Town and/or Sullivan County.

299.     During the moratorium, the Town Board proposed amending the Town Code by adopting a new escrow law, entitled "Amendments Escrow Deposits Code of the Town of Forestburgh."  The amendments codify the treatment the Town Board had already subjected the Developer Plaintiffs to.

300.     With no response to Plaintiffs' counsel's letter, and with the proposed amendment to the Town Code confirming that the Town Board was prepared to double down on its intended strategy of using the Lost Lake Escrow against the Developer Plaintiffs, on February 28, 2022, LLH filed a lawsuit against the Town of Forestburgh in New York State Supreme Court, Sullivan County, as Index No. E2022-321, challenging the illegal withdrawal and use of the Lost Lake Escrow.

301.     In response to the filing of the litigation, the Town Board caused some of the funds withdrawn from the Lost Lake Escrow to be restored.

302.     A Sullivan County Post article about the lawsuit, posted to Facebook, garnered yet more anti-Semitic comments, including:

> A.  "Well maybe if these people weren't lazy freeloading slobs who think EVERYONE should jump when they want People wouldn't have an issue with them making a home in the area."
>
> B.  "no its the other people who think they are above the law because GOD forbid you don't want them living near you that makes you anti sematic [sic] look what happened in Bloomingburg how corrupt they turned out to be"
>
> C.  "they are all in the same boat. They are the same cult, controlled by the same people. Mr. Rutberg here drinks too much shmutz"

48

D.  "Anything new in Sullivan County, 1 day in the near future there will be 1 tax payer left, what a tax bill that poor soul will be handed!"

E.  "it's sad they take beautiful Woods [sic] and turn them into trash dumps"

F.  "These people do it all the time they can't come up And assimilate the way we live We have to change our lives and live the way they do in Kira's [sic] Joel They seem to have unlimited money for lawyers but hate paying taxes they take the small towns to court and bankrupt them . . . ."

G.  "Everyone makes their own reputation and the Hasidic community has made their own over the years."

H.  "We don't need another Kiryas Joel or more property off the tax rolls."

I.  "Takeover"

303.    Upon information and belief, certain of these comments were made by individuals that reside in the Town and/or Sullivan County.

304.    Less than one week after the commencement of the escrow litigation, the Town Board amended the Town Code by adopting the proposed escrow local law.  The amended Town Code empowers a "Review Board or Official" to retain consulting services, including but not limited to, engineering, planning, legal, technical, and environmental sciences as that "Review Board or Official" deems necessary in its sole discretion.

305.    The consulting services may be retained "to assist in the review of Land Use Project applications or in the inspection and approval of any installations, infrastructure or improvements after final approval of such applications."

306.    All expenses incurred by the retained consultants are to be paid by the applicant

through its escrow deposit.

307.    In effect, the escrow law attempts to codify the Town's ability to charge the Developer Plaintiffs fees to be used to challenge Plaintiffs' ability to construct the Project.

308.    Upon information and belief, the escrow law was written by Afzali.

309.    On March 3, 2022, the Town Board adopted the new escrow law as Local Law No. 2 of 2022.

310.    The new escrow law is yet another strategy by the Town to increase the cost of the development as a result of its perception that the Project would include Hasidic Orthodox Jewish families.

**Antisemitic Animus Regarding the ZBA Appeal**

311.    The anti-Semitic animus against the Hasidic Orthodox Jewish community and Plaintiffs surrounding the ZBA Appeal was readily apparent in comments posted on Facebook made regarding the April 21, 2022, article from the Times Herald-Record reporting on the Developer Plaintiffs' ZBA Appeal:

> A.  "I'm switching to being an Hasidic . I mean who's got it better , no taxes , welfare , free everything, cheap housing .  Great hair cuts .  Why would you not switch in NY . . . ."
>
> B.  "It's the same exact story that was presented to Bloomingburg, golf course and luxury homes, ended out with 396 homes only being sold to hasidic [sic]"
>
> C.  "They'll get their way, they always do"
>
> D.  "They do that every where in New York, completely flaunt the law and there [sic] such a dominant voting block everyone is afraid to call them on it.!!!"

E.  "Time to Raise up its Criminal whats [sic] goin on! Stop them now!"

F.  "Say goodbye to forestburgh [sic]. First build the homes then takeover the local government."

G.  "We need section 8 housing reform, welfare reform and child support reform it's not fair"

H.  "Just a matter of time before the area becomes a real sh*t show- excuse by language"

I.  "Here we go again. This is their Modus-operandi!! They do what they want. I have never seen an Orthodox EVER EVER play golf!! Joke"

J.  "White non hasidic, black, latino, asian etc are not allowed to buy."

K.  "So sick of them pulling the anti semitic card every time they are denied!!!!! The poorest community does the most building?????? And continue to buy up existing neighborhoods"

312.    Upon information and belief, several of these comments were made by individuals who reside in Sullivan County.

**Plaintiffs Were Repeatedly Discriminated Against and Denied
Procedural Due Process in the ZBA Appeal**

313.    Plaintiffs were treated differently and worse throughout the ZBA Appeal process and were denied procedural due process and any semblance of a fair hearing before the ZBA.

314.    At the time the Developer Plaintiffs filed their appeal with the ZBA, they assumed that the ZBA's regular counsel, Jacqueline Ricciani, Esq. would counsel the ZBA and the Town Attorney, Troy Johnstone ("Johnstone") of the Law Offices of Brian P. Rourke, P.C., would represent the Town and the Town Building Department.

315.    However, unbeknownst to Plaintiffs and their counsel, the Town Board and Hogue, with Robbins' concurrence, had designated Afzali to serve as counsel to the ZBA with respect to the Developer Plaintiffs' appeal.

316.    This arrangement became known to Plaintiffs when Afzali appeared as counsel to the ZBA at its first meeting and when he presented an entirely new set of ZBA rules for adoption that he wrote.

317.    Afzali was actively advising the ZBA regarding its consideration of the Developer Plaintiffs' appeal of the very actions that he had orchestrated behind the scenes with Hogue, Robbins, and Voss, and which were implemented through Gabbard.

318.    One of the first indicators of the absurdity of the ZBA hearing process was at the April 26, 2022 ZBA meeting at which Barshov sought additional records beyond those which the Town had initially designated as comprising the documentary record.

319.    The ZBA Chair directed Plaintiffs' counsel Barshov to obtain the records from Johnstone, without any contrary word from Afzali.

320.    When Barshov communicated with Johnstone to obtain the records, Johnstone said he had nothing to do with the ZBA Appeal and that Afzali "represents the Town" for purposes of the Developer Plaintiffs' Appeal.

321.    On May 3, 2022, Barshov wrote to Johnstone confirming that Johnstone had stated that Afzali was representing the Town and its Building Department in the ZBA Appeal.

322.    On May 5, 2022, Johnstone emailed Barshov and contradicted his prior statement. This time he said that the Building Department did not have counsel, but if it needed counsel at the ZBA Appeal, then Johnstone's colleague would handle it, or they would identify another attorney that could.

323.    Meanwhile, it was still unknown from whom Barshov could obtain the necessary documents.

324.    Then, on June 10, 2022, a telephone conference occurred with Afzali, Barshov, Gabbard, and ZBA Chair Amaditz on the line.  During that telephone conference, Afzali and Gabbard both confirmed that the Town's Building Department was not represented by counsel in the ZBA Appeal.

325.    Then, at the ZBA meeting and appeal proceeding on June 22, 2022, Afzali and a Harris Beach associate, Elliot Hallak, Esq. ("Hallak"), arrived together.  Hallak appeared at the ZBA proceeding representing the Town Building Department.

326.    Plaintiffs' counsel Barshov strenuously objected to: (a) the arrangement of Afzali counseling the supposedly impartial ZBA, which was sitting in judgment of the Denial Letter that Afzali himself had ghost-written; and (b) an attorney from Afzali's law firm concurrently representing the Town Building Department in the same ZBA Appeal in which Afzali was to provide impartial advice and counsel to the ZBA.  Afzali then responded by stating that Harris Beach had always represented the Town Building Department.

327.    Afzali's statement contradicted what Johnstone had previously stated and what Afzali and Gabbard both stated in the June 10th telephone conference.

328.    The ZBA Chair acknowledged that Afzali and Gabbard had stated during the June 10th telephone conference that the Town Building Department was not represented by counsel during the ZBA hearing.

329.    Barshov argued to the ZBA at that meeting that: (a) the ZBA was obligated to disqualify Afzali because it was his acts and those that he orchestrated that the ZBA would be reviewing; and (b) attorneys from Harris Beach could not represent both the Town Building

Department and the ZBA in the Developer Plaintiffs' ZBA Appeal.

330.    The ZBA refused to grant Plaintiffs' counsel's disqualification motions.

331.    Thereafter, through the entire remaining ZBA Appeal process, Afzali was counsel to the ZBA, and another Harris Beach attorney appeared and represented the Building Department.

332.    At that same June 22, 2022 ZBA Appeal proceeding, Gabbard testified on behalf of the Building Department.

333.    During Gabbard's cross-examination by Barshov, and while Barshov was focused on and looking at Gabbard on the witness stand, at a certain point the Developer Plaintiffs' representatives in attendance observed Afzali looking at and typing into his phone.  When Afzali finished typing into his phone, the Developer Plaintiffs' representatives observed Hallak then looking down at his phone, then typing on his phone, followed by Afzali looking at his phone.  It was obvious that Afzali and Hallak were texting each other during Gabbard's testimony, when Barshov was not observing either one of them.

334.    When Barshov was informed by the Developer Plaintiffs' representatives of this texting activity, he raised the matter and strenuously objected.  The ZBA Chair asked Afzali if he and Hallak were texting, and Afzali refused to answer the question.

