**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

LOST LAKE HOLDINGS LLC, *et al.*,

                        Plaintiffs,

    vs

TOWN OF FORESTBURGH, *et al.*,

                        Defendants.

Civ. Action No. 7:22-cv-10656

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**SIVE, PAGET & RIESEL, P.C.**
STEVEN BARSHOV (Bar No. SB9809)
Sive, Paget & Riesel, P.C.
560 Lexington Avenue
New York, New York 10022
Tel: (646) 378-7229
sbarshov@sprlaw.com

**STORZER & ASSOCIATES, P.C.**
ERIC W. TREENE (Bar No. 2568343)
ROMAN P. STORZER (admitted *pro hac vice*)
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
Tel: (202) 857-9766
treene@storzerlaw.com
storzer@storzerlaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION .............................................................................................1

FACTUAL BACKGROUND ............................................................................2

    A.    The Plaintiffs and the Lost Lake Project...............................................2

    B.    Prior Owner and Approvals. ................................................................2

    C.    Events Prior to LLH's Purchase of the Project.....................................2

    D.    Response to LLH's Purchase of the Project. .........................................4

    E.    The Town's Review of LLH's Building Permit Applications.................5

    F.    The Appeal to the Zoning Board of Appeals. .......................................9

    G.    The Town's Current Attempts to Stop the Entire Project.....................12

ARGUMENT ...................................................................................................15

PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION PREVENTING THE TOWN FROM ENFORCING ITS DISCRIMINATORY DETERMINATION THAT THE LOST LAKE PROJECT HAS CHANGED BECAUSE OF THE DEMOGRAPHICS OF "HASIDIC JEWISH FAMILIES," AS WELL AS THE NON-EXISTENT LAWS ON WHICH IT RELIES. ................................................15

    A.    Plaintiffs Can Make a Strong Showing of Irreparable Harm................16

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims. .........18

        1.    Fair Housing Act, 42 U.S.C. § 3604. ..........................................18

            a.    Direct evidence of discriminatory intent........................19

            b.    Arlington Heights Factors................................................20

                1)    A discriminatory impact was foreseeable as the Defendants' actions "'bear[] more heavily" on Hasidic Jews than others. ...................................................20

                2)    "The historical background of the decision." ...................21

                3)    "The specific sequence of events leading up to the challenged decision" shows animus toward Hasidic Jews. ...........................................................................21

4)      The Town's actions show significant "departures from the normal procedural sequence.".............................................21

5)      The decision demonstrated "substantive departures" from the Town's decisionmaking. ................................................22

6)      "Contemporary statements by members of the decisionmaking body" and those to whom municipal decision-makers were "knowingly responsive" show animus. ...............................................................................23

7)      The Town had less discriminatory avenues available to address any purported concerns. ........................................24

2.      Fair Housing Act, 42 U.S.C § 3617. ..........................................24

a.      Plaintiffs were engaged in protected activity.................................25

b.      Defendants were aware of the protected activity............................25

c.      Plaintiffs Suffered an Adverse Action. ..........................................25

d.      There was a causal connection between the protected activity and the adverse action........................................................26

3.      42 U.S.C. § 1982 ........................................................................27

4.      Equal Protection Clause, 42 U.S.C. § 1983. ................................27

5.      Free Exercise Clause, 42 U.S.C. § 1983 .....................................28

6.      Substantive Due Process ..............................................................29

C.      The Public Interest Favors Granting Relief. ...........................................29

CONCLUSION................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Amarin Pharma., Inc. v. FDA*, 119 F. Supp. 3d 196 (S.D.N.Y. 2015) ........................................ 30

*Baltazar v. Goldfarb Properties, Inc.*, No. 22-CV-7363 (LTS), 2023 WL 2186326 (S.D.N.Y. Feb. 22, 2023) ............................................................................................................................ 18

*Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738 (2d Cir. 2000), *superseded by rule*, FED. R. CIV. P. 52(a), *as recognized in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2001) ..... 17

*Broome v. Biondi*, 17 F. Supp. 2d 211 (S.D.N.Y. 1997) ............................................................ 26

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000) .............................................................. 28

*BT Holdings, LLC v. Vill. of Chester*, No. 15-CV-1986 (CS), 2016 WL 796866 (S.D.N.Y. Feb. 23, 2016), *aff'd*, 670 F. App'x 17 (2d Cir. 2016) ................................................................... 17

*Burdick v. County of Putnam*, No. 10 CV 624 VB, 2012 WL 360644 (S.D.N.Y. Feb. 2, 2012) . 29

*Burris v. Hous. & Servs. Inc.*, No. 17-CV-9289 (JGK), 2023 WL 1966120 (S.D.N.Y. Feb. 13, 2023) ........................................................................................................................................ 25

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014) ................................................................................................................... 20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ....................... 28

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007) ............................................ 29

*City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115 (2d Cir. 2010) ......................... 16

*Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208 (D.D.C. 2003) ........................................................................................................................................ 23

*Connecticut Hosp. v. City of New London*, 129 F. Supp. 2d 123 (D. Conn. 2001) ..................... 16

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir. 2000) ............................................................ 25

*Dews v. Town of Sunnyvale,* 109 F. Supp. 2d 526 (N.D. Tex. 2000) ........................................... 27

*Dodd v. City University of N.Y.*, 489 F. Supp. 3d 219 (S.D.N.Y. 2020) ...................................... 26

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................... 17

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357 (2d Cir. 2003) ...................................................................................................................................... 15, 16

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144 (2d Cir. 1999) ........... 15, 16

*Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012) ................................................... 17

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) ........... 30

*Hayden v. Paterson,* 594 F.3d 150 (2d Cir. 2010) ...................................................................... 18

*Huntington Branch, National Assoc. for the Advancement of Colored People v. Town of Huntington,* 844 F.2d 926 (1988) ............................................................................................ 18

*Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2d Cir. 1997) ................ 23

*Jones v. Alfred H. Mayer Co.,* 392 U.S. 409 (1968) ................................................................ 27

*Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183 (2d Cir. 2012) .................................... 28

*Kitevski v. City of N.Y.*, No. 04 CIV. 7402 RCC RLE, 2006 WL 680527 (S.D.N.Y. Mar. 16, 2006) .............................................................................................................................. 30

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995) ............................................ 18, 19, 29

*Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418 (S.D.N.Y. 2005), *aff'd*, 212 F. App'x 38 (2d Cir. 2007) .................................................................................................................. 24

*Marks v. BLDG Management Co., Inc.*, No. 99 CIV. 5733(THK), 2002 WL 764473 (S.D.N.Y. Apr. 26, 2002) ...................................................................................................... 25

*Matter of Llana v Town of Pittstown*, 245 A.D.2d 968 (3d Dept. 1997) ...................................... 23

*Mazzocchi v. Windsor Owners Corp.*, No. 11 CIV. 7913 AT, 2013 WL 5295089 (S.D.N.Y. Sept. 17, 2013) .................................................................................................................. 25

*MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390 (E.D.N.Y. 2013), *aff'd sub nom. Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) ......... 19, 24

*Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) ............................... 18, 26, 28

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085 (2d Cir. 1993) .......................... 27

*Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Condo. II*, 457 F. Supp. 2d 126 (E.D.N.Y. 2006) ........................................................................................................ 25

*Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of N.Y.*, 194 F.R.D. 88 (S.D.N.Y. 2000) ................................................................................................................................ 30

*Natale v. Town of Ridgefield*, 170 F.3d 258 (2d Cir. 1999) ...................................................... 29

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ..................... 15, 16

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) .................................... 30

*Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974) ........................................ 27

*Patterson v. Cnty. of Oneida,* 375 F.3d 206 (2d Cir. 2004) ...................................................... 28

*Reynolds v. Barrett,* 685 F.3d 193 (2d Cir. 2012) .................................................................. 28

*Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2d Cir. 1979) ............................................... 11

*Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328 (2d Cir. 1995) .................................................. 16

*Silva v. Farrish,* 47 F.4th 78 (2d Cir. 2022) ......................................................................... 27

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001) ............. 16

*Stockdale v. Hughes*, 173 A.D.2d 1075 (3d Dep't 1991) ......................................................... 10

*Treglia v. Town of Manilus*, 313 F.3d 713 (2d. Cir. 2005) ...................................................... 26

*Tsombanidis v. West Haven Fire Dept.*, 352 F. 3d 565 (2d Cir. 2003) ....................................... 20

*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000) ......................................................................... 17

*United States v. Diapulse Corp. of Am.,* 457 F.2d 25 (2d Cir. 1972) ............................................ 16

*United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181 (2d Cir. 1987).................................... 18, 28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...................... *passim*

*Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001)......................................................... 26

*White v. Julian*, No. C 95-1757 MHP, 1996 WL 40192 (N.D. Cal. Jan. 5, 1996); *aff'd, White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)...................................................................................... 27

