# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

LOST LAKE HOLDINGS LLC, a domestic limited liability
company; MISHCONOS MAZAH LLC, a domestic limited
liability company; RABBI MORDECHAI HALBERSTAM;
and ROSE HALBERSTAM,

                 *Plaintiffs*,

       -against-

THE TOWN OF FORESTBURGH; THE FORESTBURGH TOWN
BOARD; FORESTBURGH ZONING BOARD OF APPEALS;
DANIEL S. HOGUE, JR.,
in his personal capacity; STEVE BUDOFSKY, in his personal
capacity; SUSAN PARKS-LANDIS, in her personal capacity;
KAREN ELLSWEIG, in her personal capacity; VINCENT
GALLIGAN, in his personal capacity; RICHARD ROBBINS,
in his personal capacity; and GLENN A. GABBARD, in
his personal capacity and his official capacity as Building
Inspector of the Town of Forestburgh,

                 *Defendants*.

------------------------------------------------------------------------------X

**Civ. Action No.:**
7:22-cv-10656-VB

Hon. Vincent L. Briccetti

## DECLARATION OF DANIEL S. HOGUE, JR

DANIEL S. HOGUE, J.R., under 28 U.S.C. § 1746 declares as follows:

1.      I am the Town Supervisor for the Town of Forestburgh ("Town"), Defendants in

this proceeding. I am over the age of eighteen, competent to testify in a court of law, and am

familiar with the resort project at issue and have personal knowledge of the matters set forth herein.

2.      I respectfully submit this Declaration in opposition to the Plaintiffs' Motion for

Preliminary Injunction.



**<u>Lost Lake Resort Project Permitting History</u>**

3.     In September of 2008, project applicant Double Diamond Companies ("Double Diamond") proposed to develop a planned resort and residential community on approximately 2,100 acres located in the Town of Forestburgh known as the Lost Lake Resort ("Lost Lake Resort" or "Resort Project").   A full description of Double Diamond's proposal is set forth in the Declaration of Richard A. Robbins, dated June 29, 2023 ("Robbins Dec.") in paragraphs 4-11.

4.     Being a small rural Town with a population of about 810 in 2010 (and 900 today), the Resort Project was the largest land use project before any municipal board in Forestburgh with potential significant impacts to the Town's existing rural and natural character.

5.     As part of its comprehensive project review, the Town required the preparation of a draft environmental impact statement ("DEIS") under the State Environmental Quality Review Act ("SEQRA") (Robbins Dec. ¶ 17).

6.     As a result of several significant adverse environmental impacts identified in the DEIS, the Resort Project was required to incorporate several project modifications to address concerns related to density, land and natural resource conservation, and preserving the existing rural and natural character of the Town.   These project modifications were discussed in the Lost Lake Resort final environmental impact statement ("FEIS").

7.     After a multi-year review, the Town Board issued its SEQRA Findings Statement ("FS") (Ex. 1)[1], which incorporated standards and requirements set forth in the Design Guidelines for Single Family Homes ("2013 Design Guidelines") (Ex. 2) and the Covenants, Restrictions and Conditions for the Lost Lake Resort and Development ("2013 CC&Rs") (Ex. 3).   The Findings Statement, 2013 Design Guidelines, and 2013 CC&Rs were an essential component of the

---

[1] References to "Ex. __" refers to true and accurate copies of the exhibits identified herein and submitted herewith. References to "Town_xx-xx" refers to the bates-stamped number on the bottom center of each page.

mitigation requirements that were made conditions of approval (Robbins Dec. ¶¶ 30-39; Declaration of Javid Afzali, Esq., dated June 29, 2023 ("Afzali Dec.") ¶¶ 38, 47).

8.      After completing its environmental review under SEQRA, the Town Board adopted Local Law 3 of 2011 on July 7, 2011 ("2011 PDD Regulations"), which repealed the Town's then existing 2008 PDD regulations and replaced it with a new set of PDD regulations to accommodate Double Diamond's Resort Project requirements (Ex. 4 at 1 [Town_3372]).

9.      Next, by resolution dated August 4, 2011, the Town authorized the rezoning of the Project Site from a RR-1 zoning district to the PDD approval ("2011 PDD Rezoning Approval") (Ex. 5). The 2011 PDD Rezoning Approval required the mitigation measures detailed in the SEQRA Findings Statement (Ex. 1), 2013 Design Guidelines (Ex. 2), and 2013 CC&R (Ex. 3) (*see* Ex. 5 at 8 [Town_3413]), which contains applicable and enforceable bulk standards, land use regulations, construction and design specifications, and mitigation measures (*see*, Afzali Dec. ¶¶ 42-44).