335.    During Gabbard's testimony, the ZBA Chair sustained objections raised by Hallak before Barshov had an opportunity to respond.  Afzali and Hallak were then observed having a meal together after the hearing.

336.    Gabbard's testimony continued to the June 23, 2022 hearing.

337.    Gabbard testified that Robbins, the Planning Board Chair, was the first to alert him to certain issues with respect to the Third Application.

338.    Gabbard testified that he "cut some slack" to some applicants but not to others.

339.    Gabbard did not "cut some slack" for the Developer Plaintiffs.

340.    At the June 23, 2022 hearing, Meghan Feenan, Esq. ("Feenan"), a different attorney from Harris Beach, represented the Building Department.

341.    Afzali and Feenan were also observed by the Developer Plaintiffs' representatives sending each other text messages.

342.    Upon information and belief, Afzali was coaching Feenan immediately before Feenan objected to one of Plaintiffs' counsel's questions posed to Gabbard.

343.    During the entire ZBA Appeal, the ZBA Chair sustained all objections by Harris Beach's attorneys representing the Town Building Department, unless Afzali advised the Chair to rule otherwise.

344.    During one colloquy about Plaintiffs' counsel's objection, ZBA member Steinberg started laughing at Barshov.

345.    Members of the ZBA, including its Chair, were secluded with the Building Department's attorney immediately after the June 23, 2022 hearing.

346.    At one point on June 23, 2022, the ZBA's hearing room was locked but members of the ZBA, members of the Planning Board, Afzali, and Feenan were all inside.

347.    Even though Voss was an integral part of the delay, obstruction, and ultimate denial of the Developer Plaintiffs' building permit applications, the Town Building Department and its Harris Beach counsel refused to produce Voss as a witness.

348.    When Barshov requested that the ZBA issue a subpoena to compel Voss' testimony, the ZBA refused.

349.    Similarly, when Barshov argued to the ZBA that Afzali was a necessary fact witness as to what had transpired during the review of the building permit applications, the ZBA refused to allow him to be called as a witness or to compel his testimony.

350.     Ultimately, in a definitive action to preclude the Developer Plaintiffs from obtaining witness testimony and evidence that its counsel represented was necessary, ZBA Board Member Steinberg made a motion that the ZBA would not issue any subpoenas, which was unanimously approved.

351.     The issuance of subpoenas by zoning boards of appeals is authorized by New York's Town Law 267, subdivision 10, and has been explicitly recognized by New York courts, for example in *Stockdale v. Hughes*, 173 A.D.2d 1075, 1077 (3d Dep't 1991).

352.     In total, the ZBA refused to issue subpoenas on April 26, 2022, May 23, 2022, June 23, 2022, July 11, 2022, July 19, 2022, August 8, 2022, and August 10, 2022.

353.     The Developer Plaintiffs' representative testified on August 10, 2022.

354.     During Plaintiffs' representative's testimony, Mr. Afzali asked the representative, purportedly on behalf of the ZBA, how many adults ages 55-years and older were expected to purchase houses in Lost Lake and how many young families were expected to purchase houses.

355.     The ZBA also violated Plaintiffs' rights by accepting several self-styled "*amicus*" briefs in violation of the ZBA rules and which raised arguments that had nothing to do with either the Third or Fourth Applications or the purported reasons stated in the Denial Letter.

356.     The ZBA accepted several *amicus* briefs from entities supporting denial of the Developer Plaintiffs' ZBA Appeal.

357.     One of these *amicus* briefs was on behalf of the Hartwood Club, of which vocal Lost Lake opponent Justin Evans was and remains a Board member.  The Hartwood Club amicus submission demanded that the Town re-open the SEQRA environmental review process.

358.     At that time, Gabbard had not relied upon or even referenced SEQRA in denying either the Third or Fourth Applications, nor did the ZBA have the power or authority to reopen SEQRA.

359.    As discussed below, after the ZBA appeal ended it became clear that the Defendants and the Hartwood Club were working together to establish a pretextual basis for the Town Board to subsequently reopen SEQRA and, by so doing, not merely prevent the construction of homes, but prevent all construction of any and all Project-related improvements requiring a permit from any other governmental agency, including but not limited to the New York State Department of Environmental Conservation.

360.    One *amicus curiae* repeatedly accused Plaintiffs of bad faith and a "bait and switch," asserting that Plaintiffs never had any intention of constructing the development as originally approved based on an Amendment to the Declaration of Reservations, Covenants, Easements, Restrictions and Conditions for Lost Lake.

361.    At least one brief relied on the statement that the housing units would be "affordable" as a reason why it believed that the Plaintiffs intended to build a project that differed from the original approvals.

362.    Upon information and belief, Afzali received these *amicus* briefs prior to the ZBA receiving them and the ZBA placed the submission of the briefs on its agenda prior to even having received them.

363.    Upon information and belief, Afzali or someone else acting on behalf of the ZBA or the Town coordinated the filing of the *amicus curiae* briefs.

364.    There was no other way that the *amici* could have learned about information contained in their submissions other than from the ZBA, or from someone acting on its or the Town's behalf.

365.    The ZBA did reject one tendered amicus submission.  That was a letter from Ivan Orisek, a former Planning Board Member.  That rejected *amicus* brief described the deficiencies in the Town's consultant's improper processing and handling of the building permit applications.

That submission was rejected, even though, unlike the *amici* submissions which were accepted by the ZBA, it was timely filed under the ZBA rules.

366.    After testimony before the ZBA ended, Plaintiffs' counsel Barshov compiled all of the documents that had been submitted to the ZBA, as well as the marketing video prepared by the Original Developer for its sister facility in Pennsylvania which Lost Lake was modeled after, in which it emphasized that the homes would be "AFFORDABLE." The Town Building Department did not proffer an objection to these documents being included in the ZBA record.

367.    At the ZBA meeting at which the ZBA voted on the contents of the record, Afzali had compiled a list of documents that were not to be included in the ZBA record. To be excluded from the ZBA record were all of the documents submitted on behalf of the Developer Plaintiffs relating to the unfairness of the ZBA hearing due to conflicts of interest and ethics violations arising from Afzali serving as counsel to the ZBA and other Harris Beach attorneys representing the Town Building Department. Over Plaintiffs' counsel's objection, and without discussion, the ZBA voted to exclude those materials and documents specified by Afzali.

368.    With the record set, the ZBA then turned to rendering a decision on the Developer Plaintiffs' Appeal. The Town Building Department never submitted to the ZBA any memorandum of law or similar submission throughout the entire ZBA Appeal articulating its position on the merits of the ZBA Appeal. That included no response to the 43-page detailed Appeal memorandum of law which had been filed on behalf of the Developer Plaintiffs at the inception of the ZBA Appeal process documenting on a factual and legal basis why the denial of the building permit applications was unlawful.

369.    Since the Town Building Department never submitted any memorandum of law or similar submission, the ZBA had no way of knowing on what basis the Building Department

contended the building permit application denials should be sustained.

370.    On November 15, 2022, when the ZBA met to render its final decision, it had not previously discussed the merits of the Appeal at any of its prior proceedings.  It had not adopted a motion or resolution directing Afzali to prepare a written decision denying the Appeal.

371.    There was no way that Afzali could have known to prepare a decision denying the Appeal, or the grounds upon which such a decision were to be based, unless there were private discussions between and among Afzali and the ZBA members outside of the ZBA meetings (at which neither Plaintiffs nor their counsel were present), or Afzali prepared the decision and the rationale for that decision on his own, which the ZBA then rubber-stamped.

372.    Despite receiving no direction of any kind from the ZBA, nor receiving any submission from the Town Building Department, Afzali prepared a written denial of the ZBA Ruling on Petitions for Appeal (the "ZBA Denial").  Afzali, on his own, decided the bases on which the ZBA would deny the Developer Plaintiffs' Appeal.

373.    At the November 15, 2022 ZBA meeting, the ZBA Chair read a short statement prepared by Afzali summarizing the written ZBA Denial.  The Chair asked if any of the ZBA members had any questions.  None did.  There was not a single word of discussion about the written ZBA Denial by any of the ZBA members.  They did not discuss its contents, evaluate its arguments, review the evidence, or in any other way deliberate.

374.    The ZBA members could not have known the contents of the ZBA Denial unless the ZBA Denial had been circulated among and between the ZBA members prior to the ZBA meeting.

375.    There is no way Afzali could have known in advance of the ZBA meeting if the ZBA Denial was acceptable as written, or required correction and revision, unless it had been

circulated among and between the ZBA members prior to the ZBA meeting.

376.    Without engaging in even the most minimal discussion of the written ZBA Denial, the ZBA voted unanimously to adopt the ZBA Denial, which had been submitted to the ZBA publicly for the first time less than ten minutes earlier.

377.    The entire ZBA Appeal process was a sham and was far from a fair hearing at which procedural due process was afforded the Developer Plaintiffs.

### The Discriminatory Basis of the ZBA's Denial of Plaintiffs' Appeal

378.    On November 16, 2022, the ZBA Denial was filed in the office of the Forestburgh Town Clerk, thereby making it official.

379.    The ZBA Denial wrongly affirmed the decision of the Building Inspector based on two justifications that demonstrate the ZBA's and Town's discriminatory intent against Hasidic Orthodox Jews.

380.    Furthermore, contrary to state law, the ZBA Denial wrongly decided that the Building Inspector had authority under state law to interpret the relevant PDD and SEQRA documents to decide that the building permit application was somehow inconsistent with the approvals of the Project.

381.    The Building Inspector did not rely on any definite zoning standards and attempted to exercise discretionary authority to decide to deny the building permits based on a subjective interpretation of the SEQRA Findings Statement.