*Wilson v. Wilder Balter Partners, Inc.*, No. 13-CV-2595 KMK, 2015 WL 685194 (S.D.N.Y. Feb. 17, 2015) ............................................................................................................................. 25

**Statutes**

42 U.S.C.A. § 1982 (West)...................................................................................................... 16, 27

42 U.S.C.A. § 1983 (West)...................................................................................................... 27, 28

42 U.S.C.A. § 3604 (West) ........................................................................................................... 18

42 U.S.C.A. § 3617 (West) ...................................................................................................... 24, 25

CODE OF THE TOWN OF FORESTBURGH § 68-4 .................................................................................. 7

FAIR HOUSING ACT, 42 U.S.C.A. § 3601, *et seq.* (West)............................................................. 16

N.Y. ENV'T CONSERV. LAW § 8-0101, *et seq.* (McKinney) .................................................. *passim*

N.Y. TOWN LAW § 267 (McKinney) ............................................................................................. 10

Town of Forestburgh Local Law No. 1 of 2020 ........................................................................ 13

**Constitutional Provisions**

U.S. CONST. Amend. I ................................................................................................................... 28

U.S. CONST. Amend. XIV............................................................................................................ 28, 29

## INTRODUCTION

Plaintiffs LOST LAKE HOLDINGS LLC, MISHCONOS MAZAH LLC, RABBI MORDECHAI HALBERSTAM, and ROSE HALBERSTAM ("Plaintiffs") move this honorable Court to enjoin the Defendant TOWN OF FORESTBURGH and its officials and employees from enforcing certain orders and resolutions–and also to prevent Defendants from prosecuting a sham state court lawsuit–all of which prevent Plaintiffs from developing the completely approved Lost Lake Project.[1] These actions are the most recent efforts by the Town to prevent the Project from being constructed because the Project's "demographics" include "offering reasonably priced and affordable units to Hasidic Jewish families." The Town has even gone so far as to attempt to enforce repealed and nonexistent zoning laws to achieve their illegitimate goals.

The Complaint recounts numerous actions by Defendants to stop this Project and prevent Hasidic Jewish families from moving to Forestburgh, including illegal denial of building permits for single-family homes, raising a per-home parkland fee tenfold to render the Project economically non-viable, a pattern of over-assessment of real property taxes, and multiple other acts. After the filing of this civil rights lawsuit in December 2022, Defendants doubled down on their illegal actions to thwart the Project, including issuing notices of violation and stop work orders to enforce a *repealed* Town zoning law, initiating sham state court litigation to halt the Project, and misusing the New York State Environmental Quality Review Act ("SEQRA") to prevent New York State agencies from issuing permits for the Project. A preliminary injunction is necessary to put an end to Defendants' retaliatory measures for filing this suit and the Defendants' continued deprivation of Plaintiffs' civil rights.

---

[1] Specifically, these include a February 1, 2023 Stop Work Order; Town Resolution 2023-02; the Town's March 30, 2023 Resolution; and a civil action captioned *Town of Forestburgh, et al. v. Lost Lake Holdings LLC, et al.*, Index No. E2023-186 (Sup. Ct. Sullivan Cy.).

**FACTUAL BACKGROUND**

**A.    The Plaintiffs and the Lost Lake Project.**

Plaintiffs Lost Lake Holdings LLC and Mishconos Mazah LLC are single-purpose real estate development companies (collectively, "LLH") whose principals are Hasidic Orthodox Jews. Declaration of Yehuda Miller dated June 1, 2023 ("MD") ¶¶ 1, 5-7, 14-15; Declaration of Mordechai Halberstam dated June 1, 2023 ("HD") ¶¶ 4-6.  In the summer of 2020, LLH purchased a shovel-ready, mixed-use primarily residential subdivision in the Town of Forestburgh, Sullivan County, New York known as the Lost Lake Resort (the "Project").  MD ¶¶ 8-10, 40.

**B.    Prior Owner and Approvals**

The Planned Development District ("PDD") rezoning for the seven-phase Project was obtained in 2011 by the previous owner, Double Diamond Resorts, Inc., a real estate developer from Texas whose principals and officers are not Orthodox Jews.  MD ¶¶ 11, 12, 122 & **Exh. GGG**.  The first phase of approximately 400 single-family lots and the first nine holes of the golf course received final subdivision and site plan approval in 2013.  MD ¶¶ 18-19 & **Exh. C** at 1-6; *id.* ¶ 20 & **Exh. D** at 2-3.  Phase 1 of the Project had obtained approvals from all other governmental agencies, and was therefore "shovel-ready," needing only the issuance of building permits for single family homes to be built.  MD ¶¶ 20-22 & **Exh. D** at 2-3.  The Town strongly supported the Project when it was being developed by Double Diamond.  Affidavit of Todd W. Price dated May 10, 2023 ("PA") **Exh. A** at 2, **Exh. B** at 3, **Exh. C** at 4; BD ¶ 32 & **Exh. Y** at 2-3; MD ¶ 17 & **Exh. B** at 5; *id.* ¶ 16 & **Exh. A** at 4-5.

**C.    Events Prior to LLH's Purchase of the Project.**

While Double Diamond had no connection to the Orthodox Jewish community (MD ¶ 12), fears about that community began manifesting early in the Town, with residents expressing

concern that the Project could draw Hasidic Jewish home buyers.[2]  MD ¶ 17 & **Exh. B** at 5 ("people

who just love to pack themselves into a house like beavers."); *id.* ¶ 23 & **Exh. E** at 2; *id.* ¶ 120 &

**Exh. EEE** at 4.  Town officials agreed with these sentiments.  MD ¶ 120 & **Exh. EEE** at 4.

In 2016, a newly elected Town Board appointed a new Planning Board Chair, Richard

Robbins,[3] and revived the Comprehensive Plan Review Committee (later redesignated as a Board).

MD ¶ 27 & **Exh. G** at 3-4; *id.* ¶ 28 & **Exh. H** at 10-11.  In August 2016, Justin Evans[4] (who was

appointed to be a Comprehensive Plan Review Committee member, MD ¶ 28 & **Exh. H** at 10-11)

sent an email to the Town Supervisor, the Planning Board Chair, the Zoning Board of Appeals

("ZBA") Chair, and other Town officials, expressing his fear that a:

> Religious group buys up hundreds of homes/parcels, and takes control of the HOA.
> It would take only about 300 new registered voters in town to remove/install the entire
> elected town structure  As has happened in countless other communities, the religious
> block defunds the town, and changes zoning to allow high density, etc  The
> community is wrecked forever.  Please don't let this happen.

PA **Exh. E** at 9.  Significantly, he called this the "worst-case thesis" of his "<u>Hartwood friends</u>."

*Id.* (emphasis added).  "Hartwood" refers to the Hartwood Club, a hunting and fishing club located

---

[2] In 2000, the then-Town Supervisor stated: "They are not the visitors we need to attract . . . . There are visions of Sullivan County becoming larger than Kiryas Joel."  PA **Exh. D** at 2.

[3] Robbins played a key part in the Town's efforts against the Plaintiffs.  BD ¶ 33 & **Exh. Z** at 2 (Town Board minutes for November 5, 2020 discussing Robbins' role with respect to hiring the consultant and land use attorneys).  Mr. Robbins was designated by the Town Supervisor as the "point person" to discuss the Project, and Plaintiffs were told to speak with him directly.  Declaration of Isaac Rosenberger dated June 1, 2023 ("RD") ¶¶ 1, 5-7 & **Exh. A**; MD ¶ 26.

[4] Evans, who is also a board member of the Hartwood Club (MD ¶ 29 & **Exh. I**; *see infra*), also played a key role in working with the Town to keep out "a religious voting block community" (PA **Exh. E** at 9).  While he had supported the Project when it was pursued by Double Diamond (MD ¶ 30 & **Exh. J** at 2), once it was placed for sale, he engaged in discussions with Town officials in 2019 about issues such as whether it would be possible to build a religious building within the site, and stated that a competing developer's attorney had "threatened" that a "religious group" would buy the project.  MD ¶ 31 & **Exh. K** at 6.  At the November 2020 Town Board Meeting, Evans urged Forestburgh to hire a law firm to provide "real litigation advice" and pay for that advice from the Project escrow, which is exactly what the Town did.  Declaration of Steven Barshov dated June 1, 2023 ("BD") ¶ 33 & **Exh. Z** at 4.

in the Town.  MD ¶ 29 & **Exh. I**.  As discussed below, Hartwood has injected itself into Town proceedings, in particular laying out a strategy in the appeal by LLH to the ZBA of the denial of single-family home building permits, which the Town has followed.  MD ¶ 70 & Exh. KK.  Evans also made the following statements demonstrating his hostility toward Orthodox Hasidic Jews:

- "LLH was going to make Lost Lake a Hasidic community"
- He asked "how single Jewish mothers of 8 could afford $400,000-$500,000 homes?"
- "Hasidic people are not legally married, only married religiously, and most of them are on welfare abusing the system."
- He asked a representative of LLH if he had "ever been to Kiryas Joel and stated that Kiryas Joel is the second most dirty town in the State.  He said that from my phone number he knew I was aware of Lakewood, NJ . . . and told [the representative] about the garbage everywhere."  MD ¶ 121 & **Exh. FFF** at 2.