10.      Finally, the Town Board granted conditional final site plan and subdivision approval for the first of seven project phases by resolution on June 25, 2013, subject to the mitigation measures in the Finding Statement ("2013 Conditional Final Approval") (Ex. 6).

11.      The Project Approvals authorized the Double Diamond to construct infrastructure (roads, utilities, etc.) necessary to sell vacant lots to individual owners who sought to build a vacation / second home in accordance with Town approved design specifications in the SEQRA Findings Statement (Ex. 1), 2013 Design Guidelines (Ex. 2), and 2013 CC&R (Ex. 3).

12.      The Lost Lake Resort Project Approvals did not authorize Double Diamond to build and sell single-family dwellings.

**Post Approval 2013-2020**

3

13.     After receiving the necessary local approvals, Double Diamond started construction of certain Resort Project infrastructure improvements (roads, utilities, a temporary sales structure, etc.), and sold a number of vacant lots to individual buyers.  Double Diamond did not attempt to obtain building permits to construct residential dwellings as such activity was not authorized under the Project Approvals.

14.     In March 2017, the Town Board adopted Local Law 2 of 2017.  This local law amended the existing PDD Regulations (*see* ¶ 8, *above*) and delegated the Town Board's authority to review certain application related to PDD onto the Planning Board.  All requirements and restrictions in the 2011 PDD Regulations, as amended by Local Law 2 of 2017, continued to remain applicable to PDD zoning districts, including the Lost Lake Resort. A true and accurate copy of Local Law 2 of 2017 is attached hereto as Exhibit 7.

15.     In June 2019, representatives from Kings USA Construction ("King"), a Hong Kong based resort developer unaffiliated with Plaintiffs, appeared before the Town Board and the Planning Board.  King represented to the Town Board and Planning Board that it was under contract to purchase the Lost Lake Resort Project and sought to modify the Project Approvals to authorize King to construct residential dwellings and offer units on a timeshare basis (Ex. 8).

16.     The Town advised King that its request would require Planning Board review as Local Law 2 of 2017, which amended the PDD Regulations, conferred jurisdiction upon the Planning Board for certain actions related to the PDD (see also Robbins Dec. ¶¶ 51-56 [providing additional details regarding the King request]).

17.     In January 2020, the Town Board adopted Local Law 1 of 2020.  This local law eliminated the PDD as a zoning district allowable in the Town.  Local Law 1 of 2020, however, expressly stated that "[s]uch repeal shall have no effect on approvals previously granted with

respect to any existing Planned Development Districts." The plain language in the local law makes it clear that all requirements and restrictions in the 2011 PDD Regulations, as amended by Local Law 2 of 2017, continued to remain applicable to and enforceable against the Lost Lake Resort, a PDD approved prior to Local Law 1 of 2020. A true and accurate copy of Local Law 1 of 2020 attached hereto as Exhibit 9.

18.     In July 2020, the Town Board considered a recommendation from the Planning Board to increase the Town's Parkland Fee.  By way of background, Town Code § 148-24 authorizes the Planning Board to condition the approval of any major subdivision or site plan application to require an applicant / property owner to reserve land for recreation and parkland purposes.  Town Code § 148-24 allows an applicant / owner to pay a fee in lieu of reserving parkland.  The fee is determined and published by the Town Board in the Fee Schedule.

19.     The Planning Board's recommended an increase to the Parkland Fee to align the Town with neighboring municipalities (*e.g.*, Town of Tompson- $2,500 per lot; Town of Mamakating- $5,000 per lot).  Ultimately, the Town Board voted and approved a fee of $2,000 per lot.  A true and accurate copy of Town Board minutes for July 2, 2020 attached hereto as Exhibit 10.

20.     Notwithstanding the Town Board's vote, the increase in the Parkland fee does not apply to the Lost Lake Resort or Plaintiffs.  The Parkland fee for the Resort Project is established in the 2011 PDD Approval, which states that "based on the recreational amenities provided in the Master Plan, a fee of $200.00 per lot shall be required in lieu of providing any additional recreation or parkland as part of this PDD approval." (Ex. 5 at 8 [Town_3413]).  As such, any Parkland fee that may be required as part of future phases of the Resort Project is governed under the 2011 PDD

Approval, and not the Town's general Fee Schedule.  The Town recognizes that any increase in the Parkland fee for Lost Lake Resort lots requires an amendment to the 2011 PDD Approval.