382.    The ZBA Denial's first justification for denial, that the PDD approval required adherence to the so-called 2013 "Design Guidelines" and the Declaration of Covenants and Restrictions, is fundamentally flawed.

383.    The ZBA repeatedly misquotes the SEQRA Finding Statement for this proposition.

384.    While the PDD Approval Resolution did state that "the Applicant shall comply with

the mitigation measures set forth in the SEQRA Findings Statement," no such mitigation measures require compliance with the Project's Design Guidelines and Declaration of Covenants and Restrictions.

385.   The section of the SEQRA Findings Statement referred to in the ZBA's Denial, which mentions the Design Guidelines and Declaration of Covenants and Restrictions, was contained in the Findings Statement's "Description of the Proposed Action" section, and not in the "Summary of Impacts and Mitigation Measures" section.

386.   No mitigation measure in the Findings Statement requires adherence to the Project's "Design Guidelines" and Declaration of Covenants and Restrictions, either the so-called "2013" versions or otherwise.

387.   In fact, in the section of the SEQRA Findings Statement relevant to the purported change in design guidelines (the "Visual Resources" section), the Findings Statement explicitly states that the project had "no significant visual impacts to aesthetic resources . . . ."  (Emphasis added.)

388.   With respect to "Visual Resources," the Findings Statement concludes "no further mitigation is proposed."

389.   The ZBA Denial's statement that "The SEQRA Findings Statement requires 'strict adherence to its Design Guidelines for Single Family Homes in Lost Lake Resort (Design Guidelines) that are binding on all lot owners' and 'subject to a declaration of exceptions, reservations, covenants, restrictions and conditions for the Lost Lake Resort (Declaration)' (R. 5 FS at 20)" is false.

390.   As is stated clearly in the Findings Statement, it was Lost Lake Resort, Inc., and not the Findings Statement, that required adherence to the Design Guidelines and Declaration of Covenants and Restrictions, as stated in its "Description of the Proposed Action" section and not the "Summary of Impacts and Mitigation Measures" section:

> Lost Lake Resort, Inc. will require strict adherence to its Design
> Guidelines for Single Family Homes in Lost Lake Resort (Design
> Guidelines) that are binding on all lot owners. The owner of each lot
> in the Resort will be subject to a declaration of exceptions,
> reservations, covenants, restrictions and conditions for the Lost
> Lake Resort (Declaration), as well as a Builder's Packet outlining
> information required to be submitted to the Lost Lake Architectural
> Control Committee (ACC) for internal review for each proposed lot
> development. This design review board will review and approve
> individual site plans in accordance with the Design Guidelines in
> conjunction with review by the Town for building permits. A copy
> of the draft Design Guidelines is included in DEIS Appendix E2.

(Emphasis added.)  The ZBA's misquotation of the Findings Statement demonstrates hostility towards the Developer Plaintiffs and Hasidic Orthodox Jews generally.

391.    Thus, the ZBA Denial's purported justification for denial of the building permits is fundamentally incorrect.

392.    Furthermore, even if the Findings Statement did require adherence to the Design Guidelines and Declaration of Covenants and Restrictions, the Developer Plaintiffs' building permit applications fully complied with them.

393.    The Developer Plaintiffs will adhere to the Design Guidelines and Declaration of Covenants and Restrictions and have never stated that they would not.

394.    The Findings Statement contained no requirement that the Declaration of Covenants and Restrictions and Design Guidelines could never be amended, or that any development in the Project must comply with the versions of those documents that were appended to the DEIS.

395.    In fact, as discussed above, both the Declaration of Covenants and Restrictions and Design Guidelines contain provisions for amendment in the sole and complete discretion of the Developer without any required Town approval, which is exactly the process followed by the Developer Plaintiffs.

396.    Therefore, the building permit applications did adhere to the Declaration of

Covenants and Restrictions and Design Guidelines, as referenced by the SEQRA Findings Statement and PDD approval resolution.

397.    The ZBA's statement that the amendments to the Design Guidelines and Declaration of Covenants and Restrictions were "unauthorized" ignored the explicit provisions of those documents which permit such amendment, and do not require approval by the Town or another entity.

398.    The ZBA's determination that compliance with the 2013 Documents is required under the August 4, 2011 PDD Approval is irrational, as they did not even exist at that time.

399.    There were never any "2013 Design Guidelines"; rather, a draft of the Design Guidelines was created in 2010.

400.    Upon information and belief, no Design Guidelines were formally adopted for the Project while it was owned by the Original Developer.

401.    Finally, even if the Design Guidelines and Declaration of Covenants and Restrictions did not contain explicit provisions that they could be amended (which they do) and even if the PDD Approval actually stated that the so-called "2013" documents must be followed, without amendment (which it did not), the building permit applications do in fact comply with each of the provisions of the draft Design Guidelines and 2013 Declaration of Covenants and Restrictions listed in the relevant section 6.12 of the Findings Statement ("Visual Resources").

402.    The ZBA's first justification for affirming the Building Inspector's denial is a blatantly incorrect reading of the SEQRA Findings Statement, manufactured for the purpose of preventing Hasidic Orthodox Jews from moving to the Town.

403.    The ZBA Denial's second justification for denial, that there was a "change" in the character of the proposed homeowners, is blatantly discriminatory.

404.    The ZBA Denial describes Double Diamond's intended target market for the single-family lots as: "[t]he demographics of the proposed project at Lost Lake will be more consistent

with the Eagle Rock Resort," that the Project would be 'an upscale high-end resort development,"
and that its projects "appeal to the higher income population of the region."

405.    This "stated project purpose and intention [wa]s relevant" to the ZBA.

406.    Upon information and belief, the homes at Eagle Rock Resort are not owned by a
significant Hasidic Orthodox Jewish population.

407.    The ZBA Denial also states that "Applicant's counsel also represented [in the
October 28, 2021 letter] that 'be advised that my client will be offering reasonably priced and
affordable units to Hasidic Jewish families who have a very significant unmet demand for such
units.' (R. 24)."

408.    In the October 28, 2021 letter, Applicant's counsel had not stated that the Project
would deviate from the Project, or that any of the Project components would be changed.

409.    As noted above, Double Diamond in the marketing of "Eagle Rock" had also
previously emphasized that buying into the Project would be "affordable."

410.    The ZBA Denial states that the Building Inspector found that offering such housing
was a departure from the approved Project.

411.    The ZBA Denial stated that "[t]he Building Inspector denied the Lot 303
application . . . on the basis that the application and Applicant's intended purpose were inconsistent
with the project approvals."

412.    Nothing in the SEQRA Findings Statement, nor in the Project's zoning,
subdivision, or site plan approvals requires that the single-family homes could only be occupied
as "second homes" by a "non-resident population," nor did the Developer Plaintiffs state or apply
for any change in this regard.

413.    The SEQRA Findings Statement contains no mitigation measures requiring Lost
Lake Homes to be occupied as second homes by a non-resident population.

414.     The ZBA affirmed the "Building Inspector's denial [] based on his review of the Lot 303 application materials, the underlying project approval documents, and <u>representations made by Applicant's agents</u>."

415.     Specifically, the ZBA noted that the Building Inspector denied the building permit applications because they were "inconsistent with the 2013 project approval documents" because of the "application materials, along with representations that Applicant 'will be offering reasonably priced and affordable units to <u>Hasidic Jewish families</u> who have a very significant unmet demand for such units' . . . ."  (Emphasis added.)

416.     The ZBA determined that the Building Inspector's determination was "rational and supported by the substantial evidence, and hereby affirm[ed] the" denials.

417.     The Building Inspector denied the Developer Plaintiffs' building permit applications, and the ZBA affirmed such denial, because they believed that the target buyers would be Hasidic Orthodox Jews and not the "upscale," "higher income population of the region" that does not include Hasidic Jews, such as the "[t]he demographics of . . . the Eagle Rock Resort."

418.     The ZBA Denial took issue with the Developer Plaintiffs' amendments to permit "family oriented amenities such as 'community facilities for family gatherings,'" which was targeted at Hasidic Orthodox Jews' religious practices.

419.     The ZBA Denial further took issue with the Developer Plaintiffs' desire to "accommodate 'a diverse and inclusive community, with homes at Lost Lake being attainable to a broad range of demographics' . . . ."

420.     The ZBA further demonstrated its hostility toward Hasidic Orthodox Jews by stating:

> While LLH's intent to expand the demographics of the Resort Project can be reasonably inferred from LLH's amendments to the 2013 CC&R and 2013 Design Guidelines, representations by its counsel confirm the change (R. 24 [LLH counsel stating 'be advised that my clients will be offering reasonably priced and affordable

units to Hasidic Jewish families who have a very significant unmet demand for such units'])."

421.    The ZBA Denial concluded by stating that "[b]ased on the above record, LLH's target market, as evidenced in the record, is materially different that [sic] Double Diamond's 'upscale high-end resort development' . . . ."

422.    The ZBA Denial stated that "[t]he Building Department, through project consultants, performed an independent review of the Lot 303 application for consistency with all applicable project approvals, conditions, and requirements, including the 2013 CC&R and 2013 Design Guidelines . . . ."

423.    The ZBA's second justification for affirming the Building Inspector's denial demonstrates both explicit discrimination against Hasidic Orthodox Jews, was motivated by discriminatory intent against Hasidic Orthodox Jews, and was manufactured for the purpose of preventing Hasidic Orthodox Jews from moving to the Town.

424.    Additionally, the ZBA Ruling violated New York State law in many other ways, as described below, *infra* Count XXII.

425.    These findings and determinations demonstrate that the applicable land use regulations were arbitrarily and capriciously imposed.