By 2019, Double Diamond had decided to sell the Project (MD ¶ 37 & **Exh. N** at 3), causing significant fear among Town residents that a Jewish developer would purchase it.  *See* MD ¶ 31 & **Exh. K** at 5-6 (fear of "religious group" discussed at Planning Board meeting).  These minutes record that the mother of the Town Supervisor was "upset" about "comments indicating that a religious group would purchase the Lost Lake property" (MD ¶ 31 & **Exh. K** at 5) after a broker threatened that a religious group would buy it.  MD ¶ 41 & **Exh. P** at 5.  Comments to news sites and social media[5] included statements such as "Hasidics will buy it and destroy it."  PA **Exh. F**.

**D.     Response to LLH's Purchase of the Project.**

In July 2020, Plaintiffs closed on their purchase of the Project and the Project Site, acquiring all rights to the Site, development rights, approvals, and infrastructure.  MD ¶¶ 35-36.

---

[5] Various Town officials, including Town Supervisor Hogue, Town Board member Susan Parks-Landis, Town Board Member Vincent Galligan, Jr., Town Clerk Joanne Nagoda, Planning Board Member Tony Cardoso, Planning Board Member Alan Devlin, Planning Board Member Susan Hawvermale, Planning Board Member Katherine Barnhart, Zoning Board of Appeals Member James Steinberg, Comprehensive Plan Review Committee Member Dana Taylor, and Comprehensive Plan Review Committee Member Gillian Kaiser are members of a Facebook group that have included such discussions about Hasidic Jews and the Project.  PA **Exh. G**.

Once the religious identity of the principals became known, the outpouring of anti-Semitic hostility was immediate.  Public comments in response to newspaper articles about the purchase included statements such as "Dirty money, endless money, amazon scammers, jewish mafia," "you wonder why the Germans did what they say they did," and "[i]t already smells like sewage. In [sic] Sullivan from putting up the first round of condos for the hissidics [sic] . . . ."[6]  PA **Exh. H** at 2, 3; *id.* **Exh. I**.  In August 2020, the Town's Supervisor assured his constituents that as to the new buyers: "There will be <u>much more oversight</u> than Lost Lake had."   BD ¶ 34 & **Exh. AA**.

During the fall of 2020, the Town Board was urged specifically by Justin Evans of the Hartwood Club to retain special outside counsel for matters pertaining to the Project (to be paid for by the developer), comments echoed by Chairman Robbins.  BD ¶ 33 & **Exh. Z** at 2.

At its July 2, 2021 meeting and prompted by Robbins, the Town increased its per-lot Parks & Playground fee tenfold, from $200 to $2,000, knowing that the Project and no other development in the Town would be subject to it.  BD ¶ 26 & **Exh. V** (among Board members it was noted that Lost Lake's Phase I paid the lower rate, but there were "several more phases to come.").  This act alone will increase the cost of future phases of the Project by approximately $3,882,000.  MD ¶¶ 43-44.  The Town adopted other laws and took other actions designed to impede and ultimately prevent the Project from being developed, including misuse of Project application review escrow funds to pay for non-eligible expenses (particularly the Town's outside counsel), imposition of a development moratorium, and over-assessing the Project properties owned by Plaintiffs.  MD ¶¶ 63-68 & **Exh. DD** at 8, **Exh. EE** at 4, **Exhs. FF-II**; BD ¶ 11 & **Exh. G**; MD ¶ 124 & **Exh. III**.

**E.     The Town's Review of LLH's Building Permit Applications.**

On November 17, 2020, Plaintiff LLH's contractor filed a building permit application for

---

[6] In comparison, the Project previously generated only positive comments.  PA **Exh. A**.

construction of one single-family home in the Project (Lot 301).  MD ¶ 45, **Exh. R** at 1-2.  That application was reviewed routinely by the Town Building Inspector, Glenn Gabbard, and granted.  MD ¶ 46, **Exh. S.**  LLH then commenced construction of the single-family home.  MD ¶ 47.

However, by the time Plaintiffs submitted another building permit application in June 2021, the Town Board had retained special outside litigation counsel, Javid Afzali from the Harris Beach law firm, and outside consultant Chuck Voss,[7] paid for by the Plaintiffs out of their escrow.[8] BD ¶ 28 & **Exh. W** at 2; *id.* ¶ 33 & **Exh. Z** at 2; MD ¶ 42 & **Exh. Q** at 2; *id.* ¶ 50 & **Exh. T** at 4.  Even though there was no material difference between the first building permit application and the new one (MD ¶ 48), the review by the Town was entirely different.  Question after question was posed supposedly coming from Gabbard, but as was confirmed by the Building Inspector himself, the actual decision of whether to issue the building permit was out of his hands and was being orchestrated by Afzali and Robbins.  Declaration of Zalman Stein dated June 1, 2023 ("SD") ¶¶ 1, 5-12 & **Exh. A**; BD ¶ 12 & **Exh. H** at 2; *id.* ¶ 5 & **Exh. A** at 43:4-45:25; *id.* ¶ 25 & **Exh. U.**

On June 25, 2021, Gabbard sent LLH's contractor's representative, Zalman Stein, an email containing erroneous bases as to why the permits had not been issued.  SD ¶¶ 1, 10 & **Exh. A**.  Not coincidentally, this was preceded by Afzali spending numerous hours "researching" the Project even though no application before the Town was then pending.  BD ¶ 12 & **Exh. H** at 2 (June 1 & 3, 2021 items).  Gabbard's email incorrectly stated that required permits from other governmental agencies had not been issued and precluded issuance of building permits.  That objection was demonstrated to be baseless when Plaintiffs provided copies of all of the required permits.  BD ¶ 6

---

[7] Contrary to its normal practices, the Town never posted the Minutes of the November 5, 2020 meeting where it was decided to hire Voss and a "litigation" firm.  MD ¶ 25.

[8] The Town agreed to pay the firm $350 per hour for matters paid for by the Plaintiffs, and $225 per hour for matters invoiced to the Town.  MD ¶ 51 & **Exh. U.**

& **Exh. B** at 1.  Equally nonsensical, Gabbard stated that "conditions" of the Phase 1 *preliminary* site plan and subdivision approvals needed to be met (SD ¶ 10 & **Exh. A**), even though Phase 1 had been issued final approvals.  MD ¶ 18 & **Exh. C** at 1-5.  Indeed, had such final subdivision and site plan approvals not been issued, Gabbard never could have issued the first building permit.

A letter signed by Gabbard was sent to LLH on August 18, 2021, again alleging meritless deficiencies (which were not raised with the first house) with the Application.  BD ¶ 7 & **Exh. C**. LLH's counsel refuted each and every purported deficiency.  BD ¶ 8 & **Exh. D** (response letter from Plaintiffs' attorney Barshov).  The Town never responded to Barshov's letter.  *Id.* ¶ 27.

Instead, the Town tried a different tactic.  Voss wrote a memorandum about the Project on October 5, 2021, which was inaccurate and exceeded the scope of any permissible inquiry as to a building permit application.  BD ¶ 9 & **Exh. E** at 5-12; Code of the Town of Forestburgh (hereinafter "Town Code," available at https://ecode360.com/FO0593) § 68-4(F).  For example, he absurdly stated that "all site infrastructure improvements for Phase I (and all subsequent phases) are to be completed . . . prior to issuance of any building permits," which is impossible because future phases of the Lost Lake development had not yet been approved.  BD ¶ 9 & **Exh. E** at 6.

LLH's representatives attempted to contact Gabbard after further correspondence (BD ¶ 9 & **Exh. E**), but he stated that the decision to approve or disapprove the second Application was out of his hands (SD ¶ 11) and further attempts to meet with the Town Supervisor and Gabbard were ignored.  RD ¶¶ 7-12 & **Exhs. A** and **B**.  On October 28, 2021, LLH's counsel issued a letter detailing why each basis for not issuing the building permit, including Voss' memorandum, had no basis in either fact or law.  Mr. Barshov also stated that the Town's obstruction and refusal to issue the building permit was precluding LLH from providing units at a reasonable and affordable price to the Orthodox Jewish community.  BD ¶ 10 & **Exh. F** at 2.