**Plaintiffs' Housing Development Project**

21.     Double Diamond sold the Resort Project to Plaintiffs in June 2020.

22.     Double Diamond conveyed the Resort Project property to Plaintiffs without having completed the infrastructure improvements required under the Resort Project Approvals.

23.     In November 2020, Plaintiffs submitted two building permit applications to construct a residential dwelling on Resort Lot 301 and Lot 302. (Declaration of Glenn A. Gabbard, Jr., dated June 28, 2023 ("Gabbard Dec.") ¶ 6).  While the Building Inspector reviewed and initially issued permits for the lots, he discovered that the Plaintiffs misrepresented that it owned Lot 302 and identified other misrepresentations and deficiencies in the Lot 301 and Lot 302 applications (Gabbard Dec. ¶ 8).

24.     As detailed in the Gabbard Declaration, the Building Inspector discovered that the applications for  Lot 301 and Lot 302 contained sworn statements that turned out to be materially false (Gabbard Dec. ¶ 8).  As a result, he revoked the Lot 302 permit due to the fact that Plaintiffs did not own the lot.  While the Lot 301 application had similar deficiencies, the Building Inspector did not revoke the permit for Lot 301 because unlike Lot 302, there was no parcel ownership issue with Lot 301 (Gabbard Dec. ¶ 9).

25.     According to the Building Inspector, he reviewed the Resort project approval documents in more detail to avoid future permitting issues and discovered that there were complex design and legal requirements that were applicable to all residential dwellings approved for the Lost Lake Resort Project (Gabbard Dec. ¶¶ 10-14).  The Building Inspector brought these issues to my attention and requested assistance from professional consultants to help him understand the

applicable regulations and standards for the review and issuance of building permits for the Lost Lake Resort.

26. His request was reasonable given the record that was generated during the September 2008 through June of 2013 project review and approval period. This record included a multi-volume draft environmental impact statement, a multi-volume final environmental impact statement, multiple resolutions, preliminary approval, final approvals, design specifications, covenants and restrictions, and requirements for approximately ten different state and federal permits.

27. As a result, Chuck Voss (the Town's planning and engineering consultant previously engaged for the Resort Project) was asked to continue assisting the Building Inspector with technical review of applications.

28. In addition, because the Town's then planning and zoning attorney was stepping down, the Town sought to engage a new special counsel to provide legal support. On February 4, 2021, the Town Board adopted a resolution to retain Harris Beach, PLLC ("Harris Beach") as special counsel to provide legal support to the Building Inspector and to the Town for all legislative, planning, and zoning matters related to the Lost Lake Resort.

29. After becoming familiar with the Resort Project approvals, the Building Inspector realized that he had issued the Lot 301 permit in error (Gabbard Dec. ¶ 17).

30. In June of 2021, Plaintiffs submitted its third application for a building permit for Resort Lot 303. After several notices of incomplete application and requests for information related to application deficiencies (*e.g.*, unsigned, undated application; submission of materially false statements; failure to submit application fee) (*see* Gabbard Declaration ¶¶ 18-23), Plaintiffs submitted an "Amended and Restated Declaration of Reservations, Covenants, Easements,

Restrictions and Conditions for the Lost Lake Development" and a "Lost Lake Resort Design Guidelines for Single-Family Homes" revised September 2021 which contained material alterations and modifications to the terms, conditions, and restriction contained in the 2013 Design Guidelines and 2013 CC&R (Gabbard Dec. ¶ 31).

31.     Plaintiffs' counsel subsequently confirmed the construction plans for Lot 303 were designed in accordance with that Plaintiffs' amended Design Guidelines and amended CC&R and not the required 2013 Design Guidelines and 2013 CC&R (Gabbard Dec. ¶ 26).

32.     The Town's planning and engineering consultant prepared a report detailing substantive and material deficiencies with the proposed building design and construction plan for the Lot 303 application.  After independently reviewing the consultant's report and Plaintiffs' application submissions from June 2021 through October 1, 2021, the Building Inspector sent his findings to Plaintiffs in an October 7, 2021 notice and provided Plaintiffs an opportunity to correct the deficiencies (Gabbard Dec. ¶¶ 28-32).