426.    The ZBA Ruling was a final determination on the Developer Plaintiffs' building permit applications.

427.    The Developer Plaintiffs cannot seek a "variance" as they do not seek to engage in a prohibited use that would require a variance.

428.    Variances under the Town Code are only permitted in situations where "a proposed site plan contains one or more features which do not comply with the zoning requirements of [Chapter 85] . . . ."

429.    The Developer Plaintiffs' site plan has already been granted, and they do not seek

any deviation from the requirements of Chapter 85 of the Town Code.

430.    The Developer Plaintiffs have no reason to request an amendment of any of the Project approvals, as they seek only to develop the Lost Lake Project as permitted by those Project approvals.

431.    The Developer Plaintiffs further cannot seek an amendment to the PDD approval because the PDD law (under which the original approval was obtained) was repealed by the Town Board.

432.    The ZBA Ruling is a final, definitive position on whether the Developer Plaintiffs' building permits should have been denied.

### Actions Subsequent to the ZBA Decision

433.    Approximately two weeks after the ZBA Decision was issued, a lengthy letter from the Hartwood Club was read by the Town Supervisor at the December 1, 2022 Town Board meeting.  Further advocating the position that it pressed in its amicus brief to the ZBA, the letter demanded that the environmental review of the Project be reopened, stating as follows: "Given that the Lost Lake Developer is hard at work building out roads, pouring concrete, and taking other actions with respect to infrastructure, it is imperative for the Town Board to reopen SEQRA sooner rather than later."

434.    On Sunday, January 1, 2023, the Town affixed a Notice of Violation and Stop Work Order at the Project Site.  The violation inexplicably stated that the permit for the one home that had been built had expired.  The construction on that home had been completed months earlier, while the permit was active.  When an LLH representative attempted to obtain information from Gabbard about the Stop Work Order, he ignored all phone calls and emails, and the one time he answered he hung up the phone right away without providing any answers.

435.    At the January 5, 2023 Town Board meeting, the Town Supervisor stated the Town

received a letter from Frederick Weirdsma, a Forestburgh resident and Hartwood Club Board member, in which Mr. Weirdsma states: "I am interested in contributing monies to the Town of Forestburgh to help support legal action that may be required in the Lost Lake PDD Development matter."

436.    Neither the Lost Lake Project, nor any action regarding Mr. Weirdsma's correspondence were on the Agenda for the meeting.

437.    Thereupon, the Town Board adopted a written resolution that had been pre-prepared by Mr. Afzali authorizing the Town to accept so-called "unsolicited" gifts.

438.    On January 27, 2023, the Town issued a "Stop Work and Compliance Order" to the Developer Plaintiffs, again related to construction activities related to the home that was completed months earlier.

439.    On February 1, 2023, Gabbard then issued a "Notice of Violation, Stop Work Order, and Compliance Order" ("February 1 Stop Work Order") halting all work on the Lost Lake Project, including infrastructure work for which no building permit is required and which is undertaken pursuant to permits issued by NYSDEC.

440.    The February 1 Stop Work Order was not posted on the Project Site and the Developer Plaintiffs did not receive the February 1 Stop Work Order until weeks later by certified mail.

441.    The various justifications for Gabbard's February 1 Stop Work Order were purported violations of Town Code sections (namely, the former PDD Law §§ 85-17, 85-18, 85-19, and 85-21) (the "Repealed Code Sections") that do not exist, having been repealed by the Town Board years earlier.

442.    Moreover, the purported violations concerned work that Double Diamond, and not the Developer Plaintiffs, had previously performed, yet Double Diamond was not cited by the

Town for such violations when the repealed Town Code sections had actually been in force.

443.    The February 1 Stop Work Order additionally claimed that illegal "paving" activity occurred, when not only had no paving occurred, but the Town's counsel refused to even identify the location of such allegedly illegal paving when Plaintiffs' counsel called to inquire where it had supposedly occurred.

444.    The Town Board held a meeting on the next day, February 2, 2023.  The Lost Lake Project was not on the Agenda for such meeting, which was also confirmed by the Town Supervisor at the start of the meeting where he stated "Lost Lake is not on the Agenda."

445.    Nevertheless, without any public notice or public attendance or input, the Town Board went into Executive Session at the February 2 meeting, inviting Robbins to join them even though he was not a Board member.  Following the Executive Session, the Town Board adopted Resolution 2023-02, which accomplished exactly what the Hartwood Club demanded in its "amicus brief" submitted to the ZBA and subsequent demands in their December letter:  The Town Board reopened the SEQRA process for the Lost Lake Project, precluded the Project from going forward, and authorized commencement of litigation against the Developer Plaintiffs to halt all clearance and construction of the Project.

446.    Resolution 2023-02 was purportedly based on the ZBA Ruling.

447.    At the February 2, 2023 Town Board meeting, Justin Evans appeared on behalf of the Hartwood Club and criticized the Developer Plaintiffs with anti-Semitic tropes.

448.    The Town Board's actions adopting the Hartwood Club's position in the "amicus brief" it submitted to the ZBA–which falsely claimed that the Developer Plaintiffs would be developing an entirely different project, requiring reopening of SEQRA–demonstrate the coordinated efforts of the Hartwood Club and the Town, as well as the Defendants' responsiveness

to the hostile opposition of the Hartwood Club and Justin Evans, who were hostile to Hasidic Orthodox Jews.

449.    One of the principal reasons the Hartwood Club demanded that SEQRA be reopened, and why the Town Board did so, is to attempt to prevent other governmental agencies from issuing any permits for the Project.  Thus, by re-opening SEQRA, the Town Board has intentionally acted to preclude NYSDEC from issuing permits for infrastructure-related work on the Project Site.

450.    The next day, on February 3, 2023, the following litigation was commenced in New York state court:  *Town of Forestburgh et al. v. Lost Lake Holdings*, LLC et al., Index No. E2023-186, demanding an injunction precluding any further construction, installation of infrastructure, or disturbance of the land.

451.    Similar to the February 1 Stop Work Order, the litigation commenced by the Town relied on purported violations of the Repealed Code Sections that, again, do not exist, as well as purported paving work that never occurred, and which the Town refused to identify.

452.    The discriminatory animus of the Defendants is demonstrated by their outrageous abuse of power and the state court system by attempting to enforce the Repealed Code Sections against the Developer Plaintiffs, seeking to injure the Developer Plaintiffs through this misuse of government process.

453.    The Town's lawsuit is objectively baseless, as it seeks to enforce the Repealed Code Sections, which no longer regulate PDDs.

454.    Because the Repealed Code Sections no longer exist, Defendants have no reasonable expectation of prevailing in the state court action.

455.    In its complaint, the Town also claims that the Developer Plaintiffs violated the

February 1 Stop Work Order, even though its complaint was filed before the Developer Plaintiffs received the February 1 Stop Work Order via Certified Mail.

456.    Concurrently, the Town Board gave notice to all governmental agencies that SEQRA had been reopened in order to preclude any permits of any kind from being issued for the Project.

457.    On February 9, 2023, the Town Board issued a "Notice Requiring Preparation of a Supplemental Impact Statement for the Project known as Lost Lake Resort," which it sent to County, State and Federal agencies, as well as the Hartwood and Merriewold Clubs, stating in part that "The Town Board also suspended all Town issued permits and approvals, including the Resort Project's 2011 PDD Approval and 2013 Conditional Final Approval and any construction or land disturbance activities permitted thereunder are no longer authorized unless and until Developer submits its proposed changes to the Town Board to undergo additional review under SEQRA, and obtain necessary and appropriate modifications to the terms and conditions of the Project Approval."

458.    The Town Board took these actions to prevent any non-Town agency, including NYSDEC, from issuing any permits for the Project and thereby bringing all work on the Project to a halt and preventing any future work on the Project.

459.    The February 9, 2023 Notice was purportedly based on the ZBA Ruling.

460.    On or about February 12, 2023, construction equipment at the Project Site was again vandalized, and a representative of the Sullivan County Sheriff's Office stated that the Office will be investigating the incident as a possible hate crime.

461.    On March 10, 2023, the New York State Department of Environmental Conservation ("NYSDEC") informed the Developer Plaintiffs that their application for certain

permits is deemed "incomplete" until supplemental SEQRA review by the Town is completed.

462.   The NYSDEC's action, based on the Town's Resolution concerning the reopening of SEQRA review of the Lost Lake Project, prevents the Developer Plaintiffs from continuing work on the Lost Lake Project, which was Defendants' intended effect.

463.   On March 30, 2023, the Town Board adopted a Resolution "Adopting SEQRA Positive Declaration and Requiring the Preparation of a Supplemental Environmental Impact Statement for the Lost Lake Resort Property . . . ."

464.   The March 30 Resolution was purportedly based on the ZBA Ruling.

465.   The March 30 Resolution was passed immediately after an Executive Session into which Robbins was invited even though he is not a Board Member.  The March 30 Resolution was never made public nor presented to the public prior to or during the public meeting preceding the Executive Session.

466.   Reopening SEQRA review of the Lost Lake Project will add years of unnecessary review and substantial expenditure of funds for a project that has already been approved and which the Developer Plaintiffs intend to develop according to its original approvals.

467.   Reopening SEQRA review has no purpose other than delay and an attempt to block the project for discriminatory reasons.

### The Impact on Plaintiffs of the Building Permit Denials

468.   The Town and multiple other governmental agencies all lawfully issued various approvals for the Project, including but not limited to the PDD rezoning approval, the subsequent grant of final subdivision and site plan approval, and the grant of other required governmental permits, approvals, and permissions for the Project.  No litigation was commenced challenging any of these prior Project approvals.