Then, on November 23, 2021, in a denial letter (the "Denial Letter"), the Building Inspector formally denied the building permit Application.  MD ¶ 52 & **Exh. V**.  The Denial Letter did not reference any noncompliance with the Uniform Fire Prevention and Building Code, the Energy Code, or any other technical requirement, or take issue with any of the contents of Mr. Barshov's October 28, 2021 letter.  *Id.*; Town Code § 68-4(F).  The only specific reason stated for the denial was the statement in Mr. Barshov's letter that the units will be offered at a reasonable and affordable price to the Orthodox Jewish community.[9]  MD ¶ 52 & **Exh. V** at 1.  It contrived the idea that Plaintiffs intended to change the project to be an "affordable housing community" (*id.*), a falsehood that was later repeated by Afzali.  MD ¶ 53 & **Exh. W** at 3.  The Denial Letter also stated that LLH did not explicitly reaffirm that it would construct all of the Project's amenities (MD ¶ 52 & **Exh. V** at 1); however, the only amenity to be built in Phase 1 is the first nine holes of the golf course, which Plaintiffs have always intended to build (MD ¶¶ 95-96), never said otherwise, and which was not the subject of the Application.  Plaintiffs' subsequent application for an additional fourteen building permits was also filed and summarily denied by the Building Inspector for identical reasons.  MD ¶¶ 61-62 & **Exhs. BB** and **CC**.[10]

On February 10, 2022, the Town's Clerk informed Plaintiffs that the Town community had concerns that Plaintiffs would use one of the amenity buildings in the Project plan as a Yeshiva, and that they would try to take the entire Project off the tax rolls.  MD ¶ 92.  The Town Clerk also

---

[9] Double Diamond had previously prepared a marketing video that was shown to the ZBA on August 10, 2022 (MD ¶ 55; **BD** ¶ 20 & **Exh. P** at 24:2-26:21) in which it stated that the lots in its twin comparison project that it was selling would be "affordable."  MD ¶ 54 & **Exh. X**.

[10] When the Denial Letter was posted on Facebook by a local newspaper columnist, local residents confirmed their anti-Jewish animus, accusing LLH of seeking to build "low income housing" for Hasidic Jews, a (false) sentiment echoed by the Town itself, *see supra*; that "big money people of the sect buy these houses and rent to section eight people so the taxpayers wind up paying off the houses"; and that Orthodox Jews will "use our town parks and filthy them up clutter them with hundreds of kids."  PA **Exh. K**.

said that the community is concerned that Plaintiffs would not build the golf course and that she had never seen Hasids play golf.  MD ¶ 93.  Similarly, a Commissioner of the Forestburgh Fire Department told Mr. Miller, Plaintiffs' representative, that most Town residents have a "fear" of the "bloc vote" controlling the Town, comparing the Town to Kiryas Joel and other developments where homes are owned by Hasidic Orthodox Jews.  MD ¶ 94.

## F.     The Appeal to the Zoning Board of Appeals.

LLH and its contractor, Rose Improvement ("Rose"), appealed the denial of the building permits to the ZBA (BD ¶ 13 & **Exh. I**), where they received nothing even remotely resembling a fair and impartial hearing before the ZBA.  The supposedly impartial ZBA was represented by Attorney Afzali, who was intimately involved with and counseled the Town Building Inspector in connection with the building permit denials, *see* BD ¶ 12 & **Exh. H** at 2-7; BD ¶ 14 & **Exh. J** at 1-2.  Thus, the *same* attorney who had counseled the Town Building Inspector (and likely drafted his denial letter (*see* BD ¶ 12 & **Exh. H** at 6) was then appointed to counsel the "impartial" body that was to review the appeal of the denial of the building permit applications.  Equal absurdly, other attorneys from Afzali's firm represented the Building Inspector and the Town at the ZBA hearing.[11]  BD ¶ 15 & **Exh. K** at 2.  The ZBA did nothing, refusing to disqualify Mr. Afzali or otherwise address this obvious unfairness in any way.  *Id.* at 3-10.

There were other procedural irregularities.  The ZBA sustained virtually all objections by Afzali's colleague.  BD ¶ 5 & **Exh. A** at 7, 31, 33, 68, 70.  The ZBA members were seen to be

---

[11] Mr. Afzali and his colleague, Meaghan Feenan, can be seen on video texting one another during the proceedings on July 19, 2022.  Declaration of Efraim Wagschal dated June 1, 2023 ("WD") ¶¶ 1-8 & **Exh. A** at 00:36.  This was despite Barshov's prior objection to texting between Afzali and Elliott Hallek, another colleague from the Harris Beach firm representing the building department, at the June 22, 2022 hearing.  WD ¶¶ 9-10 & **Exh. A** at 11:38-12:50; BD ¶ 15 & **Exh. K** at 67.  There, when the ZBA Chair asked Afzali if he and his colleague were texting each other, Afzali refused to answer.  *Id.*

secluded with the Building Department's special counsel immediately after the June 23, 2022 ZBA hearing.  MD ¶¶ 97-98.  The ZBA refused to issue a subpoena to compel Voss to testify or issue any subpoenas, even though such action is authorized by New York's Town Law 267, subdivision 10, and has been explicitly recognized by New York courts.  *See Stockdale v. Hughes*, 173 A.D.2d 1075, 1077 (3d Dep't 1991); BD ¶ 5 & **Exh. A** at 105:21-113:22; *id.* ¶ 18 & **Exh. N** at 75:14-76:6; *id.* ¶ 16 & **Exh. L** at 49:13-52:24, 110:6-116:17; *id.* ¶ 17 & **Exh. M** at 174:23-176:20; *id.* ¶ 19 & **Exh. O** at 2.  It also refused to accept into the record Plaintiffs' submissions regarding the unfairness of the proceedings.  BD ¶ 23 & **Exh. S** at 36:3-57:8.

In order to generate a pretext to prevent the Project from being developed (and therefore prevent Hasidic Orthodox Jews from moving to the Town), the Town increasingly focused on the fact that LLH had amended–as was its right under the approval obtained from the Town[12]–certain restrictive covenants and had adopted design guidelines for homes in Phase 1, and then claimed that these changes in exterior appearance purportedly caused the Project to be materially different from the Project approved by the Town Board.[13]  MD ¶ 60 & **Exh. AA** at 23.

On November 15, 2022, the ZBA met to rule on the appeal.  MD ¶ 69 & **Exh. JJ**.  The meeting lasted only twenty minutes.  *Id.*  There was no discussion of any of the issues, the evidence, or the written resolution Afzali presented for adoption (*see* MD ¶ 125 & **Exh. JJJ** at 2:24-3:2, 6:18-20, 10:2-11:12; WD ¶¶ 1-6, 9-10 & **Exh. B** at 11:38-12:50); rather, the ZBA simply met and unanimously approved a Resolution affirming the denial of the building permit applications.  *Id.*;

---

[12] The restrictive covenants (and even the draft design guidelines) contained express reservations–which existed when the Town Board issued its Project approvals–that the developer reserved the right to amend those covenants.  MD ¶ 56 & **Exh. Y** at 4; MD ¶ 57 & **Exh. Z** at 4.

[13] Foreshadowing the Town's later actions that are sought to be enjoined in this Motion, the Hartwood Club submitted an "amicus brief" which went far beyond the scope of the appeal and asserted that "the entire reopening of SEQRA and/or the rescinding of the prior subdivision approval" may be warranted.  BD ¶ 24 & **Exh. T** at 5.

MD ¶ 60 & **Exh. AA**  at 36.  The ZBA's reasons were explicitly discriminatory:

> While LLH's intent to expand the <u>demographics</u> of the Resort Project can be
> reasonably inferred from LLH's amendments to the 2013 CC&R and 2013 Design
> Guidelines [sic], representations by its counsel confirm the change (R. 24 [LLH
> counsel stating 'be advised that my clients will be offering reasonably priced and
> affordable units <u>to Hasidic Jewish families</u> who have a very significant unmet
> demand for such units'])."

MD ¶ 60 & **Exh. AA** at 28 (alteration in original, emphases added); *see id.* at 5-6, 16-17 (noting

same as the basis for the Building Inspector's denial).  The ZBA took issue with Plaintiffs' desire

to "accommodate 'a diverse and inclusive community, with homes at Lost Lake being attainable

to a broad range of demographics' . . . ."  MD ¶ 60 & **Exh. AA** at 28.  The ZBA determined that

Hasidic Jewish families would not be consistent with the "upscale," "higher income population of

the region" preferred by the Town.  MD ¶ 60 & **Exh. AA** at 7, 8 n.7, 19.  This "change" in the

character of the homeowners was "relevant" to the ZBA.  MD ¶ 60 & **Exh. AA** at 17, 35.

While the ZBA also stated an additional (and pretextual) justification–inconsistency with

nonexistent "2013 Design Guidelines"[14]–the Court need not consider it if it determines that the

evidence supports a finding of discriminatory motivation as well.[15]  Nevertheless, that conclusion

was erroneous and nonsensical but for the Town's discriminatory motivation.  MD ¶ 60 & **Exh.**

**AA** at 29, 35, 29-30.  Plaintiffs have always intended–and continue to intend–to build the Project

in conformity with the Project approvals, as the Town was aware.  MD ¶ 95; BD ¶ 34 & **Exh. AA**

at 2 (Supervisor Hogue stating that Plaintiffs "plan on building it as it was approved"); BD ¶ 29

(Plaintiffs' counsel confirmed to Afzali that Plaintiffs would not seek to modify Phase 1).