33.     In its October 28, 2021 response, Plaintiffs' counsel demanded that the Building Inspector issue building permits because Plaintiffs intended to develop "reasonably priced and affordable units to the Hasidic Jewish families who have a very significant unmet demand for such units" (Gabbard Dec. ¶¶ 33-34).  Instead of addressing the merits of the deficiencies with the Lot 303 application, Plaintiffs' counsel continued to bluster and threaten a civil rights action against the Town if the Building Inspector did not immediately issue a permit for Lot 303 (Gabbard Dec. ¶¶ 34-35).

34.     On November 23, 2021, the Building Inspector denied Plaintiffs' application for a building permit and referred Plaintiffs to the Town ZBA for an appeal (Gabbard Dec. ¶ 36).

**Plaintiff' Objections to Reimbursement Costs and Moratorium**

35.    In November 2021, Plaintiff, through counsel, raised objections regarding the Town's use of funds in an account established by Double Diamond to reimburse the Town for costs related to the Resort Project.  Plaintiffs argued that use of the reimbursement account funds for outside consultant costs related to the review of the Lot 303 application was not authorized under the Town Code or state law, and that Town Code provisions related to reimbursement requirements for building permit applications were unlawful.

36.    To address potential deficiencies in the Town Code, the Town started the rule making process to amend Town Code provisions to incorporate some of the procedural protections and substantive limitations that Plaintiffs raised their November 2021 objection  letter.

37.    In February 2022, a resolution introducing a proposed local law to amend Town Code provisions related to reimbursement requirements was put before the Town Board for its consideration ("Proposed Local Law 2-2022").

38.    In addition, the Town Board adopted a three-month moratorium on all land use applications requiring posting of reimbursement funds at its February 3, 2022 meeting.  The Town Board deemed the moratorium necessary to prevent uncertainty or a dispute in the event a project applicant sought a permit or approval that required the Town to engage outside consultant assistance.  The Moratorium did not impact, delay or stop Plaintiffs' permit application efforts or infrastructure construction activities.

39.    The Town Board adopted Proposed Local Law 2-2022 at its regular meeting on May 5, 2022 (Ex. 11).  Moreover, the Moratorium expired on its own terms on May 3, 2022.

40.    Despite the fact that the Town was in the process of amending the Town Code to address deficiencies that Plaintiffs identified, they served a verified petition-complaint in a hybrid action/proceeding entitled *Lost Lake Holdings, LLC et al. v Town of Forestburgh et al.*, Index No.

2022.321 (filed February 28, 2022) asserting six causes action alleging: (a) improper use of reimbursement funds; (b) unlawfulness of Town Code § 68-16(B) which requires applicants to reimburse the Town for costs incurred in the review of land use projects; and (c) unlawfulness of a three-month moratorium related to project cost reimbursement requirements.

41.    By Decision and Order dated August 11, 2022, the court dismissed Plaintiffs' second cause (breach of fiduciary duty), third cause (accounting), fourth cause (waste, fraud, collusion, and other unlawful acts), and sixth cause (to declare the Moratorium void) (Afzali Dec. Ex. 7). .

42.     By Decision and Order dated January 20, 2023, the court dismissed Plaintiffs' fifth cause (to declare Town Code § 68-16 void). The court also awarded the Town costs from a bond Plaintiff was required to post. (Afzali Dec. Ex. 8).

43.    Finally, by Decision and Order dated June 26, 2023, the court dismissed Plaintiffs' first cause (challenging the reimbursement fees) (Afzali Dec. Ex. 9).

44.    As such, to the extent that Plaintiffs' discrimination claims rely on issues raised in NYSCEF Case 2022-321 (*e.g.* misuse of reimbursement funds for planning and legal consultants; fraud and collusion, imposition of a moratorium, etc.), those claims have been adjudicated and found meritless.

**Plaintiffs' Administrative Appeal to the Zoning Board of Appeals**

45.    Plaintiffs commenced an administrative appeal to the ZBA challenging the denial of its building permit applications in January 2022.  Plaintiffs' appeal was subject to a formal evidentiary hearing in accordance with the ZBA's Rules and Procedures.  The evidentiary hearing included six days of witness direct and cross-examination testimony.  Testimony was heard from the following witnesses: (1) Glenn Gabard, Town Building Inspector (Gabbard Dec. ¶ 41]; (2)

Bradley Grant, Town Landscape Architect and outside consultant (Ex. 12 [July 19, 2022 Transcript], Ex. 13 [August 8, 2022 Transcript]), (3) Joanne Nagoda, Town Clerk (Ex. 14 [August 10, 2022 Transcript]); and Yahuda Miller, LLH Officer (Ex. 14  [August 10, 2022 Transcript]).