469.     In reliance upon these approvals, both the Original Developer and the Developer Plaintiffs expended substantial sums making improvements to the Project Site, including but not limited to partial and substantial construction of Project infrastructure.  The Developer Plaintiffs' rights to these approvals have vested.

470.     The denial of the building permit applications deprives the Developer Plaintiffs of their vested property rights and precludes them from making any economically productive use of the Project Site.

**Unlawful and Discriminatory Assessment of the Project Site**

471.     In 2018, the Town assessed the Developer Plaintiffs' lots as if they were fully buildable, while substantial infrastructure was still required to be developed before any certificate of occupancy could be granted.

472.     The Town Assessor was well aware of the local residents' hostility toward Hasidic Orthodox Jews, as he was copied on the discriminatory email from Justin Evans described above.

473.     The Developer Plaintiffs filed lawsuits in state court challenging such assessments.

474.     A New York State court agreed with the Developer Plaintiffs that the sale of the subject property was the best evidence of its value and ordered that the assessed tax values be reduced as set forth in Plaintiffs' requests.

475.     Rather than complying with the court's order, the Town has appealed it.

476.     In contrast, the Town settled many similar lawsuits with other landowners that have challenged its assessments.

477.     The Town's unjustified assessments of the Developer Plaintiffs' property and refusal to lower them and settle with the Plaintiffs, even in the face of a judicial determination, was motivated by hostility toward Hasidic Orthodox Jews.

478.    The Town Assessor ("Ketcham" or the "Assessor") caused the Project Site's taxable value to be over-assessed, forcing the Developer Plaintiffs to pay millions of dollars in additional real property taxes.

479.    Similarly, the Town Board adopted a local law imposing a 1000% increase in the Town's parkland fees (from $200 per lot to $2000 per lot) that would drive up the Developer Plaintiffs' cost to develop the future phases of the Project by almost 4 million dollars.  These acts were undertaken to attempt to force Plaintiffs to abandon the Project and to abandon their vested rights in the Project's approvals.

## The Town's Obstruction of the NYSDEC Permit Process

480.    The Town, principally via communications from Afzali, has attempted to obstruct and delay processing of applications that the Developer Plaintiffs filed with NYSDEC.

481.    The Developer Plaintiffs require certain approvals and permits from NYSDEC in order to slightly modify the location of the Project sewer outfall installation.

482.    The Town, through Afzali, wrote to the NYSDEC falsely claiming that the Developer Plaintiffs had changed the Project and pressing NYSDEC to require a new or supplemental environmental review of the entire Project under SEQRA.

483.    Upon information and belief, the Town has colluded with the Hartwood Club, whose prominent members have been active in opposing the Developer Plaintiffs' efforts to construct the Project, to cause the NYSDEC to delay issuance of Plaintiffs' requested approvals and to attempt to subject the entire Project to SEQRA review.  The Town's position as communicated by Afzali is the same as articulated by the Hartwood Club in its *amicus* brief submitted to the ZBA.

484.    The false representations about fundamentally changing the Project by Afzali on

behalf of the Town caused significant delays in NYSDEC granting the Developer Plaintiffs' permits.

485.    Afzali communicated to the NYSDEC that the ZBA had "required" preparation of a supplemental EIS for the Project.  Not only was this false, but the ZBA never had such power and still does not.  The only reason for this intentional misstatement was to cause NYSDEC to refuse to issue permits for the Project.

486.    Justin Evans and the Hartwood Club have likewise communicated with NYSDEC and the Town in their coordinated effort to obstruct the development of the Lost Lake Project.

487.    Ultimately, NYSDEC determined that further delays pending Town review were unwarranted, and informed the Developer Plaintiffs that they would proceed on the applications.

488.    The Town contacted NYSDEC as recently as November 22, 2022, in a further attempt to prevent NYSDEC from issuing any permits to the Developer Plaintiffs.

489.    Having failed via the communications from Afzali to the NYSDEC to preclude the issuance of permits, the Defendants accomplished that goal by the Town Board reopening SEQRA.

## Unlawful Search of the Project Site

490.    In complete darkness and before dawn on Election Day, November 8, 2022, when Town offices were closed, Hogue and Gabbard were observed walking in and around the Project Site.

491.    Neither Hogue nor Gabbard had requested permission to enter the Project Site and neither had informed the Developer Plaintiffs or their representatives of the desire or intention to do so.

492.    At that time, due to the denial of building permit applications, the only work being performed on the Project Site involved disturbance of land pursuant to permits issued by non-

Town governmental agencies including the NYSDEC.

493. Because none of the work had been authorized by any permits issued by Gabbard, and because Gabbard had no enforcement authority regarding whatever work was being undertaken, Gabbard had no lawful basis to be searching and inspecting the Project Site at all, no less in predawn darkness.

494. Because Town Supervisor Hogue has no permit enforcement authority, he did not even have a colorable basis for searching and inspecting the Project Site.

495. Both Hogue and Gabbard unlawfully trespassed on the Project Site and conducted an unlawful warrantless search of the Project Site in violation of the Developer Plaintiffs' constitutional rights.

## Disproportionate Impact On and Discrimination Against Hasidic Orthodox Jews

496. Upon information and belief, members of the Hasidic Orthodox Jewish community likely would purchase lots and homes in the Project.

497. Both principals of the Developer Plaintiffs, Yehuda Miller, and Rabbi Mordechai Halberstam intend to reside at the Lost Lake Project.

498. The Halberstam Plaintiffs intend to purchase a home in Phase 1 and reside at the Lost Lake Project, along with other members of their family.

499. Mr. Miller informed Supervisor Hogue in August 2021 that Mr. Miller will be living at the Lost Lake Project.

500. Relatives of both Mr. Miller and Rabbi Mordechai Halberstam also intend to purchase homes in the Project.

501. Although the Developer Plaintiffs have not yet begun marketing the Project,

various Hasidic Orthodox Jews have contacted them seeking to purchase homes in the Project.

502.    All persons seeking to buy homes at the Lost Lake Project will be encouraged to do so and will be offered properties without regard to race, religion or other protected class, although the Developer Plaintiffs' assessment of current market conditions and demand for housing in the Hasidic Orthodox Jewish community in the region indicates that a large number of purchasers likely will be Hasidic Orthodox Jews.

503.    A group of Hasidic Orthodox Jews visited the Project Site in the Summer of 2022 with the intention of purchasing homes in the Project.

504.    Other Hasidic Orthodox Jews have repeatedly contacted Plaintiffs for updates because they intended to purchase homes in the Project.

505.    One Hasidic Orthodox Jewish individual who lived near the Lost Lake Project has informed the Developer Plaintiffs that he is interested in purchasing a home at the Project.

506.    Representatives of three Hasidic Orthodox Jewish communities, including some that were ready to pay deposits, have contacted the Developer Plaintiffs seeking to purchase multiple homes in the Project.

507.    Upon information and belief, the Developer Plaintiffs' Third and Fourth Applications and the subsequent ZBA Appeal were denied because granting building permits would likely have caused members of the Hasidic Orthodox Jewish community to purchase homes and lots in the Project.

508.    The practice of Town officials denying building permits to the Developer Plaintiffs disproportionately impacts Hasidic Orthodox Jews.

509.    The practice of Town officials denying building permits to the Developer Plaintiffs discriminates against Hasidic Orthodox Jews.

510.    The Town officials imposed different terms and conditions on the Developer Plaintiffs' Third and Fourth applications and subsequent ZBA Appeal than are imposed on other property owners in the Town in order to disproportionately impact and discriminate against Hasidic Orthodox Jews.

511.    The Town's officials made statements indicating a preference against Hasidic Orthodox Jews and endorsed statements by others that indicated a preference against Hasidic Orthodox Jews.

512.    The Town officials' approach to the Project was different before the Developer Plaintiffs purchased it and before the Project was perceived as potentially providing homes for Hasidic Orthodox Jews.

513.    The Defendants' actions described above all took place under color of state law.

514.    The Defendants have made individualized assessments of the proposed uses of the Project.

515.    Defendants have treated the Developer Plaintiffs differently and worse than other similarly situated applicants.

516.    Upon information and belief, Defendants have issued building permits for homes and projects that were not perceived as serving the Hasidic Orthodox Jewish community without requiring the same documentation that was required of the Developer Plaintiffs.

**Overview of Plaintiffs' Injuries, Damages,
and Lack of an Adequate Remedy at Law**

517.    The injury to the Plaintiffs caused by the Defendants' actions, which prevent them from building sorely needed homes, is immediate and severe.

518.    The Defendants' actions establish a pattern and practice of discrimination in

violation of Plaintiffs' free exercise of religion.

519.     There are no quick, reliable and viable options for Plaintiffs to build homes in the Project.

520.     Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful actions.

521.     Plaintiffs have also suffered significant financial damages, loss of all economically productive use of the Project Site, lost profits and asset value, all as a result of the Defendants' actions and their application to the Plaintiffs, including Defendants' discriminatory conduct.

522.     Plaintiffs have suffered substantial damages in an amount to be proven at trial.

523.     On August 6, 2020, Town Supervisor Hogue reported to the Town Board that he, Planning Board Chair Robbins, and Code Enforcement Officer Gabbard met with the Plaintiffs' representatives.  As he stated during the meeting, among other things, the Developer Plaintiffs "are looking to start selling home sites in approximately two years - once all of the infrastructure has been  replaced/installed."   This acknowledgement confirms that Defendants' unlawful acts were contemplated and implemented beginning within a very short time after Plaintiffs purchased the Project and Project Site.

524.     Plaintiffs' damages include but are not limited to carrying costs, infrastructure costs, lost profits, increases in construction costs and financing that are due to the Defendants' intentional delays and obstruction in issuing building permits and to the Defendants' discriminatory conduct, and expenses for legal and professional fees.