---

[14] No "2013 Design Guidelines" ever existed, as only a *draft* version was created in 2010
that was never adopted; did not exist until 2021.  MD ¶¶ 58-59, 99-100.

[15] *See Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1042 (2d Cir. 1979) ("race need
not be the sole motivating factor in a denial that has a discriminatory effect in order for the plaintiff
to succeed . . . .  The denial violates s 3604(a) if race is even one of the motivating factors.").

**G.**     **The Town's Current Attempts to Stop the Entire Project.**

In response to Plaintiffs' commencement of this litigation, Defendants have undertaken a number of illegal actions to prevent any element of the Project from moving forward (even necessary infrastructure for the Project such as road clearing and installation of utilities and water treatment facilities (MD ¶¶ 89-90)), including attempting to enforce *repealed* laws against the Plaintiffs.   These actions further implement the discriminatory ZBA Decision, and track the approach advocated by the Hartwood Club and Evans in their "amicus" submissions to the ZBA and similar submissions to the Town Board.[16]

On New Year's Day, Sunday, January 1, 2023, the Town affixed a Notice of Violation and Stop Work Order ("SWO") on the Project Site.  MD ¶ 71 & **Exh. LL**.  The Notice inexplicably stated that the permit for the one home that had been built had expired.  MD ¶ 72 & **Exh. MM**.  In fact, construction of the home had been completed months earlier while the permit was active. MD ¶ 75.  When LLH sought information about it, the inspector ignored nearly all calls and emails, hanging up the phone without providing any answers the one time he picked up the phone. MD ¶¶ 73-79 & **Exhs. NN-QQ**; Declaration of Jack Gold dated June 1, 2023 ("GD") ¶¶ 1, 5-8 & **Exh. A**.

On February 1, 2023, the Building Inspector issued another set of violations, which was served on LLH by certified mail and received weeks later.  MD ¶¶ 80-81 & **Exh. RR**.  These stated that LLH and Rose were required*, inter alia*, to "immediately cease all construction activities" on the Property.  MD ¶ 81 & **Exh RR** at 1-2.  However, in order to attempt to shut down the entire Project, the Town relied on zoning laws that did not exist because the Town Board had already

---

[16] Soon after the ZBA Decision, a lengthy letter from the Hartwood Club was entered into the minutes of the December 1, 2022 Town Board meeting, demanding that SEQRA review be reopened.  MD  ¶ 123 & **Exh. HHH** at 1-6.

repealed them.[17]  *See* MD ¶ 81 & **Exh. RR** at 1-2 ("violations" under the PDD Law sections 85-18, 85-19 and 85-21); MD ¶ 38 & **Exh. O** (Town Local Law No. 1 of 2020, *repealing* PDD laws, including sections 85-18, 85-19 and 85-21).  Gabbard relied first on a purported section 85-21 of the Town Code (initially mistakenly referred to as "sec. 85-121," which never existed) for supposed violations related to inspection fees, notice, scheduling, and guarantees.  MD ¶ 81 & **Exh. RR** at 2.  Gabbard also relied on a purported section 85-18 for a supposed violation related to extensions.  Neither of these sections exist in the Town Code.  Additionally, relying on no legal authority whatsoever, the stop work order purported to eliminate the Site Plan Approval already granted for the Project by claiming that the project is somehow now "unapproved."  MD ¶ 81 & **Exh. RR** at 1.  In addition, the Town's notice orders the Plaintiffs to file an application with the Town Board to re-open the entire Project approval and review (MD ¶ 81 & **Exh. RR** at 3), something that LLH will not do (especially since it is committed to constructing the Project as approved), and which Gabbard had absolutely no authority to order.  Town Code § 68-3.

The next day, at the February 2, 2023 Town Board meeting, correspondence from Evans on behalf of the Hartwood Club was entered into the minutes that overtly attacked the Plaintiffs.  MD ¶ 82 & **Exh. SS** at 3.  After Justin Evans' attack on Plaintiffs, in which he claimed (using an anti-Semitic stereotype): "[t]his developer has a group of investors who want to maximize their rate of return. He knows this has absolutely nothing to do with religion. It's disgusting what's [sic] he's willing to say and do, for money," the Town Board went into executive session, following

---

[17] The Town has also claimed that illegal paving occurred in violation of Town Code section 148-25(E).  MD ¶ 81 & **Exh. RR** at 2; *id.* ¶ 85 & **Exh. TT** at 5.  This was false (MD ¶ 101) and when Plaintiffs' attorney called and asked Afzali to identify the location of the alleged illegal paving, he refused to do so.  BD ¶¶ 30-31 & **Exh. X**.

which it adopted Resolution 2023-02.[18]  MD ¶ 88 & **Exh. WW** at 10.  In that Resolution, the Town

Board did exactly what the Hartwood Club demanded from the filing of its amicus brief and recent

submissions to the Town Board:[19]  It purported to reopen the SEQRA process for the Project and

require a Supplemental Environmental Review, suspended all permits and approvals granted to the

Project, and provided that "any construction or land disturbance activities permitted thereunder are

no longer authorized" until said review.  It also authorized commencement of litigation against

LLH to achieve compliance with its terms.  *Id.* at 13.  The Town reconfirmed this on March 30,

2023, when it adopted a "Resolution" "Adopting SEQRA Positive Declaration and Requiring the

Preparation of a Supplemental Environmental Impact Statement," which requires Plaintiffs to

restart the lengthy and expensive SEQRA review process.  MD ¶ 91 & **Exh. XX** at 12-14.

On February 3, 2023, the Town commenced litigation in state court, seeking an injunction

precluding any further construction, installation of infrastructure, and disturbance of the land.  MD

¶ 85 & **Exh. TT**.  Like the stop work order, the state court litigation relies on the same repealed

PDD Law provisions (as well as section 85-17, also repealed).  *Id.* ¶¶ 262-72.  Both the February

1, 2023 stop work order and the state complaint also rely on the ZBA's discriminatory

determinations.  MD ¶ 85 & **Exh. TT** at ¶¶ 21-23 (citing the November 15, 2022 ZBA decision,

this lawsuit and the February 1, 2023 Notice of Violation); MD ¶ 81 & **Exh. RR** at 1 (citing the

---

[18] This was even though the Project was never placed on the Board's Agenda for the meeting and Supervisor Hogue made the statement that "Lost Lake is not on the agenda today." *Id.* at 3; MD ¶¶ 83-84.

[19] On November 30, 2022, the Hartwood Club submitted a letter to the Town Board, again arguing that the Town should reopen SEQRA review for the Project.  MD ¶ 86 & **Exh. UU**. Correspondence from Justin Evans, "on behalf of the Hartwood Club Board of Trustees," was made part of the Town's February 2, 2023 meeting minutes in which Evans demanded that "rogue developer" LLH be held "accountable."  MD ¶ 82 & **Exh. SS**.  The Township's February 2 action was directly responsive to Justin Evans and the Hartwood Club's efforts.  Meanwhile, the Board refused to accept the only amicus brief supporting some of Plaintiffs' claims.  BD ¶ 21 & **Exh. Q**.

November 15, 2022 ZBA decision).

On February 9, 2023, the Town Board, in another abuse of its power, gave notice to all third party-governmental agencies that would have to issue approvals for the Project that SEQRA review had been reopened, in order to preclude any other permits or approvals from being issued. MD ¶ 87 & **Exh. VV**. The absence of the third-party approvals and the SWO prevent the construction of infrastructure, including the installation of miles of sewer lines, water lines, access roads, the Project's water treatment plant and water tanks and other associated work.  MD ¶ 90. All of these actions undertaken after the commencement of this litigation are for the sole purpose of preventing LLH from ever constructing the Project.

## ARGUMENT

**PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION PREVENTING THE TOWN FROM ENFORCING ITS DISCRIMINATORY DETERMINATION THAT THE LOST LAKE PROJECT HAS CHANGED BECAUSE OF THE DEMOGRAPHICS OF "HASIDIC JEWISH FAMILIES," AS WELL AS THE NON-EXISTENT LAWS ON WHICH IT RELIES.**

The Second Circuit's standard for a preliminary injunction requires a showing of:

(1) "irreparable harm"; (2) "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party"; and (3) "that a preliminary injunction is in the public interest." *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted).

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  This is the standard used in cases brought under the FHA.  *See Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 365 (2d Cir. 2003); *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149-51 (2d Cir. 1999).  The Second Circuit has noted, in upholding a grant of a preliminary injunction, "the Supreme Court's admonition that the [FHA] be given a

'generous construction,' based on the importance of the anti-discrimination policies that it vindicates. " *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 335 (2d Cir. 1995). In considering a request for a preliminary injunction, the Court is also to assume as true the facts in Plaintiffs' complaint and "construe the complaint in their favor." *Fair Hous. in Huntington Comm. Inc.*, 316 F.3d at 362 (the "appropriate standard to apply at this stage of the proceedings is more analogous to that applied to a motion to dismiss").