46.     The ZBA's evidentiary hearing closed on September 29, 2022.  During that public meeting, the ZBA considered all evidentiary objections to the documentary evidence proffered during the witness testimony and ruled on accepting the documents into the evidentiary hearing record (Ex. 15). As a result, the ZBA had developed an extensive evidentiary hearing record that included the Resort Project's environmental and permitting record from 2008 through 2019, Defendants' building permit application record, documents and records proffered by Defendants, the Town, and the *amici* parties, as well as witness direct and cross-examination testimony (Ex. 15).

47.     It should be noted that during the pendency of the ZBA administrative proceeding, Plaintiffs commenced three separate actions/proceedings in state supreme court (Afzali Dec. ¶ 20), in all of which the Town prevailed or substantially prevailed. On its face, it appears that Plaintiffs were using frivolous litigation as a tactic to force a settlement on the land use issues that Plaintiffs have little chance of prevailing.

48.     Two weeks after the close of the evidentiary hearing record, the ZBA duly convened a public meeting on November 15, 2022 and issued its final decision ("Final Decision") addressing each of the issues raised on appeal, finding that the Building Inspector's findings and determinations were rational and supported by substantial evidence, and affirmed the Building Inspector's November 23, 2021 denial of the Lot 303 application (Ex. 16). The ZBA provided a comprehensive written decision detailing its review and findings.

49.     The ZBA's findings and conclusions are summarized on pages 33-36 of the Final

Decision  (Ex.  22  [Town_5068-5070].     The  ZBA  rendered  the  following  findings  and

determinations:

    a.   that Plaintiffs' build permit applications were subject to the requirements of  Town

       Code Chapter 68 (Building Code Administration, which includes compliance with

       the  NYS  Uniform  Code  and  NYS  Energy  Code),  Town  Code  Chapter  180

       (Zoning,  requiring  compliance  with  all  applicable  district  regulations);  and  the

       2011 PDD Regulations;

    b.   that the building permit applications were also subject to the terms, conditions,

       and  restrictions  in  the  2011  PDD  Approval  including  Condition  2  requiring

       compliance  with  the  mitigation  measures  set  forth  in  the  SEQRA  Findings

       Statement,  the  2013  Design  Guidelines,  and  2013  CC&R,  which  contains

       applicable and enforceable bulk standards, land use regulations, construction and

       design specifications, and mitigation measures for the PDD and Resort Project;

    c.   that the Town Building Department retained authority and jurisdiction to enforce

       all terms and conditions set forth in the 2011 PDD Approval Resolution, including

       the 2013 Design Guidelines, and 2013 CC&R, because they have the force and

       effect of the law as the applicable zoning standards and regulations for the PDD

       under the 2011 RDD Regulations § 85-17 (B);

    d.   that the Town remains the sole authority to amend any term, restriction and

       condition  of  the  Resort  PDD  because  such  authority  belongs  solely  to  the

       municipal authority and may not be vested unto any private party under the 2011

       RDD Regulations § 85-19 (B) (2) (i);

e.   that while PDD Local Law 3 of 2011, as amended, was repealed under Local Law 1 of 2020, the Resort Project PDD Approval remains valid and subject to the 2011 PDD Regulations to the extent the project complies with the limitations of Town Code Chapter 180, Article III (non-conforming use or structures), and with all Project Approval terms, conditions, and restrictions;

f.   that the Building Inspector properly considered the terms, conditions, and restrictions in the 2011 PDD Approval Resolution, including the SEQRA Findings Statement, the 2013 Design Guidelines, and 2013 CC&R in his evaluation of the building permit applications; and

g.   that the Building Inspector's determination that Plaintiffs' building permit applications were not consistent with the Resort Project Approvals was rational and sufficiently supported by the record.

50.   Based on the findings detailed above, the ZBA held that Plaintiffs had undertaken a course of action that was inconsistent with and materially different from the terms and conditions in the Resort Project Approvals by: (a) unilaterally and without authority amending the 2013 Design Guidelines and 2013 CC&R which served as the PDD zoning regulations and Project mitigation requirements under PDD § 85-17 and § 85-19; and (b) that Plaintiffs' amendments to the 2013 Design Guidelines and 2013 CC&R, their written representations, and witness testimony, sufficiently evidenced Plaintiffs' intent to construct a housing development that was materially different from the Resort Project proposed by Double Diamond and reviewed and approved by the Town.