525.     Plaintiffs' consequential damages include but are not limited to the value of the improvements to land stated in each building permit application representing contracts with craftsmen, laborers, and suppliers that were intentionally interfered with by the Defendants' actions.

526.     Plaintiffs' consequential damages also include but are not limited to the loss of

79

home sales to interested and identified buyers, some of whom appeared at the Town Board meeting on February 3, 2022 to voice their hope to buy homes from the Plaintiffs and voice their opposition to the Town's moratorium.

527.    The following entities, all of which are active and duly registered in New York, are corporations that were established to provide necessary services to the properties denied building permits by the Defendants: Lost Lake Property Owners Association, Inc., Lost Lake Resort Sewer Company, Inc., Lost Lake Resort Water Company, Inc., and Lost Lake Management Corporation.

528.    If granted, the Plaintiffs' prayer for relief would allow these entities to provide those necessary services.

529.    Pursuant to Rule 19(c), these corporations are necessary parties under Rule 19(a), but they decline to be joined in this litigation because their rights will be adequately represented by the Plaintiffs.

530.    Pursuant to General Municipal Law § 50-i(1)(b), a notice of claim compliant with General Municipal Law § 50-e was served upon the Town on December 1, 2022, which claim Defendants have to date failed to adjust or pay.

531.    An amended Notice of Claim was served upon the Town on December 15, 2022, which claim Defendants have also to date failed to adjust or pay.

532.    Plaintiffs have complied with the requirements of New York Civil Rights Law § 40-d by serving notice prior to the filing of this action upon the New York Attorney General of its claim under New York Civil Rights Law § 40-c and serving a copy of the Complaint, and also by serving notice on the New York Attorney General of the filing of this amended Complaint prior to its filing and serving a copy of this amended Complaint.

## COUNT I

### Violation of the Fair Housing Act
### 42 U.S.C. § 3604(a)

533.    Paragraphs 1 through 532 are incorporated by reference as if set forth fully herein.

534.    Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful to "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religious, sex, familial status, or national origin."

## COUNT II

### Violation of the Fair Housing Act
### 42 U.S.C. § 3604(b)

535.    Paragraphs 1 through 534  are incorporated by reference as if set forth fully herein.

536.    Defendants, through their actions and the actions of their agents described above, are liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religious, sex, familial status, or national origin."

## COUNT III

### Violation of the Fair Housing Act
### 42 U.S.C. § 3617

537.    Paragraphs 1 through 536 are incorporated by reference as if set forth fully herein.

538.    Defendants, through their actions and the actions of their agents described above, are liable under 42 U.S.C. § 3617, which makes it unlawful to "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or

enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . of this title."

## COUNT IV

**United States Constitution**
**42 U.S.C. § 1983: First Amendment**
**Free Exercise Clause**

539.    Paragraphs 1 through 538 are incorporated by reference as if set forth fully herein.

540.    Defendants have deprived and continue to deprive Plaintiffs of their right to free exercise of religion, as secured by the First Amendment of the United States Constitution as incorporated in the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by implementing and imposing land use regulations as applied in a manner that discriminates against them on the basis of religion.

## COUNT V

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection Clause**
**Religious Discrimination**

541.    Paragraphs 1 through 540 are incorporated by reference as if set forth fully herein.

542.    Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against and targeting Plaintiffs and the Jewish individuals who may reside in the Project for disfavor on the basis of their religion.

## COUNT VI

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection Clause**

**Racial Discrimination**

543.    Paragraphs 1 through 542 are incorporated by reference as if set forth fully herein.

544.    Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against and targeting Plaintiffs and the Jewish individuals who may reside in the Project for disfavor on the basis of their race.

**COUNT VII**

**United States Constitution
42 U.S.C. § 1983: Fourteenth Amendment
Procedural Due Process**

545.    Paragraphs 1 through 544 are incorporated by reference as if set forth fully herein.

546.    The Developer Plaintiffs have a federally protected constitutional right to a fair and impartial review of their building permit applications and a fair and impartial hearing of their appeal to the ZBA.  Plaintiffs were deprived of both in violation of their right to procedural due process of law, as made applicable to the Defendants by the Fourteenth Amendment to the United States Constitution.

547.    Defendants' actions, beginning with the designation of Afzali as counsel to the Town Building Department and Building Inspector, and culminating with the denial of the Third and Fourth Applications, were consistently undertaken to prevent a fair and impartial review of the building permit applications.  Rather, it was preordained that the Third and Fourth Applications would be denied, regardless of their contents, and the review process was nothing more than an attempt to identify some pretext upon which the Third and Fourth Applications would be denied.

548.    Because there never was a full, fair, and impartial review of the Third and Fourth Applications, the Developer Plaintiffs' procedural due process rights were violated.

549.     From the designation of Afzali as counsel to the ZBA through the denial of the Developer Plaintiffs' ZBA Appeal, they were repeatedly denied a fair and impartial review of their appeal.  Among other due process violations, the ZBA: (a) allowed Afzali to counsel the ZBA, precluding a fair review of the building permit application denials because Afzali was advising the ZBA regarding his own actions and actions he orchestrated; (b) allowed Afzali and his Harris Beach colleagues to concurrently represent the ZBA and the Town Building Department concurrently, and to surreptitiously communicate with one another during the appeal proceedings; (c) refused to subpoena witnesses and evidence necessary to the Developer Plaintiffs' Appeal; (d) excluded documents and other evidence from the ZBA record submitted by the Developer Plaintiffs which addressed the due process violations that occurred during the ZBA Appeal; and (e) made decisions regarding the ZBA Appeal privately and without public deliberation, including to deny the Plaintiffs' Appeal.

550.     Because there was never a full, fair, and impartial review of the ZBA Appeal, the Developer Plaintiffs' procedural due process rights were violated.

551.     Gabbard issued the February 1 Stop Work Order without any colorably lawful basis, for the purpose of providing a pretextual basis for the Town Board's commencement of state court litigation against the Developer Plaintiffs.  The February 1 Stop Work Order's attempt to enforce the Repealed Code Sections and cause an immediate shut-down of all Project work, without prior notice or an opportunity to be heard, violates the Developer Plaintiffs' right to procedural due process of law.

552.     The Town Board's reopening of SEQRA was undertaken for the purpose of interfering with and precluding NYSDEC from issuing permits on applications then pending before the agency.  The Defendants were aware of the Developer Plaintiffs' pending applications before

NYSDEC and had attempted to interfere with and obstruct the issuance of such permits via correspondence and communications from Afzali.  When that effort was unsuccessful, the Town Board reopened SEQRA unilaterally, without any prior notice to the Developer Plaintiffs or opportunity to be heard.  The purpose of reopening SEQRA was, *inter alia,* to prevent NYSDEC from being able to issue permits for the Project because, so long as SEQRA is "open," NYSDEC has confirmed that it cannot lawfully issue Project permits.  The misuse of the SEQRA process to prevent a state agency from issuing permits for the Project that it would otherwise have the power to issue is an intentional act undertaken for the purpose of depriving the Developer Plaintiffs of their right to procedural due process in connection with their applications before non-Town agencies, including NYSDEC.

553.    The private interests of the Developer Plaintiffs that were affected by these violations of procedural due process were very important.  The risk of violation of the Developer Plaintiffs' right to procedural due process of law was certain given the procedures used by the Defendants and all such violations could have been eliminated or would never have occurred if the Town had acted in accordance with law and followed normal administrative review and hearing procedures.  No significant fiscal or administrative burden would have been imposed upon the Town if the Defendants had acted in accordance with Plaintiffs' procedural due process rights.

554.    For all of the foregoing reasons, the Developer Plaintiffs were deprived of their right to procedural due process, as secured by the United States Constitution and made applicable to the States by the Fourteenth Amendment.

## COUNT VIII

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Substantive Due Process**

555.    Paragraphs 1 through 554 are incorporated by reference as if set forth fully herein.

556.    The Developer Plaintiffs have constitutionally protected property rights in all of the governmental permits and approvals issued for the Project, including but not limited to the Project's Phase 1 final subdivision and site plan approvals.  The Original Developer and the Plaintiffs vested those property rights by expending substantial sums on Project improvements including infrastructure. By their purchase of the Project, the Developer Plaintiffs acquired those vested property rights.

557.    The Developer Plaintiffs' vested property rights include the right to receive building permits to construct single-family homes in Phase 1 of the Project.

558.    The Third and Fourth Applications were in accordance with the Uniform Code and the Energy Code and there was no lawful basis for their denial.  Hogue, Robbins, and Afzali collectively manufactured legally baseless and pretextual reasons for denying the Third and Fourth Applications.  Gabbard denied the Third and Fourth Applications utilizing the same legally baseless and pretextual reasons for denial created by Hogue, Robbins, and Afzali.  Because there was no colorably legal basis for denying the Third and Fourth Applications, and because those denials were intentionally issued to deprive the Developer Plaintiffs of their property rights under the Phase 1 subdivision and plan approvals to construct Phase 1 single family homes, the Developer Plaintiffs were deprived of a vested property right without due process of law.