      A.    <u>Plaintiffs Can Make a Strong Showing of Irreparable Harm.</u>

Irreparable harm is "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Actavis*, 787 F.3d at 660 (quoting *Forest City*, 175 F.3d at 153 (internal quotation marks omitted)). The type of harm at issue here— which arises under civil rights statutes (the Fair Housing Act, 42 U.S.C.A. § 3601, *et seq.* (West) and 42 U.S.C.A. § 1982 (West)) and the federal and New York Constitutions (free exercise, freedom of worship, and freedom of association)—strongly demonstrates irreparable harm. "[W]hen the party seeks a statutory injunction, [the Second Circuit] ha[s] dispensed with the requirement of showing irreparable harm, and instead employ a presumption of irreparable harm based on a statutory violation." *City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010) (citing *United States v. Diapulse Corp. of Am.,* 457 F.2d 25, 27 (2d Cir. 1972)). *See also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("We have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation"). "[I]rreparable harm may be presumed" where "plaintiffs have established a likelihood of success on their claim that their rights under the FHA have been violated." *Connecticut Hosp. v. City of New London*, 129 F. Supp. 2d 123, 128 (D. Conn. 2001).

The same applies to Plaintiffs' constitutional rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (citation and internal quotation marks omitted) ("violations of First Amendment rights are <u>presumed irreparable</u>" (emphasis added)); *Brewer v. W. Irondequoit Cent. Sch. Dist.,* 212 F.3d 738, 744-45 (2d Cir. 2000) (same, for Equal Protection Clause claims), *superseded by rule*, FED. R. CIV. P. 52(a), *as recognized in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2001).

In addition to the statutory and constitutional injuries justifying preliminary relief described above, the Town's most recent actions–taken in retaliation for the Plaintiffs filing this action, *see infra*–should be enjoined as outrageous and lawless actions that compound the statutory and constitutional harms. The retaliatory actions, including the issuance of violations and stop work orders and the related state court litigation based on a repealed ordinance, as well as demanding a re-opening of SEQRA, are an attempt to thwart the Plaintiffs' efforts to vindicate their civil rights and to prevent any construction or infrastructure from moving forward. If not enjoined, the Defendants' actions will have a substantial effect on the ability of Hasidic Orthodox Jews to obtain housing and will substantially harm the Plaintiffs. Through its SWOs and demand that Plaintiffs begin the SEQRA process anew, at the very best the Defendants will be adding unnecessary *years* to the development, as well as subjecting Plaintiffs to redundant review by Town officials and bodies with known discriminatory animus. *See, e.g., Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012) (describing "lengthy SEQRA review process"); *BT Holdings, LLC v. Vill. of Chester*, No. 15-CV-1986 (CS), 2016 WL 796866, at *1 (S.D.N.Y. Feb. 23, 2016), *aff'd,* 670 F. App'x 17 (2d Cir. 2016) (SEQRA review "took approximately four years"). In this particular case, the SEQRA review took approximately four years. MD ¶ 102. The harm here is irreparable.

17

B.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

There is a very high likelihood of success on the merits of Plaintiffs' claims.  Motivated by

discriminatory animus, Defendants' hostility to the idea of Hasidic Jews living in the Project has

now extended to enforcing laws that do not even exist.

### 1.      Fair Housing Act, 42 U.S.C. § 3604.

"The Fair Housing Act makes it unlawful '[t]o refuse to sell or rent . . . or otherwise make

unavailable or deny, a dwelling to any person because of [race] . . .[or]. . . religion.' 42 U.S.C.

§ 3604(a)." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *see Shaare Tefila*

*Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (anti-Semitism is also racial discrimination).

"An FHA violation may be established on a theory of disparate impact or one of disparate

treatment." *Id.* at 425 (citing *Huntington Branch, National Assoc. for the Advancement of Colored*

*People v. Town of Huntington,* 844 F.2d 926, 934-35 (1988)).  "A plaintiff can establish a prima

facie case of disparate treatment 'by showing that animus against the protected group was a

significant factor in the position taken by the municipal decision-makers themselves or by those

to whom the decision-makers were knowingly responsive.'"  *Mhany Mgmt., Inc. v. Cnty. of*

*Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *LeBlanc-Sternberg,* 67 F.3d at 425); *United*

*States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1217, 1223, 1226 (2d Cir. 1987) ("*Yonkers*") (same).

Significantly, "a plaintiff may not need to prove that her protected status was a but-for

cause of the adverse action she suffered, but only a motivating factor."  *Baltazar v. Goldfarb*

*Properties, Inc.*, No. 22-CV-7363 (LTS), 2023 WL 2186326, at *2 (S.D.N.Y. Feb. 22, 2023);

*Hayden v. Paterson,* 594 F.3d 150, 163 (2d Cir. 2010) ("a plaintiff need not prove that the

'challenged action rested solely on racially discriminatory purposes.'" (quoting *Vill. of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977))).  Here, the Town has engaged in

18

a no-holds-barred effort to prevent the development from going forward, not based on the development itself or any purported "environmental" effects, but rather on *who* the Town believes will reside in the proposed homes, the "materially different" "target market" consisting of "a broad range of demographics" that includes "Hasidic Jewish families." MD ¶ 60 & **Exh. AA** at 28.

The Town has made housing unavailable to Hasidic Jews through the implementation of its zoning regulations. *See LeBlanc-Sternberg*, 67 F.3d at 424 ("The phrase 'otherwise make unavailable' [in 42 U.S.C. § 3604(a)] has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions.").

a) *Direct evidence of discriminatory intent.*

While "[d]iscriminatory intent may of course be demonstrated by direct evidence." *MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390, 414 (E.D.N.Y. 2013), *aff'd sub nom. Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016), and such evidence "is rarely available to plaintiffs," *id.* at 414, it exists here in the underlying ZBA decision itself, which is also the basis of the SWOs, Resolution 2023-02, the March 30 Resolution, and the state Complaint filed by the Town. While there is other ample evidence of the discriminatory motivation of the Town and those working in concert with it, this is the rare case where government actors have explicitly admitted that the Town's actions are based on "representations by [Plaintiffs'] counsel . . . stating 'be advised that my clients will be offering reasonably priced and affordable units to <u>Hasidic Jewish families</u> who have a very significant unmet demand for such units'])." MD ¶ 60 & **Exh. AA** at 28 (emphasis added). This decision affirmed the Building Inspector's earlier *ultra vires* determination that Plaintiffs' building permit applications were inconsistent with the prior approvals because of "representations that Applicant 'will be offering reasonably priced and affordable units to Hasidic Jewish families . . . .'" MD ¶ 60 & **Exh. AA** at

17; *id.* ¶ 52 & **Exh. V** at 1.  As described above, the recent actions sought to be enjoined by this Motion are based upon the ZBA's discriminatory actions and by the filing of this lawsuit.  The ZBA's determination that Hasidic Jews would not be consistent with the "upscale," "higher income population of the region" (MD ¶ 60 & **Exh. AA** at 28) that the Town prefers for the Project is direct evidence of discrimination.

> b)  *Arlington Heights Factors.*

Discriminatory intent may also be inferred through circumstantial evidence such as: "[t]he impact of the official action–whether it 'bears more heavily on one race than another,'" "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and "contemporary statements by members of the decisionmaking body, or reports."  *Vill. of Arlington Heights,* 429 U.S. at 267-68 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  "These factors are not exclusive or mandatory but merely a framework within which a court conducts its analysis."  *Tsombanidis v. West Haven Fire Dept.*, 352 F. 3d 565, 580 (2d Cir. 2003).  Within this Circuit, they include "statements made by . . . community members, . . . whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available."  *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014).

> (1) A discriminatory impact was foreseeable as the Defendants'
> actions "'bear[] more heavily'" on Hasidic Jews than others.

The ZBA Decision and resulting actions will have a greater effect on Hasidic Jews than others.  The ZBA Decision explicitly targets "Hasidic Jewish families."  MD ¶ 60 & **Exh. AA** at 28; *see also id.* at 5-6, 16-17.  Moreover, it is evident that nearly all individuals seeking housing

at the Project are Jewish.  MD ¶¶ 103-07; HD ¶¶ 7-8 (Hasidic Jews intending to purchase homes).

(2) "The historical background of the decision."

As described above, the historical background of the ultimate ZBA decision and subsequent targeted actions by the Town demonstrate repeated and focused attempts to block the Project specifically in order to prevent Hasidic Jews from living in the Town.  In addition to the explicitly discriminatory statements by Town officials and residents (*see supra*; MD ¶¶ 108-119 & **Exhs. YY-DDD**; PA **Exhs. N-S**), this includes the fears of Hasidic Jews taking over the Project, the 2020 repeal of the PDD law, increasing the Parks & Playground fee tenfold specifically targeting the Project to increase the cost by approximately $3,600,000, and the over-assessment of the Project Site's lots.