51.   Plaintiffs never sought review of the ZBA determination in New York Supreme Court with the 30-day statute of limitations period allowed under Town Law § 267-c.

13

**The Town Board's SEQRA Determinations and State Court Zoning Enforcement Action**

52.     The Town Board reviewed the ZBA's Final Decision and found it to be consistent with the Resort Project Approvals and the SEQRA Findings Statement.  The Town Board adopted the ZBA's findings and determination in its February 2, 2022 Resolution during a public meeting (Ex. 17 [Town_5236-5239]).

53.     As the Lead Agency, the Town Board also determined that the changes and modifications to the Resort Project as detailed in the ZBA's November 15, 2022 Decision constitute "changes in the project" or "a change in the circumstance" as those terms are used in 6 NYCRR § 617.9 (a) (7) and required the preparation of a supplemental environmental impact statement and approvals for the modifications as required under 2011 PDD Regulations § 85-19 (B) (2) (i) (Ex. 23 [Town_5238]).  By resolution dated March 30, 2023, the Town Board issued a formal determination of significance under SEQRA and 6 NYCRR § 617.9 (a) (7) (Ex. 18).

54.     Consistent with 6  NYCRR § 617.12 (b), the Town provided notice of its SEQRA determination to all involved and interested agencies identified in the DEIS (Ex. 23 [Town_5238]).

55.     Moreover, the Town Board also suspended the Resort Project Approvals until Plaintiffs satisfied their SEQRA obligations and authorized the Town's special counsel to institute legal action on behalf of the Town against Plaintiffs to compel compliance with any Town Code, local law, ordinance, rule or regulation applicable to the Resort Project and Plaintiffs' conduct (*id.*).

56.     By verified complaint dated February 2, 2022, the Town's special counsel commenced an action entitled *Town of Forestburgh, et al. v. Lost Lake Holdings LLC, et al.*, commenced in Supreme Court, Sullivan County under Index number 2023-186 ("Zoning Enforcement Action") (*see* Afzali Dec. ¶ 17; Afzali Ex. 4).

14

57.     The Zoning Enforcement Action asserts the following five claims:

a.  that the developers' unilateral changes to the 2013 Design Guidelines and 2013 CC&R, and construction in furtherance thereof, is in violation of the Town Code, Zoning Code, the 2011 PDD Regulations, and the Resort Project Approvals;

b.  that the developers' unilateral changes to the 2013 Design Guidelines and 2013 CC&R require additional review under SEQRA;

c.  that developers are in violation of 2011 PDD Regulations § 85-21 (C) for failing to post the required financial security for the project infrastructure;

d.  that the Resort Project Approvals have lapsed under 2011 PDD Regulations § 85-21 (A), which requires all infrastructure improvements to be completed with 2 years from date of approval; and

e.  that the Resort Project Approvals have lapsed under 2011 PDD Regulations § 85-18 (M), which requires that the first phase of a phased PDD must be complete within three years of the date that the final site plan of the PDD is approved.

58.     The Zoning Enforcement Action was commenced in an effort to enforce the Town's zoning laws which are essential to safeguarding public interest and ensuring the orderly development of the community. Enjoining the enforcement of these zoning laws, even on a temporary basis, could have adverse impacts, including environmental harm and detriment to public health, especially if the Plaintiff is allowed to continue with a construction project that patently violates the town's zoning codes. Furthermore, the zoning laws play a vital role in the Town's land use planning, which is designed to ensure the safety and well-being of its residents. Suspending these laws can lead to unchecked developments that are inconsistent with the Town's

15

long-term goals. Additionally, the injunction could set a dangerous precedent, encouraging others to bypass zoning laws, leading to legal instability and unpredictability in land use regulations.

**Responses to Plaintiffs Factual Assertions**

59.     After having reviewed the "Factual Background"  and other "factual" assertions in Plaintiffs' memorandum of law ("Plfs. MOL"), Plaintiffs make a number of statements that have no factual basis, are grossly mischaracterized, or just plainly false and require a response.[2]

60.     Plaintiffs' assertion: "In the summer of 2020, LLH purchased a shovel-ready, mixed-use primarily residential subdivision in the Town of Forestburgh, Sullivan County, New York known as the Lost Lake Resort (the "Project")." (Plfs. MOL at 2). RESPONSE: False. The Resort is a Planned Development District, not a "primary residential subdivision".  LLH or its predecessor was never approved to build houses.  The developer was only approved to construct the resort infrastructure and sell vacant lots.  LLH's intent to build any housing development is not authorized.