559.    The Developer Plaintiffs have a reserved property right to revise and amend the Declaration of Covenants and Restrictions and the Design Guidelines for the Project in the Developer Plaintiffs' sole discretion, whose existence was acknowledged and confirmed by the Town Board in its review and approval of the Project, including but not limited to its review under SEQRA.  The denial of the Third and Fourth Applications abrogates and denies the Developer

Plaintiffs' property right to amend the Covenants and Restrictions, including the design guidelines, without due process of law.  There is no colorable basis under any applicable statutory or decisional law for the Defendants to exercise control over the Developer Plaintiffs' reserved right to amend the Covenants and Restrictions, and their design guidelines, in their sole and complete discretion. Because the denial of the Third and Fourth Applications, as well as the affirmance thereof, was not merely arbitrary and capricious, but was an intentional overreach beyond any colorable power of any Town board, agency, or official, and was undertaken for the purpose of depriving Developer Plaintiffs of their vested property right to build homes as set forth in the Phase 1 subdivision and site plan approvals, as well as to deprive Developer Plaintiffs of their vested right to amend the Covenants and Restrictions, including their design guidelines, the Developer Plaintiffs have been denied substantive due process of law.

560.    Defendants' actions, as applied, deprived and continue to deprive the Developer Plaintiffs of their right to substantive due process, as secured by the United States Constitution and made applicable to the States by the Fourteenth Amendment.

## COUNT IX

**United States Constitution**
**42 U.S.C. § 1983: Fifth and Fourteenth Amendments**
**Regulatory Taking**

561.    Paragraphs 1 through 560 are incorporated by reference as if set forth fully herein.

562.    The denial of the Third and Fourth Applications, the affirmance of that denial by the ZBA, the issuance of the February 1 Stop Work Order, and the Town Board's reopening of SEQRA collectively prevent the Developer Plaintiffs from constructing single-family homes in Phase 1 of the Project, completing infrastructure for the Project, and doing any work in furtherance of the Project's approvals.  The foregoing actions deprive the Developer Plaintiffs of the ability to make

any economically productive use of the Project Site or to develop the Project.  The only approved use of property allowed for Phase 1 of the Project is construction of single-family homes and the Developer Plaintiffs are precluded from constructing such homes.  They are also precluded from occupying the one home that they were allowed to build, because they are precluded by the Town's actions from completing the necessary Project infrastructure.

563.    The one home built pursuant to the grant of the First Application is unmarketable because no one will purchase a home in a residential subdivision when the infrastructure to serve that home is not installed and no certificate of occupancy could be obtained.

564.    The Developer Plaintiffs had significant investment-backed expectations in being able to install infrastructure for Phase 1 and construct and sell homes in Phase 1 of the Project. Without the ability to complete such infrastructure and to build and sell Phase 1 homes, the entire Project is not economically viable.

565.    The denial of the Third and Fourth applications and the affirmance of that denial by the ZBA, in combination with the other actions undertaken by Defendants, including but not limited to the tenfold increases in Parks and Playground fees, the issuance of the February 1 Stop Work Order, and the reopening of SEQRA, preclude all or virtually all of the economically productive use of the Project Site, thereby causing a regulatory taking of the Developer Plaintiffs' property.

566.    Plaintiffs are entitled to just compensation for the taking of their property as guaranteed by the Fifth Amendment to the United States Constitution as made applicable to Defendants by the Fourteenth Amendment.

### COUNT X

#### 42 U.S.C. § 1982

567.    Paragraphs 1 through 566 are incorporated by reference as if set forth fully herein.

88

568. The Plaintiffs' principals are members of the Jewish race.

569. The actions by Defendants are violations of Plaintiffs' right to have the same rights as enjoyed by other citizens to hold and convey real and personal property in violation of 42 U.S.C. § 1982.

## COUNT XI

**United States Constitution
42 U.S.C. § 1983: Fourth and Fourteenth Amendments
Unconstitutional Search**

570. Paragraphs 1 through 569 are incorporated by reference as if set forth fully herein.

571. Prior to dawn, in the pitch black of night, on November 8, 2022, Town Supervisor Hogue and Building Inspector Gabbard entered the Project Site without permission and without a warrant.

572. They walked well into the Project Site to search locations in the Project Site not visible from any public road or place.

573. The Developer Plaintiffs have a reasonable expectation of privacy against searches of their land in the predawn hours of darkness and at locations not visible from any public road or place.

574. No emergency or other similar exigency existed at the time, and neither Hogue nor Gabbard was responding to any emergency condition or immediate and serious threat to the public health, safety and welfare.

575. Hogue's duties as Town Supervisor do not include inspecting private property.

576. Gabbard had issued no permit for work being undertaken at that time as to which he had a right to inspect the Project Site. Even if he had such a right, he only would have had the right to inspect with permission of the Developer Plaintiffs and during reasonable hours, or

pursuant to a warrant.

577.    The warrantless search of the Project Site by Hogue and Gabbard violated the Developer Plaintiffs' rights under the Fourth Amendment to the United States Constitution, as made applicable to Defendants by the Fourteenth Amendment.

## COUNT XII

### New York State Constitution
### Article I § 3
### Freedom of Worship

578.    Paragraphs 1 through 577 are incorporated by reference as if set forth fully herein.

579.    Defendants have deprived and continue to deprive Plaintiffs of their right to the free exercise and enjoyment of religious profession and worship, without discrimination.

## COUNT XIII

### New York State Constitution
### Article I § 11
### Equal Protection of the Laws

580.    Paragraphs 1 through 579 are incorporated by reference as if set forth fully herein.

581.    On the same basis and for the same reasons as set forth in Counts V and VI, Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by Article I § 11 of the New York State Constitution.

## COUNT XIV

### New York State Constitution
### Article I § 5
### Procedural Due Process

582.    Paragraphs 1 through 581 are incorporated by reference as if set forth fully herein.

583.    For the same reasons as set forth in Count VII, Defendants have deprived and

continue to deprive the Developer Plaintiffs of their right to procedural due process of law, as secured by Article 1 § 5 of the New York State Constitution.

## COUNT XV

**New York State Constitution**
**Article I § 5**
**Substantive Due Process**

584.    Paragraphs 1 through 583 are incorporated by reference as if set forth fully herein.

585.    For the same reasons as set forth in Count VIII, Defendants have deprived and continue to deprive the Developer Plaintiffs of their right to substantive due process of law, as secured by Article 1 § 5 of the New York State Constitution.

## COUNT XVI

**New York State Constitution**
**Article I §§ 6 and 7**
**Regulatory Taking**

586.    Paragraphs 1 through 585 are incorporated by reference as if set forth fully herein.

587.    For the same reasons as set forth in Count IX, Defendants have caused a regulatory taking of the Developer Plaintiffs' property in violation of Article I § 6 of the New York Constitution and requiring payment of just compensation as provided in Article 1 § 7 of the New York State Constitution.

## COUNT XVII

**New York State Constitution**
**Article I § 12**
**Unlawful Search**

588.    Paragraphs 1 through 587 are incorporated by reference as if set forth fully herein.

589.    For the same reasons as set forth in Count XI, Town Supervisor Hogue and Building

Inspector Gabbard undertook an illegal warrantless search of the Project Site in violation of Article 1 § 12 of the New York State Constitution.

## COUNT XVIII

### Trespass

590.    Paragraphs 1 through 589 are incorporated by reference as if set forth fully herein.

591.    For the same reasons as set forth in Count IX, Hogue and Gabbard intentionally and without permission entered into and trespassed on the Project Site.

## COUNT XIX

### New York State Constitution
### Article I §§ 6 and 9
### Interference with the Right to Petition Government

592.    Paragraphs 1 through 591 are incorporated by reference as if set forth fully herein.

593.    The letters from Afzali to the NYSDEC regarding the Project were issued on behalf of Defendants to obstruct and delay the issuance of permits sought by the Developer Plaintiffs from NYSDEC for the Project.

594.    The aforementioned letters from Afzali to the NYSDEC falsely represented that the Developer Plaintiffs had fundamentally changed the Project.

595.    The aforementioned letters and other communications from Afzali and/or one or more Defendants to the NYSDEC, were actions taken to delay, obstruct and prevent issuance of permits for the Project and to unlawfully interfere with and deprive the Developer Plaintiffs of the right to Petition Government, as guaranteed by Article I §§ 6 and 9 of the New York State Constitution.

## COUNT XX

### New York Civil Rights Law § 40-c

596.    Paragraphs 1 through 595 are incorporated by reference as if set forth fully herein.

597.    For the same reasons as set forth in Counts XII, XIII, and XVI, Defendants violated New York Civil Rights Law § 40-c.

## COUNT XXI

### New York State Common Law
### Tortious Interference with Prospective Business Advantage

598.    Paragraphs 1 through 597 are incorporated by reference as if set forth fully herein.

599.    The actions by Afzali on behalf of Defendants as set forth in Count XII, XIII, and XVI, constituted attempts to tortiously interfere with the Developer Plaintiffs ability to develop the Project, construct homes, and sell lots and homes in the Project.  These wrongful acts constitute tortious interference with a prospective business advantage.

## COUNT XXII

### New York Civil Practice Law and Rules Article 78

600.    Paragraphs 1 through 599 are incorporated by reference as if set forth fully herein.

601.    The ZBA Denial wrongly affirmed the building permit denials by the Building Inspector, and the bases for ZBA Denial were arbitrary, capricious, and contrary to New York State law, and should be annulled and vacated pursuant to Article 78 of the New York Civil Practice Laws and Rules.