(3) "The specific sequence of events leading up to the challenged<br>decision" shows animus toward Hasidic Jews.

The Town's actions demonstrate animus, specifically with respect to the Plaintiffs' applications and subsequent targeted actions.  Beginning with the Supervisor's statement that Plaintiffs will have "much more oversight than Lost Lake had" (BD ¶ 34 & **Exh. AA** at 2), the Town–at Justin Evans' suggestion, *see supra*–hired a special consultant and attorney (charging Plaintiffs a 56% premium over the Town's rate) to be "locked and ready to go."  BD ¶ 33 & **Exh. Z** at 4.  Other examples of the Town's targeting of the Plaintiffs include the misuse of their escrow funds, the routine granting of the building permit for lot 301 as compared to subsequent applications filed after the Town's strategy was established, and the various refusals to respond to Plaintiffs.  The myriad pretexts used by the Town to deny simple building applications (such as claiming that all infrastructure for future unapproved Phases of the Project must be complete before a building permit for Phase 1 will be granted) further demonstrate hostility.

(4) The Town's actions show significant "departures from the

21

normal procedural sequence."

In addition to receiving "much more oversight" than the prior non-Hasidic owners of the Project, the treatment of Plaintiffs' building permit application and appeal to the ZBA was riddled with procedural irregularities.  As discussed above, some of these include: (a) not posting minutes of Town Board meetings; (b) the Building Inspector refusing to grant or deny the building permit but demanding that it be "pick[ed] up" (SD ¶¶ 5-9); (c) allowing Town officials other than the Building Inspector to review the building permit application; (d) the Building Inspector requiring "conditions" of preliminary site plan approval, when final site plan approval had *already* been granted; (e) various improper justifications in the ultimate denial of the building permits; (f) demanding and reviewing information far beyond the scope of the normal building permit review process; (g) demanding information that was not previously demanded with other applications or which had already provided; (h) requiring *unapproved* infrastructure to be constructed prior to *approved* homes being built; (i) refusing to meet with the Plaintiffs about the building permit applications; (j) Afzali and his law firm representing both the Town/Building Inspector and the ZBA in the supposedly impartial ZBA proceeding; (k) ZBA members being secluded with the Building Inspector's attorney after a ZBA hearing; (l) refusal to issue a subpoena or compel Voss to testify at the ZBA hearing; (m) the ZBA's refusal to issue subpoenas necessary to Plaintiffs' appeal; (n) refusal to include Plaintiffs' documents into the ZBA record; and (o) the ZBA adopting a Resolution denying the appeal that it had never seen, considered, or requested to be drafted.

> (5) The decision demonstrated "substantive departures" from the Town's decisionmaking.

The negative treatment suffered by the Plaintiffs was substantive as well as procedural. The same project went from being an "excellent" and "wonderful project" and an "absolute benefit to [their] community," supported by Town officials, to being an environmental and existential risk.

22

The Town's differential treatment between granting the building permit for the first home and the subsequent denial of building permits for *identical* (for all relevant purposes) applications also demonstrates a significant substantive departure.   The ZBA has based its mistreatment of the Plaintiffs on the "demographics" issue; namely, "affordable" units that would be available to Hasidic Jews.   The Town had no issue with Double Diamond's plan, even though marketing for the development on which Lost Lake was modeled also used the term "Affordable."   MD ¶ 54 & **Exh. X**.   The building permits were denied for reasons that went far beyond the legitimate scope of the Building Inspector's review per the Town Code, and instead improperly focused on *who* would live in the houses (also falsely stating that the project would be an "affordable housing community").   Similarly, during the appeal proceedings, Afzali demanded to know how many "younger families" would buy homes in the Project.   BD ¶ 20 & **Exh. P** at 38:15-19.

Most significantly, the Town has now adopted further draconian measures prohibiting the Plaintiffs from taking *any* further steps to develop the Property based improperly on laws that *no longer exist* and no longer have any force.   *See Matter of Llana v Town of Pittstown*, 245 A.D.2d 968 (3d Dept. 1997) ("the repeal of a municipal ordinance wipes out the act for all purposes.").

> (6) "Contemporary statements by members of the decisionmaking body" and those to whom municipal decision-makers were "knowingly responsive" show animus.

In addition to the explicitly anti-Hasidic statements made by the Building Inspector, the ZBA and other officials described above, "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 49 (2d Cir. 1997); *see also Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208, 227 (D.D.C. 2003) ("[E]ven where individual members of government are found

not to be biased themselves, plaintiffs may demonstrate a violation of the [FHA] if they can show that discriminatory governmental actions are taken in response to a significant community bias.").[20]  "[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process."  *MHANY Mgmt. Inc.*, 985 F. Supp. 2d at 414.  The Town's responsiveness to hostile local residents is apparent, as it took the exact steps to reopen the SEQRA review as requested by Evans and the Hartwood Club.

> (7) The Town had less discriminatory avenues available to address any purported concerns.

There is no question that the Town had less discriminatory alternatives to achieve any legitimate goals.  It had means of enforcement, including enforcing the conditions of the PDD approval.  Rather, it chose the *most* restrictive means by shutting the Project down altogether.

## 2.  Fair Housing Act, 42 U.S.C. § 3617.

"To prevail on a claim of retaliation under the FHA, plaintiffs must establish: (1) that she engaged in protected activity by opposing conduct prohibited under the FHA; (2) that the defendant(s) was aware of the protected activity; (3) that the defendant(s) subsequently took adverse action against the plaintiff; and (4) that there is a causal connection between the protected activity and the adverse action, i.e., that a retaliatory motive played a part . . . ."  *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005), *aff'd*, 212 F. App'x 38 (2d Cir. 2007).  "[P]rotected activity" is "'action taken to protest or oppose statutorily prohibited discrimination.'"  *Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Condo. II*, 457 F. Supp. 2d 126,

---

[20] As described above, the Town was very responsive to individuals such as Justin Evans, who was active in the effort to stall Plaintiffs' Project and who was concerned about "mak[ing] Lost Lake a Hasidic community" and a Hasidic "religious group" "wreck[ing the community] forever" (PA **Exh. E** at 9; MD ¶121 & **Exh. FFF**), the mother of the Town Supervisor upset "that a religious group would purchase the Lost Lake property" (MD ¶ 31, **Exh. K** at 5); and numerous others making anti-Semitic statements in response to news articles and on social media.

131 (E.D.N.Y. 2006) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir. 2000)).

a)   Plaintiffs were engaged in protected activity.

Here, the Plaintiffs filed suit in response to the Defendant's conduct that violated the FHA. This was protected activity because the Plaintiffs were "protesting or opposing discrimination prohibited under the FHA" and the Defendants were aware that the Plaintiffs were "complaining about discrimination." *Mazzocchi v. Windsor Owners Corp.*, No. 11 CIV. 7913 AT, 2013 WL 5295089, at *12 (S.D.N.Y. Sept. 17, 2013) (citing 42 U.S.C. § 3617); *Marks v. BLDG Management Co., Inc.*, No. 99 CIV. 5733(THK), 2002 WL 764473, at *10 (S.D.N.Y. Apr. 26, 2002) ("Plaintiff's filing of a lawsuit under the FHA constitutes 'protected activity.'").

b)   Defendants were aware of the protected activity.

This action was filed on Friday, December 16, 2022 (ECF No. 1).  The Sullivan County Times reported on the filing on Monday, December 19, 2022, and emailed Supervisor Hogue for comment on the same day.  PA **Exh. L** at 2.  On Tuesday, December 27, 2022, the Sullivan County Democrat reported on the lawsuit, including a statement from the Town Supervisor.  PA **Exh. M** at 2.  The Town then posted a Stop Work Order on the property on January 1, 2023.  MD ¶ 71 & **Exh. LL**.  At this point, the Defendants were aware that the Plaintiffs were "complaining about discrimination."  *Mazzocchi*, 2013 WL 5295089, at *12 (citing 42 U.S.C. § 3617).

c)   Plaintiffs Suffered an Adverse Action.

Plaintiffs also suffered an adverse action that had "some materially adverse effect on the[m]."  *Wilson v. Wilder Balter Partners, Inc.*, No. 13-CV-2595 KMK, 2015 WL 685194, at *13 (S.D.N.Y. Feb. 17, 2015).  The filing of the State Petition, coupled with the Stop Work Orders and February and March Resolutions, constitute adverse action.  *See Burris v. Hous. & Servs. Inc.*, No. 17-CV-9289 (JGK), 2023 WL 1966120, at *10 (S.D.N.Y. Feb. 13, 2023) (filing of eviction

proceedings); *Broome v. Biondi*, 17 F. Supp. 2d 211, 218 (S.D.N.Y. 1997) (retaliation found where adverse actions against claimant included being rejected for a sublease, being issued a Notice of Default, and being sued twice after engaging in protected behavior) .