61.     Plaintiffs' assertion: "Phase 1 of the Project had obtained approvals from all other governmental agencies, and was therefore 'shovel-ready,' needing only the issuance of building permits for single family homes to be built." (Plfs. MOL at 2). RESPONSE: False. The 2011 PDD Approval and 2013 Conditional Final Site Plan and Subdivision Approval for Phase 1 authorized Double Diamond to obtain construction permits and begin construction on the infrastructure components. PDD Regulations § 85-21 (A) requires that the construction or installation of any infrastructure improvement be completed pursuant to an approved schedule of construction for infrastructure or if no such schedule exists, then all infrastructure must be completed within two years of the site plan approval.  Also, PDD Regulations § 85-18 (M) required the Resort Project

---

[2] Factual assertion not expressly addressed here are not admitted or conceded by Defendants.

Phase 1 to be completed within 3 years of the 2014 Final Conditional Approval.  The Resort Project

Approvals had lapsed before LLH purchased the Resort Project in 2020. Moreover, the Lost Lake

Resort Project approvals authorize the developer to construct infrastructure (roads, utilities, etc.)

necessary to sell vacant lots to individual owners who wish to build a vacation / second home in

accordance with Town approved design specifications. The Lost Lake Resort Project approvals do

not authorize the developer to build and sell single-family dwellings.

62.    Plaintiffs' assertion: "The Town strongly supported the Project when it was being

developed by Double Diamond." (Plfs. MOL at 2). <u>RESPONSE</u>: Misleading.  Any Town support

for Double Diamond was based on the developer's representation and proposal to construct the

infrastructure and resort amenities to support the sale of vacant lots to individual owners seeking

to build a vacation or second home in accordance with design specification and requirements that

were approved and incorporated into the 2011 PDD Approval.

63.    Plaintiffs' assertion: "While Double Diamond had no connection to the Orthodox

Jewish community, fears about that community began manifesting early in the Town, with

residents expressing concern that the Project could draw Hasidic Jewish home buyers." (Plfs. MOL

at 2-3). <u>RESPONSE</u>: Misleading.  The citations supporting this assertion are Town Board meeting

minutes from 2011 and 2016 capturing public comments.

64.    Plaintiffs' assertion: [referencing statements or actions of Justin Evans]    (*see

generally*, Plfs. MOL).  <u>RESPONSE</u>: Evans is a private citizen with no affiliation with the ZBA

or the Town except that he was appointed as a member of the comprehensive review committee

which was disbanded / dissolved in 2017, prior to LLH's purchase of the Resort Project.

65.    Plaintiffs' assertion: "By 2019, Double Diamond had decided to sell the Project,

causing significant fear among Town residents that a Jewish developer would purchase it. These

minutes record that the mother of the Town Supervisor was 'upset' about 'comments indicating that a religious group would purchase the Lost Lake property' after a broker threatened that a religious group would buy it." (Plfs. MOL at 4, 24 at fn 20). <u>RESPONSE</u>: Misleading and False. Exhibit is July 27, 2019 Planning Board minutes (1 year before LLH's purchase of the resort). They capture discussions by a Hong Kong resort developer that was interested in purchasing the resort 1 year before the property was sold to LLH.  The minutes starting on page 2 "Lost Lake / Love Lake Resort Application" capture the discussion between the Planning Board and the other developer who sought to purchase the property from Double Diamond and wanted approval to be able to sell timeshares rather than vacant developable lots.  The Planning Board told these developers that they are free to apply for the change but any material changes would require additional SEQRA review.  The Hong Kong resort developer made a statement that if the Planning Board did not approve the time share request, they would walk away from the sale and that a "religious group" would purchase the property. In response to a public comment by Evans asking if a religious building could be erected at the resort, the Planning Board stated "there was no provisions in the Lost Lake approvals that include religious buildings" but that "All groups  have an equal opportunity to submit an application for whatever they want to build. The identity of the applicant is irrelevant"  In the Town Board minutes for June 6, 2019, the minutes indicate that Millie Hogue, a public commentor, commented on the potential sale to the Hong Kong based developer or to the county Industrial Development Authority (IDA) stating "In my heart, I knew this Lost Lake would be sold. There it is, I agree with Councilman Budofsky 100% and I'm very upset that a few people want to wait and see what we need to do to opt back in. It [sic] Lost Lake is sold, here we go. Where do we end up if Lost Lake goes to the IDA or the IDA approaches them? I'm sorry we didn't opt out and when we have to worry about opting back in – just do it.