602.    Among the more serious and obvious errors and deficiencies, are the following:

     a.    The ZBA ignored the undisputed facts that the Town Building Inspector granted the First Application, issued the requested building permit, never revoked that

building permit, and in reliance thereon, Plaintiffs built the home which was approved.  The facts are undisputed that all of the homes for which building permits were denied were not in any way materially different from the home built pursuant to the First Application.  Accordingly, the Town Building Inspector acted arbitrarily and capriciously by denying all of the materially identical subsequent building permit applications, and the ZBA Denial's was arbitrary and capricious as well.

b.  The ZBA Denial unlawfully expanded the Town Building Inspector's decision making jurisdiction beyond what the Town Code authorizes.  The Town Code requires the issuance of a building permit if the application complies with the Uniform Code and Energy Code.  There is no dispute that all of the denied building permit applications were fully compliant with both.  Since the Denial Letter and the ZBA Denial both assert bases for denial that have nothing to do with either the Uniform Code or the Energy Code, they are both arbitrary, capricious, and contrary to law.

c.  The ZBA Denial claims that the SEQRA Findings Statement and PDD rezoning Resolution of approval required that the building permit applications had to propose buildings whose architectural design was identical to the specifications set forth in Declaration of Covenants and Restrictions and the Design Guidelines which were appended to the DEIS.  The ZBA Denial completely ignores the undisputed fact that both the Declaration of Covenants and Restrictions, as well as the Design Guidelines, contained express language reserving the right to change either or both in the sole discretion of the declarant

94

and developer of the Project.  Put simply, neither the Declaration of Covenants and Restrictions, nor the Design Guidelines, were written in stone.  Plaintiffs had modified some of the architectural design elements in the Declaration of Covenants and Restrictions and Design Guidelines, and there is no factual dispute that the building permit applications were consistent with the revised architectural guidelines.

d.  The ZBA Denial also stated that the building permit applications were properly denied because Plaintiffs were creating a "change" in the identity and character of the proposed Project homeowners.  This is blatantly discriminatory.  The ZBA Denial describes Original Developer's intended target market for the single-family lots as: "[t]he demographics of the proposed project at Lost Lake will be more consistent with the Eagle Rock Resort," that the Project would be 'an upscale high-end resort development," and that its projects "appeal to the higher income population of the region."  This "stated project purpose and intention [wa]s relevant" to the ZBA.  Upon information and belief, the homes at Eagle Rock Resort are not owned by a significant Hasidic Orthodox Jewish population.

e.  The ZBA Denial also states that "Applicant's counsel also represented [in the October 28, 2021 letter] that 'be advised that my client will be offering reasonably priced and affordable units to Hasidic Jewish families who have a very significant unmet demand for such units.' (R. 24)."  In the October 28, 2021 letter, Plaintiffs' counsel had not stated that the Project would deviate from the Project, or that any of the Project components would be changed.  As

noted above, the Original Developer had also marketed their project at Eagle Rock as being "affordable." The Building Inspector denied Plaintiffs' building permit applications, and the ZBA affirmed such denial, because they believed that the target buyers would be Hasidic Orthodox Jews and not the "upscale," "higher income population of the region" that does not include Hasidic Orthodox Jews, such as the "[t]he demographics of . . . the Eagle Rock Resort." This affirmance of the Building Inspector's building permit application denials demonstrates explicit discrimination against Hasidic Orthodox Jews, was motivated by discriminatory intent against Hasidic Orthodox Jews, and was manufactured for the purpose of preventing Hasidic Orthodox Jews from moving to the Town.

596.    The Town Board's reopening of SEQRA was arbitrary, capricious and contrary to law.  The Developer Plaintiffs filed no discretionary application with the Town that triggered SEQRA.  The Town Board's status as lead agency under SEQRA ended when it issued the Phase 1 subdivision and site plan approvals.  Unless and until the Developer Plaintiffs file a new application for a discretionary approval, the Town Board has no jurisdictional basis under the law to unilaterally reopen SEQRA.  The Developer Plaintiffs have never filed any application, including applications for building permits, that would change the number of homes to be built in Phase 1, the location of such homes, or to seek permission to build anything other than single family homes. The Developer Plaintiffs' exercise of their reserved power to change the design guidelines pursuant the Covenants and Restrictions for the Project is not a lawful basis upon which to reopen SEQRA and require a supplemental environmental review of the Project.  Nor does the Town Board have the power to force the Developer Plaintiffs to file applications to amend the Project's Phase 1 and zoning approvals in order to thereby enable the Town Board to reopen SEQRA.  Because all of the

aforementioned actions of the Town Board in reopening SEQRA were arbitrary, capricious, and contrary to law the reopening of SEQRA should be annulled and vacated pursuant to Article 78 of the New York State CPLR.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs respectfully request that this Court grant the following relief:

A. A declaration that the building permit denials as affirmed by the ZBA Denial are void, invalid and unconstitutional on the ground that their denial violates the Fair Housing Act, the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1982, Article I §§ 3, 11 of the New York State Constitution, and New York Civil Rights Law § 40-c;

B. A declaration that the Town's February 1, 2023 Stop Work Order, the Town Board's Resolution 2023-02, the Town's "Notice Requiring Preparation of a Supplemental Impact Statement for the Project known as Lost Lake Resort," the Town Board's March 30, 2023 Resolution "Adopting SEQRA Positive Declaration and Requiring the Preparation of a Supplemental Environmental Impact Statement for the Lost Lake Resort Property," the Town's January 1, 2023 Notice of Violation and Stop Work Order, and the Town's January 27, 2023 "Stop Work and Compliance Order" are void, invalid and unconstitutional on the ground that their denial violates the Fair Housing Act, the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1982, Article I §§ 3, 11 of the New York State Constitution, and New York Civil Rights Law § 40-c;

C.  A declaration that Defendants' actions denying the Developer Plaintiffs a fair and impartial review of their building permit applications and a fair and impartial ZBA Appeal violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I § 5 of the New York State Constitution;

D.  A declaration that Defendants' actions deprive the Developer Plaintiffs of their property rights in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I § 5 of the New York State Constitution;

E.  A declaration that Defendants' actions denying the Developer Plaintiffs' applications for building permits have caused an unconstitutional taking of Plaintiffs' property in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I §§ 6 and 7 of the New York State Constitution;

F.  A declaration that Hogue's and Gabbard's warrantless entry and search of the Project site property was an unconstitutional search in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article I § 12 of the New York Constitution, and an illegal trespass under New York Law;

G.  A declaration that Defendants' actions in obstructing and delaying the issuance of permits by NYSDEC for the Project violated Article I §§ 6 and 9 of the New York State Constitution;

H.  A declaration that Defendants' actions constitute an unlawful tortious interference with prospective business advantage under New York law;

I.  Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with Defendants from:

    1.  Enforcing the Town's February 1, 2023 Stop Work Order, the Town Board's

Resolution 2023-02, the Town's "Notice Requiring Preparation of a Supplemental Impact Statement for the Project known as Lost Lake Resort," and the Town Board's March 30, 2023 Resolution "Adopting SEQRA Positive Declaration and Requiring the Preparation of a Supplemental Environmental Impact Statement for the Lost Lake Resort Property";

2. Enforcing the Town's January 1, 2023 Notice of Violation and Stop Work Order, and the Town's January 27, 2023 "Stop Work and Compliance Order";

3. Prosecuting the litigation captioned *Town of Forestburgh et al. v. Lost Lake Holdings, LLC et al.*, Index No. E2023-186 and filed on February 3, 2023 in New York state court;

4. Discriminating against the Plaintiffs on the basis of religion or race or otherwise acting in a manner that violates the Fair Housing Act, Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1982, Article I §§ 3, 11 of the New York State Constitution, and New York Civil Rights Law § 40-c;

5. Denying the Developer Plaintiffs due process in a manner that violates the Fourteenth Amendment to the United States Constitution and Article I § 5 of the New York State Constitution;

6. Entering and searching the Developer Plaintiffs' property in a manner that violates the Fourth and Fourteenth Amendments to the United States Constitution, Article I § 12 of the New York Constitution, and an illegal trespass under New York Law; and

      7. Obstructing and delaying the issuance of permits by NYSDEC for the Project in a manner that violates Article I §§ 6 and 9 of the New York State Constitution;

J. Preliminary and permanent orders requiring the Defendants, their officers, employees, agents, successors and all others acting in concert with Defendants to issue building permits to the Developer Plaintiffs, subject only to their compliance with the New York State Uniform Fire Prevention and Building Code and Energy Code;

K. A permanent order enjoining the Defendant, its officers, employees, agents, successors and all others acting in concert with Defendant from enforcing the Town's increase in the Parks and Playground fee from $200 to $2000;

L. An order annulling and vacating the ZBA Denial and the denial of the Third and Fourth Applications, and an order directing the Town Building Inspector to issue the building permits sought in those Applications;

M. An order annulling and vacating the Town Board's reopening of SEQRA;

N. An award of compensatory, consequential, presumed, and punitive damages against Defendants in favor of the Plaintiffs as the Court deems just for:

      1. The loss of Plaintiffs' rights under the Fair Housing Act, the Free Exercise Clause of the First Amendment to the United States Constitution, the Fourth Amendment to the United States Constitution, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1982, and Article I §§ 3, 6, 9, 11 and 12 of the New York State Constitution;

      2. The Defendants' trespass and tortious interference with prospective business

advantage under New York law; and

3. Each incident of discrimination under NY Civil Rights Law 40-c;

O. An award of just compensation for the unconstitutional taking of the Developer Plaintiffs' property;

P. An order precluding the Defendants from imposing any property tax or special levy on the Developer Plaintiffs' property to pay any or all of the damages awarded by the Court;

Q. An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendant's actions and out of this litigation; and

R. Such other and further relief as this Court may deem just and appropriate.

Dated: April 20, 2023

**STORZER & ASSOCIATES, P.C.**

By: _____

ERIC W. TREENE (Bar No. 2568343)
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
Tel: (202) 857-9766
Fax: (202) 315-3996
treene@storzerlaw.com

**SIVE, PAGET & RIESEL, P.C.**

By: _____

STEVEN BARSHOV (Bar No. SB9809)
560 Lexington Avenue
New York, New York 10022
Tel: (646) 378-7229
Fax: (212) 412-1891
sbarshov@sprlaw.com