> d) There was a causal connection between the protected activity and the adverse action.

> A causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow [individuals] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."

*Burris v. Hous. & Servs. Inc.*, No. 17-CV-9289 (JGK), 2023 WL 1966120, at *9 (S.D.N.Y. Feb. 13, 2023). Once Plaintiff establishes this, "then the defendant can prevail if it sustains its burden of proving its affirmative defense that it would have taken the adverse action on the basis of . . . permissible reason[s] alone." *Mhany Mgmt., Inc.*, 819 F.3d at 613. *Treglia v. Town of Manilus*, 313 F.3d 713, 721 (2d. Cir. 2005) (finding that temporal proximity of one month in retaliatory employment discrimination context was sufficient to establish causation). This Court has noted: "Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action." *Dodd v. City University of N.Y.*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020). LLH's Complaint against the Town was filed in this Court on December 16, 2022; less than two months later on February 3, 2023, the Town filed the State Petition, and the Stop Work Orders were issued. MD ¶ 85 & **Exh. TT**; *id.* ¶ 72 & **Exh. MM**; *id.* ¶ 81 & **Exh. RR**.

Defendants' retaliation against the Plaintiffs for asserting their Fair Housing rights against discrimination is egregious and must be stopped. *See White v. Julian*, No. C 95-1757 MHP, 1996 WL 40192, at *4 (N.D. Cal. Jan. 5, 1996) ("Congress intended section 3617 of the FHA to prohibit certain forms of conduct–conduct amounting to threat, coercion, or interference with the equal

housing opportunity of identified groups"); *aff'd, White v. Lee*, 227 F.3d 1214 (9th Cir. 2000).

### 3.  42 U.S.C. § 1982.

To establish a claim under 42 U.S.C. § 1982, a plaintiff must prove the following elements: (1) the plaintiff is a member of a racial minority[21]; (2) the defendant acted with the requisite intent to discriminate based on race; and (3) the discrimination concerned one or more of the activities enumerated in the statute including the right to make and enforce contracts such as a real estate contract or lease agreement.  *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Silva v. Farrish*, 47 F.4th 78, 89-90 (2d Cir. 2022).  The first two elements are met, as discussed above.  With respect to the third element, the Court of Appeals has stated that "Section 1982 provides that all citizens shall have the same right as white citizens 'to inherit, purchase, lease, sell, hold, and convey real and personal property.'"  *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1339 (2d Cir. 1974); *see also Dews v. Town of Sunnyvale,* 109 F. Supp. 2d 526, 529, 572-73 (N.D. Tex. 2000) (after bench trial, court found violation of 42 U.S.C. § 1982 where town's zoning laws that ban apartment buildings were enacted for racially discriminatory purposes).  As the fee simple owners of the Project, the Plaintiffs were directly affected by the racially discriminatory actions of the Defendants as set out above.  *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 423-24 (1968) ("Thus, when Congress provided in [the predecessor to 42 U.S.C. § 1982] that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private.").

### 4.  Equal Protection Clause, 42 U.S.C. § 1983.

---

[21] Section 1982 prohibits not merely discrimination against Jews generally, *see Shaare Tefila Congregation*, 481 U.S. at 617-18, but discrimination against particular subsets of Jews, such as Orthodox Jews.  *See LeBlanc-Sternberg v. Fletcher*, 781 F. Supp. at 267 (S.D.N.Y. 1991).

A violation of the Equal Protection Clause under § 1983 "requires personal involvement by a defendant, who must act with discriminatory purpose." *Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir. 2012). Race and religion are protected classes under the Equal Protection Clause. *Id.*; *Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir. 2000) (race); *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183, 189 (2d Cir. 2012) (religion). Similar to a claim under the FHA, a § 1983 claimant must show that "the discrimination was intentional," *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir. 2004), but "need not show that the decisionmaker was motivated solely, primarily, or even predominantly by concerns that were racial." *Yonkers*, 837 F.2d at 1216-17. Upon showing the decision was made with discriminatory purpose, "the burden shifts to the defendant to show that the same result would have been reached even without consideration of race." *Yonkers,* 837 F.2d at 1217. All of the reasons set forth above detailing a likelihood of success under the FHA apply to Plaintiffs' Equal Protection claim. *See Arlington Heights,* 429 U.S. at 260 (upholding invalidation of zoning denial as discriminatory under Equal Protection Clause); *Mhany Mgmt., Inc.* 819 F.3d at 606 (applying "the familiar *Arlington Heights* factors" to affirm court's holding that conduct violated FHA and Equal Protection).[22]

### 5.   Free Exercise Clause, 42 U.S.C. § 1983.

The Free Exercise Clause of the First Amendment to the United States Constitution also forbids discrimination on the basis of religion. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (zoning law that had the effect of singling out religious

---

[22]   Even if Plaintiffs did not establish racial and religious discrimination, by enforcing ordinances that do not exist only against the Plaintiffs, Defendants' actions are "irrational and wholly arbitrary" in violation of the Equal Protection Clause. *Village of Willowbrook v. Olech,* 528 U.S. 562, 563 (2000) (*per curiam*) (Equal Protection Clause violated by Village requiring larger easement from Plaintiff to connect to water supply than required of others).

group violated Free Exercise Clause); *LeBlanc-Sternberg*, 67 F.3d at 426 (discrimination against home synagogues violated Free Exercise Clause).  In upholding the finding of discrimination against Orthodox Jews in *LeBlanc-Sternberg*, the Second Circuit ruled that, "[i]n determining whether a law is based on religious animus, the same kinds of evidence noted above with respect to a disparate treatment claim under the FHA are relevant."  *Id*. at 426.  Thus, for the same reasons discussed above, there is a likelihood of success on Plaintiffs' Free Exercise claim.

### 6.  Substantive Due Process.

Where a "planning dispute [is] tainted with racial animus or fundamental procedural irregularity," it violates substantive due process under the Fourteenth Amendment.  *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 785 (2d Cir. 2007) (allowing substantive due process claim regarding denial of special use permit to go to trial) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999)).  To sustain a substantive due process claim, a plaintiff must show that (1) she had a valid property interest; and (2) defendants infringed on that property interest in an arbitrary or irrational manner."  *Burdick v. County of Putnam*, No. 10 CV 624 VB, 2012 WL 360644, *2 (S.D.N.Y. Feb. 2, 2012) (citations omitted).  For state action to rise to the level of a substantive due process violation, it "must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.'"  *Cine SK8, Inc.,* 507 F.3d at 785.  The Plaintiffs have a property interest in being able to develop the Property according to the PDD and related approvals obtained by their predecessor in interest.  The Defendants' actions in attempting to prevent them from doing so through the SWOs, the state lawsuit, and various Resolutions when there is no legal basis for doing so is arbitrary and outrageous.  It rises to this level both because it is tainted by racial animus, and because it is an outrageous exercise of power untethered from any legal basis.

C.   The Public Interest Favors Granting Relief.

Given the "strong public interest in uncovering . . . civil rights violations," the public interest favors also granting Plaintiffs' relief in this case.[23]  *Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of N.Y.*, 194 F.R.D. 88, 96 (S.D.N.Y. 2000); *see also Kitevski v. City of N.Y.*, No. 04 CIV. 7402 RCC RLE, 2006 WL 680527, at *3 (S.D.N.Y. Mar. 16, 2006) ("the government has a vital interest in upholding civil rights"); *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights").  Conversely, it is well established that "[t]he Government does not have an interest in the enforcement of an unconstitutional law." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted); *see also Amarin Pharma., Inc. v. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015) (explaining that enjoining an unconstitutional regulatory scheme "serves the public interest, because . . . 'the Government does not have an interest' in the unconstitutional enforcement of a law").

## CONCLUSION

Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction as necessary to vindicate their important constitutional rights.

Dated: June 1, 2023

**SIVE, PAGET & RIESEL, P.C.**

_____
STEVEN BARSHOV (Bar No. SB9809)
Sive, Paget & Riesel, P.C.
560 Lexington Avenue
New York, New York 10022
Tel: (646) 378-7229
sbarshov@sprlaw.com

**STORZER & ASSOCIATES, P.C.**

_____
ERIC W. TREENE (Bar No. 2568343)
ROMAN P. STORZER (admitted *pro hac vice*)
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
Tel: (202) 857-9766
treene@storzerlaw.com, storzer@storzerlaw.com

---

[23] *See, e.g., Fortress Bible Church*, 694 F.3d at 224-25 (ordering, *inter alia,* "(1) . . . the Church's 2000 site plan be deemed approved for SEQRA purposes and enjoined any further SEQRA review; . . . . (4) . . . the Town to issue a building permit for the 2000 site plan; and (5) enjoined the Town from taking any action that unreasonably interferes with the Church's project.").