Here we go….there's Lost Lake. I'm sorry, I'm just upset." Millie Hogue's comments, made in 2019, made no reference to religion or imply discrimination (*see* ¶¶ 15-16, *above*; *see* Robbins Dec. ¶¶ 51-56).

66.     Plaintiffs' assertion: "Comments to news sites and social media [fn 5] included statements such as 'Hasidics will buy it and destroy it.'" (Plfs. MOL at 54). RESPONSE: Misleading.  The social media cite referenced in footnote 5 is the Facebook Group page for the Sullivan County Democrat, and the Facebook Group page for the Sullivan County Post, both local papers.  The Facebook Group for the Sullivan County Democrat has over 10,000 followers. The Facebook Group for the Sullivan County Post has almost 30,000 followers.  Comments made on theses pages are not under the control of the Town Board members.  Nor did the comments referenced by Plaintiffs influence any Town Board member,

67.     Plaintiffs' assertion: "In August 2020, the Town's Supervisor assured his constituents that as to the new buyers: 'There will be much more oversight than Lost Lake had.'" (Plfs. MOL at 5, 21, 22). <u>RESPONSE</u>: Misleading. The referenced statement that "There will be much more oversight than Lost Lake had" was made on August 6, 2020 during a Town Board Meeting where I reported to the Town Board representations LLH made to me. As evidenced by the referenced minutes, LLH cherry-picked that sentence out of context.  The full statement was: "Supervisor Hogue asked [LLH representatives] about inspections and the additional overload on our part time building inspector. They are willing to hire an outside inspection company to oversee all of the construction.  There will be much more oversight than Lost Lake had."  The "much more oversight" was in reference to the outside inspection company that LLH stated it would hire to oversee compliance.  To date, LLH has not hired an outside inspection company.

68.     Plaintiffs' assertion: "The ZBA's reasons were explicitly discriminatory."   (Plfs. MOL at 11). <u>RESPONSE</u>: False and misleading. Plaintiffs have conflated and mischaracterized the word "demographics".  As used in the underlying SEQRA documents and the ZBA decision, "demographics" is a technical term that refers to the vacation / seasonal home real estate market that the prior developer based the resort project on (ZBA Decision at 12, 19-20, 27-28) and which the + 435% density increase was based on.   Plaintiffs use "demographics" to connote religious affiliation or economic-class, which is not how the term is used in the permit record.

69.     Plaintiffs' assertion: "The ZBA determined that Hasidic Jewish families would not be consistent with the 'upscale,' 'higher income population of the region' preferred by the Town" (Plfs. MOL at 11). <u>RESPONSE</u>: False and misleading.  Plaintiffs have conflated and mischaracterized the word "demographics".  As used in the underlying SEQRA documents and the ZBA decision, "demographics" is a technical term that refers to the vacation / seasonal home real estate market that the prior developer based the Resort Project on (ZBA Decision at 12, 19-20, 27-28) and which the  435% density increase was based on.    Plaintiffs use the term "demographics" to connote religious affiliation or economic-class, which is not how the term is used in the permit record

70.     Plaintiffs' assertion: "Plaintiffs have always intended–and continue to intend–to build the Project in conformity with the Project approvals, as the Town was aware (Supervisor Hogue stating that Plaintiffs 'plan on building it as it was approved')." (Plfs. MOL at 11). <u>RESPONSE</u>: Misleading.  The referenced statement that Plaintiffs "plan on building it as it was approved" was made on August 6, 2020 during a Town Board Meeting where I reported to the Town Board representations LLH made to me.  These representations were made in 2020, months

before LLH submitted its first building permit application in November 2020, and over a year before LLH submitted amended Design Guidelines and amended CC&Rs.

71.    Plaintiffs' assertion: " In addition to the explicitly anti-Hasidic statements made by the Building Inspector, the ZBA and other officials described above. . ." (Plfs. MOL at 21, 23).

RESPONSE: False, unsupported. Plaintiffs' MOL does not describe or evidence an "explicitly anti-Hasidic statements" uttered by the Building Inspector, the ZBA, or other Town officials. Statement is made without support.

72.    Any statements in Plaintiffs' MOL not addressed above remain disputed.

[signature page follows]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 29, 2023.
Forestburgh, New York

WENDY M WELLS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01WE6340304
Qualified in Sullivan County
Commission Expires April 18, 20 24

DANIEL S. HOGUE, JR.
TOWN OF FORESTBURGH
TOWN SUPERVISOR

22