UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
LOST LAKE HOLDINGS LLC, a domestic :
limited liability company; MISHCONOS :
MAZAH LLC, a domestic limited liability :
company; RABBI MORDECHAI :
HALBERSTAM; and ROSE HALBERSTAM, :
                Plaintiffs, :
v. :
                 :
THE TOWN OF FORESTBURGH; THE :
FORESTBURGH TOWN BOARD; :
FORESTBURGH ZONING BOARD OF : **OPINION AND ORDER**
APPEALS; DANIEL S. HOGUE, JR., in his :
personal capacity; STEVE BUDOFSKY, in his : 22 CV 10656 (VB)
personal capacity; SUSAN PARKS-LANDIS, in :
her personal capacity; KAREN ELLSWEIG, in :
her personal capacity; VINCENT GALLIGAN, :
in his personal capacity; RICHARD ROBBINS, :
in his personal capacity; and GLENN A. :
GABBARD, in his personal capacity and his :
official capacity as Building Inspector of the :
Town of Forestburgh, :
                Defendants. :
--------------------------------------------------------------x

Briccetti, J:

      Plaintiffs Lost Lake Holdings LLC ("LLH"), Mishconos Mazah LLC ("Mishconos"), and Rabbi Mordechai Halberstam and Rose Halberstam (together, the "Halberstam Plaintiffs") bring this action against the Town of Forestburgh (the "Town"), the Forestburgh Town Board, the Forestburgh Zoning Board of Appeals (the "ZBA"), and several Town officials and employees. Plaintiffs allege defendants have prevented construction of a housing development known as the "Lost Lake Resort" ("Lost Lake") and, in so doing, have violated plaintiffs' rights under the United States Constitution, the New York State Constitution, the Fair Housing Act ("FHA"), 42 U.S.C. § 1982, and the New York State Civil Rights Law. Plaintiffs also bring claims for common-law trespass and tortious interference with prospective business advantage. Lastly,

1

plaintiffs ask this Court to annul and vacate, under Article 78 of the New York Civil Practice Law and Rules, the ZBA's decision to deny plaintiffs building permits to construct homes on the Lost Lake property.

Now pending is plaintiffs' motion for a preliminary injunction.  (Doc. #82).  Plaintiffs seek to enjoin the Town from (i) enforcing various orders that prohibit plaintiffs from developing the Lost Lake site, (ii) requiring supplemental environmental review of the Lost Lake development pursuant to the New York State Environmental Quality Review Act ("SEQRA"), and (iii) further prosecuting a New York state civil action to enjoin plaintiffs from unlawful construction, see Town of Forestburgh v. Lost Lake Holdings, No. 2023-186 (N.Y. Sup. Ct., Sullivan Cnty. 2023).

For the reasons set forth below, the motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

**BACKGROUND**

The parties have submitted memoranda of law and supporting declarations and exhibits.[1] Together, they reflect the following facts.[2]

I.      Development Under Double Diamond

Forestburgh is a rural enclave, home to approximately 900 residents in Sullivan County, New York. (Doc. #99-16 at ECF 8).[3] In 2008, a developer named Double Diamond, Inc. ("Double Diamond"), purchased a 3.3-square-mile undeveloped parcel of land in the Town, with the intention of turning the property into the "Lost Lake Resort." Double Diamond promised that Lost Lake would be "an upscale recreational destination," boasting a gated community, extensive on-site recreational amenities, "hotel/conference facilities," and more. (Doc. #110-5 at 2).

---

[1] Both plaintiffs and defendants argue the Court should disregard the opposing parties' supporting declarations. Defendants argue plaintiffs' declarations are based on impermissible hearsay (Doc. #103 at 7), and plaintiffs argue defendants' declarations contain legal argument and are not based on personal knowledge (Doc. #116 at 1–2). The Court disagrees with both positions. It is well settled in this Circuit "that hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010). Moreover, preliminary injunctive proceedings usually involve "procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). Accordingly, the Court has weighed and considered the parties' supporting sworn declarations in making its findings of fact.

Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

[2] Although the Court is required to make findings of fact on a motion for a preliminary injunction, these findings are not binding and may be modified after a trial on the merits. See Visual Scis., Inc. v. Integrated Comm'cns Inc., 660 F.2d 56, 58 (2d Cir. 1981).

[3] "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

3

At the time of Double Diamond's purchase, the Lost Lake property was located within a residential zoning district.  Under the Town Code, residential zones were subject to population-density and size limits, which restricted lots to a minimum of 100,000 square feet (approximately 2.3 acres), with a maximum of one dwelling per lot.  (Doc. #110-16 (the "ZBA decision") at 7).  However, Double Diamond determined that for the project to be "economically feasible," it would need to subdivide the land into a larger number of total lots than the size and density limits permitted.  (Doc. #112-1 at 5).  Accordingly, Double Diamond asked the Town Board to rezone Lost Lake as a "Planned Development District" ("PDD").  Rezoning the property as a PDD would permit the Town to depart from its standard residential density and size limits to accommodate the Lost Lake project plan, if warranted.  (Doc. #112 ¶ 15).

Before acting on Double Diamond's PDD application, the Town Board undertook a mandatory environmental review of the proposed project under SEQRA.  SEQRA provides a set of procedures municipalities must employ to evaluate the environmental impacts of a proposed real estate development project in New York State.  Here, SEQRA required the Town to request and approve an Environmental Impact Statement ("EIS")—a document that "weighs the social, economic, and environmental factors of a municipality's proposed decision or regulation" and accounts for any available alternatives and possible mitigating factors.  Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, 945 F.3d 83, 90–91 (2d Cir. 2019) ("Tartikov II").

Double Diamond submitted a final EIS to the Town Board on March 21, 2011.  (Docs. ##112-3, 112-4).  After review, comment, and public hearings, the Town Board prepared and adopted a "Findings Statement," which summarized the three-year environmental review process.  (Doc. #112-5).  The Findings Statement identified possible adverse environmental,

4

social, and economic impacts of Double Diamond's proposed project, and it specified mitigation measures the developer would undertake as conditions to construction approvals.

On July 7, 2011, the Town Board adopted Local Law 3 of 2011, which amended the Town's then-existing PDD regulations to allow for the modified size and density limits necessary to accommodate Double Diamond's proposal. On August 4, 2011, the Town Board officially voted to rezone Lost Lake as a PDD. (Doc. #60 (the "FAC") ¶ 62). In 2012 and 2013, the Town Board approved Double Diamond's proposed site plan and subdivision plat.[4] Double Diamond thus began constructing necessary infrastructure improvements on the land, such as roads and utilities.

II.     Sale to Plaintiffs

At some point in 2019, Double Diamond put the Lost Lake project up for sale. In July 2020, LLH and Mishconos purchased the project. Plaintiffs contend their purchase included a conveyance of the land, transfer of all development rights and rights in all previously issued approvals and authorizations, and ownership of all installed infrastructure. (FAC ¶ 116). Plaintiffs assert they bought the project based on their belief that it was "shovel-ready," i.e., "all that was needed to begin construction of single-family homes" was "issuance of building permits." (Id. ¶ 115).

The principals of LLH and Mishconos are practicing Hasidic Orthodox Jews. Plaintiffs assert that when the Town and its residents learned the new owners and developers of Lost Lake

---

[4]     The Town Code contains complex procedures for the review and submission of subdivision plans and documentation. The Court need not delve into the details of those procedures here. Suffice it to say, pursuant to the Town Code, Double Diamond had to secure approval of both a "site plan" (showing the Lost Lake parcel, all adjacent structures, and all proposed changes or improvements), and a "subdivision plat" (showing the intended division and layout of the proposed subdivision). Forestburgh, N.Y., Code §§ 85-29, 148-16, 148-17.

were Hasidic Orthodox Jews, the Town commenced a campaign to prevent plaintiffs from building Lost Lake and, thus, to keep Hasidic Orthodox Jews from moving to Forestburgh.

      A.      <u>Building Permit Applications</u>

In the fall of 2020, shortly after purchasing the project, plaintiffs submitted several building permit applications for construction of single-family homes on the Lost Lake site. Pursuant to the Town Code, defendant Gabbard reviewed these applications in his capacity as the Town's Building Inspector. Gabbard approved the first two applications, for construction on Lots 301 and 302, respectively. (Docs. ##111-1, 111-2). In a sworn declaration, Gabbard asserts, after issuing the first two building permits, he discovered misrepresentations and deficiencies in the applications. (Doc. #111 ¶ 8). Specifically, he states plaintiffs misrepresented they owned Lot 302, and both applications were submitted with misleading and false supporting documentation. (<u>Id</u>.) Gabbard ultimately decided to revoke the permit for Lot 302 because of its disputed ownership, but he permitted construction to begin on Lot 301.

In June 2021, plaintiffs submitted a third application—this time for Lot 303. The Lot 303 application triggered a lengthy period of correspondence and vigorous disputes between plaintiffs and their counsel on the one hand, and Gabbard and various Town officials on the other. In an October 28, 2021, letter, plaintiffs' counsel, Steven Barshov, wrote to Gabbard, saying plaintiffs would "be offering reasonably priced and affordable units to Hasidic Jewish families who have a very significant unmet demand for such units." (Doc. #99-6 at 1). Approximately one month later, Gabbard denied the Lot 303 application and issued a memorandum explaining his decision. (Doc. #100-22). In January 2022, plaintiffs filed fourteen

additional building permit applications. Gabbard denied all fourteen applications, citing the same defects as contained in the Lot 303 application. (FAC ¶¶ 269–70; Doc. #111 ¶¶ 38–39).

On January 20, 2022, plaintiffs commenced an administrative appeal with the ZBA, challenging Gabbard's denial of the building permit applications. After an evidentiary hearing, in which the ZBA received extensive evidence and witness testimony, the ZBA issued a final decision affirming Gabbard's denial of the permits. (ZBA Decision at 33–35). Plaintiffs allege their procedural and substantive due process rights under the New York and United States Constitutions were repeatedly violated throughout the ZBA proceedings.

In sum and substance, the ZBA decision concludes the building permit applications reveal plaintiffs intend to build a substantially different development than the one the Town had previously endorsed. According to the ZBA, the Town approved the Lost Lake project, after extensive consideration, because Double Diamond represented it would be an "upscale" recreational resort occupied by affluent, seasonal residents whose environmental and economic impact on the Town would be mitigated or offset. Instead, the ZBA concluded, plaintiffs intend to build Lost Lake as a high-density, affordable-housing community—lacking certain environmental controls—and designed for full-time residents and families. The ZBA also emphasized the Town's understanding it would retain substantial control over the development of the project. The ZBA determined plaintiffs have, in contrast, tried to vest themselves with near unilateral control over the project.

B.   Post-Appeal Events

The parties vigorously dispute what happened next. Defendants assert plaintiffs, by continuing to work on the Lost Lake site without permits and after losing their ZBA appeal, engaged in unauthorized construction. Plaintiffs assert they were doing authorized infrastructure

work pursuant to permits issued by the New York State Department of Environmental Conservation. Plaintiffs argue no Town building permits were required to install such infrastructure.

In any event, the parties do agree that, in January 2023, the Town issued a series of orders commanding plaintiffs to stop all construction work on the Lost Lake property and submit to an inspection of the project site. Then, on February 3, 2023, the Town filed a complaint against plaintiffs in New York State Supreme Court, Sullivan County, seeking to enjoin "any further construction, installation of infrastructure, or disturbance of the land." (FAC ¶ 450). On March 30, 2023, the Town Board adopted a resolution calling for a supplemental environmental review of the Lost Lake project under SEQRA. Plaintiffs contend they have no obligation to comply with the supplemental review.

Plaintiffs assert defendants' actions are motivated by discriminatory animus against Hasidic Orthodox Jews. Plaintiffs point, in particular, to many vehement anti-Semitic statements made by alleged Sullivan County residents, both at public hearings and on websites and forums discussing the Lost Lake project.

## DISCUSSION

I.      Ripeness

Because defendants' response to the instant motion raises a jurisdictional issue, the Court must address at the outset whether plaintiffs' claims are ripe for adjudication. See Missere v. Gross, 826 F. Supp. 2d 542, 554 (S.D.N.Y. 2011). Defendants argue plaintiffs' claims are unripe because the Town's denial of plaintiffs' requested building permits is not a "final, definitive position." (Doc. #103 at 17–18).

The Court disagrees.

A.      Legal Standard

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority."  Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005).  Thus, the Court cannot hear plaintiffs' claims unless it "appears affirmatively from the record" such claims are ripe.  Id.

As-applied challenges to municipal land-use decisions "are generally not ripe for adjudication until a landowner receives a final, definitive decision" dictating how the property may be used.  Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th 287, 290 (2d Cir. 2022).  However, as the Second Circuit recently observed, "[s]o long as a plaintiff has submitted a meaningful application to municipal agencies to address its land-use controversy," and the municipality "has had an opportunity to commit to a position that by all accounts, it intends to be final, the parties' dispute is sufficiently final for ripeness purposes."  Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown, 2023 WL 8494453, at *5 (2d Cir. Dec. 8, 2023).  Additionally, a plaintiff need not appeal a zoning agency's decision when to do so would be futile.  Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 296.

B.      Analysis

Defendants argue plaintiffs' claims are unripe for three reasons:  (i) a land-use challenge is not ripe until the property owner seeks, and is denied, a variance, (ii) plaintiffs never appealed the ZBA's decision to the Town Board or sought modifications of the original project approvals, and (iii) plaintiffs have not initiated an Article 78 proceeding in state court to challenge the ZBA's decision or the Town's subsequent actions.  None of these arguments is availing.

First, defendants are correct that in Murphy v. New Milford Zoning Commission, the Second Circuit concluded the property owner had to apply for a land-use variance before seeking

9

federal review. 402 F.3d at 348. However, in the same breath, the court cautioned that the finality requirement is not to be "mechanically applied." Id. at 349. And, in Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown, the Circuit emphasized "nothing more than de facto finality is necessary." 2023 WL 8494453, at *5. In other words, finality is fact-specific and there is no magic formula that will satisfy the finality requirement in every case.

Second, there is no practical or logical reason to require plaintiffs to apply for a variance, further appeal the ZBA's decision, or seek project approval modifications from the Town Board. The record on the instant motion clearly demonstrates defendants intend to insist on plaintiffs' strict compliance with the Town's zoning and land-use regulations. (See, e.g., Doc. #108 ¶ 58 ("Enjoining the enforcement of these zoning laws, even on a temporary basis, could have adverse impacts, including environmental harm and detriment to public health, especially if the Plaintiff is allowed to continue with a construction project that patently violates the town's zoning codes.")). Defendants have also conditioned construction and development approvals on a supplemental environmental review of the project—a review with which plaintiffs contend they have no obligation to comply. In other words, the parties have clearly staked out their positions. Accordingly, for plaintiffs to seek a variance, return to the Town Board, or apply for project modifications at this stage would be a useless and perfunctory exercise that would not aid the Court in adjudicating their claims.

Third, it is well settled plaintiffs need not necessarily bring an Article 78 action in state court before challenging a land-use decision in federal court. 545 Halsey Lane Props., LLC v. Town of Southampton, 39 F. Supp. 3d 326, 338 (E.D.N.Y. 2014). See Congregational Rabbinical Coll. of Tartikov v. Village of Pomona, 915 F. Supp. 2d 574, 609–10 (S.D.N.Y. 2013) ("Tartikov I") (observing exhaustion of state or local remedies is not a prerequisite to a

federal FHA suit). Therefore, plaintiffs' claims are not rendered unripe simply because they failed to file an Article 78 action challenging the ZBA's decision.

Accordingly, plaintiffs' claims are ripe for adjudication by this Court.

II. Standard of Review

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a <u>clear</u> <u>showing</u>, carries the burden of persuasion." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2017).

A party seeking a preliminary injunction "must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." MONY Grp., Inc. v. Highfields Cap. Mgmt., L.P., 368 F.3d 138, 143 (2d Cir. 2004).

Moreover, "a mandatory injunction that alters the status quo by commanding a positive act" requires "a clear or substantial showing of a likelihood of success on the merits," especially when the moving party seeks to enjoin the government. D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 510 (2d Cir. 2006), amended on denial of reh'g, 480 F.3d 138 (2d Cir. 2007). Thus, "mandatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party." Haley v. Pataki, 106 F.3d 478, 483 (2d Cir. 1997).[5]

---

[5] Although plaintiff's proposed preliminary injunction could be described as either mandatory or prohibitory, "the proposed injunction's effect on the status quo drives the standard." A.H. ex rel. Hester v. French, 985 F.3d 165, 176–77 (2d Cir. 2021). The status quo is "the last actual, peaceable, uncontested status which preceded the pending controversy." Id. Thus, in this case, the status quo is the state of affairs that existed prior to plaintiffs' application for building permits—which precipitated the events challenged here. Because the proposed preliminary injunction would prevent defendants from prohibiting construction on the Lost Lake property, the higher legal standard for a mandatory injunction is the appropriate one on this motion.

Further, it is axiomatic that when an alleged injury "could be adequately compensated with money damages," a preliminary injunction should not issue. Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 82 (2d Cir. 1994). Only injuries that are "actual and imminent," Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002), and "cannot be remedied at the end of trial if the movant were to prevail," Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 115 (2d Cir. 2005) (emphasis omitted), may constitute irreparable harm.

III. Irreparable Harm

In substance, plaintiffs allege they have suffered both per se irreparable harm flowing from violations of their constitutional[6] and statutory rights, and economic harm caused by the Town's prohibition on construction at the Lost Lake site. The Court disagrees and concludes neither species of injury is sufficient in this case to warrant the preliminary injunction plaintiffs seek.

    A.    Constitutional Claims[7]

Relying principally on Elrod v. Burns, 427 U.S. 347, 373 (1976), plaintiffs assert the Court should presume irreparable harm because they have alleged violations of their First Amendment rights. Elrod involved a First Amendment challenge brought by employees of a county sheriff's office who were threatened with discharge for their failure to support or

---

[6] Plaintiffs mention their state constitutional claims in passing when asserting they have established irreparable harm. However, the Court need not separately analyze plaintiffs' state constitutional claims because "[t]he New York Constitution's due process, equal protection, and free exercise protections are essentially coextensive with those provided by the federal Constitution." Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F. Supp. 3d 459, 482 (S.D.N.Y. 2015). Moreover, "[t]here is no private right of action for violations of the New York State Constitution where alternative remedies exist, for example under § 1983." Id. at 483.

[7] Plaintiffs raise their constitutional claims through the statutory vehicle of 42 U.S.C. § 1983, which creates a private right of action for individuals to sue state actors for deprivations of their constitutional rights.

associate with the Democratic Party.  Id. at 349–50.  In reflecting on the district court's denial of preliminary injunctive relief, the Supreme Court observed "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Id. at 373.

However, in the years since Elrod, "[c]ourts in this circuit 'have not spoken with a single voice'" when deciding whether irreparable harm should be presumed in cases "alleging the abridgement of First Amendment rights.'"  Blatt v. City of New York, 2019 WL 1367605, at *3 (S.D.N.Y. Mar. 26, 2019) (quoting Amandola v. Town of Babylon, 251 F.3d 339, 343 (2d Cir. 2001) (per curiam)).  Indeed, many courts have distinguished between a plaintiff whose First Amendment rights are directly regulated or restrained and one who retains her First Amendment rights but has suffered only economic injury in the pursuit thereof.  See Talukder v. N.Y. State Dep't of Corr. & Cmty. Supervision, 2023 WL 3675920, at *6 (S.D.N.Y. May 26, 2023); Greer v. Mehiel, 2016 WL 828128, at *9–10 (S.D.N.Y. Feb. 24, 2016).  In the latter category, although the claim is of a constitutional dimension, the injury itself is compensable by money damages and, therefore, not irreparable for the purposes of a preliminary injunction.  See, e.g., Smith v. Fredrico, 2013 WL 122954, at *6 (E.D.N.Y. Jan. 8, 2013) (collecting cases).

This distinction is well illustrated by the Second Circuit's decision in Kane v. DeBlasio, 19 F.4th 152 (2d Cir. 2021), a free exercise case brought by a group of teachers and administrators who were suspended from work because they had refused to comply, for religious reasons, with a COVID-19 vaccine mandate.  The Kane court found the government should be enjoined from employing administrative procedures that challenged the sincerity of plaintiffs' religious beliefs and practices.  However, the plaintiffs were not entitled to a preliminary injunction immediately reinstating them and awarding back pay because they were "not required

13

to perform or abstain from any action that violates their religious beliefs." Although the plaintiffs were undoubtedly harmed by a loss of income while on leave, "that harm is not irreparable." Id. at 172.

So too here. Nothing in the record suggests defendants' actions have impaired, impinged on, or prevented plaintiffs from freely exercising their sincerely held religious beliefs. Moreover, in contrast to other free exercise cases, plaintiffs are not religious institutions, their motivations are not religious in nature, and they do not seek to use the land for anything other than purely secular purposes. Cf. Tartikov I, 915 F. Supp. 2d at 631–32 (collecting cases) (noting that zoning schemes which limit the way a religious institution can use its property may directly restrict religious exercise); Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349–50 (2d Cir. 2003) (concluding "irreparable harm may be presumed" when a middle school denied a church's request to rent space for religious services). Rather, plaintiffs face the prospect of private economic loss if the Town prevents them from developing the Lost Lake project site. This alleged harm, while serious, is compensable by money damages should plaintiffs prevail on the merits of their claims. See Savage v. Gorski, 850 F.2d 64, 68 (2d Cir. 1998).

In reply, plaintiffs obliquely reference stigmatic injury. (Doc. #116 at 18). However, the case plaintiffs quote, Tartikov II, observed only that the stigma of discrimination may support Article III standing. 945 F.3d at 110. Contrary to plaintiffs' suggestion, the court did not conclude stigmatic injury on its own constitutes irreparable harm warranting a preliminary injunction.

In any event, although the Court does not doubt discrimination of the kind alleged here works a deeply painful dignitary harm on its targets, "it is unclear how an injunction would cure

the purported stigma." Blatt v. City of New York, 2019 WL 1367605, at *2 n.2. The Court is mindful of the sensitive historical, religious, and political context of this case. However, assuming plaintiffs are correct that defendants intended to stigmatize them "as less worthy participants in the political community," Tartikov II, 945 F.3d at 110, plaintiffs have not sufficiently articulated how the proposed preliminary injunction would address the sting of that stigma. Cf. Roe v. Dep't of Def., 947 F.3d 207, 229 (4th Cir. 2020) (absent an injunction, HIV-positive servicemembers would likely "be forced to reveal their condition" and confront "the stigma facing those living with HIV").

Accordingly, the Court neither presumes nor discerns irreparable harm on the basis of plaintiffs' constitutional claims.[8]

B.  Economic Harm

Plaintiffs also assert they have been irreparably harmed because (i) defendants' actions, taken together, have prevented plaintiffs from building or installing any infrastructure on the Lost Lake property, and (ii) the Town's decision to reopen SEQRA review "will be adding unnecessary years to the development." (Doc. #83 at 17).

The Court disagrees.

As a general matter, economic harm is rarely irreparable. Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, 934 F.3d 30, 34 (2d Cir. 1991). Ordinarily, economic injury only constitutes irreparable harm under special circumstances. For example, courts have found irreparable harm when monetary damages would be barred by sovereign immunity, Regeneron Pharms., Inc. v.

---

[8]  Although plaintiffs address their likelihood of success on the merits of an equal protection claim, they do not address equal protection in the context of irreparable harm. Accordingly, the Court need not decide whether an equal protection violation would suffice, on its own, to warrant a presumption of irreparable harm.

U.S. Dep't of Health & Hum. Servs., 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020), or the potential economic loss is so great it threatens to put a party out of business. JTH Tax, LLC v. Agnant, 62 F.4th 658, 668 & n.3 (2d Cir. 2023).

Here, plaintiffs have not shown they cannot be made whole with monetary damages after a trial on the merits. This is not a case in which the loss of an interest in real property constitutes irreparable, non-compensable harm. "[W]hether real property loss creates irreparable injury is a fact-sensitive inquiry." Medgar Evers Houses Assocs., L.P. v. Carro, 2001 WL 1456190, at *4 (E.D.N.Y. Nov. 6, 2001). And when, as here, "a Plaintiff's interest in the real estate is commercial, and the harm it fears is the loss of its investment, as opposed to loss of its home or a unique piece of property in which it has an unquantifiable interest," damages to property rights generally do not amount to irreparable harm. Atlas MF Mezzanine Borrower, LLC v. Macquarie Tex. Loan Holder, LLC, 2017 WL 729128, at *3 (S.D.N.Y. Feb. 23, 2017); Wickapogue 1 LLC v. Blue Castle (Cayman) Ltd., 657 F. Supp. 3d 234, 239 (E.D.N.Y. 2023).

Moreover, plaintiffs cite no authority (and the Court is aware of none) supporting the proposition that a delay in construction and development caused by a supplemental SEQRA review, without more, constitutes irreparable harm. Cf. Joglo Realties, Inc. v. Seggos, 2016 WL 4491409, at *17 (E.D.N.Y. Aug. 24, 2016). Plaintiffs do not allege the delay will effectively make future development impossible or infeasible such that the absence of an injunction will preclude them from ever building on the Lost Lake property at all. Further, if the Court were to enjoin the Town from insisting on the supplemental SEQRA review during the pendency of this litigation, and defendants were ultimately to prevail on the merits, the proposed injunction would have effectively delayed development even longer.

Accordingly, the Court concludes plaintiffs have not established their economic injuries are irreparable for purposes of a preliminary injunction.

C.     Statutory Claims

Lastly, plaintiffs argue the Court should presume irreparable harm because they seek an injunction based on statutory violations of the FHA and 42 U.S.C. § 1982.

The Court disagrees.

Plaintiffs assert that when parties seek a statutorily authorized injunction, the Second Circuit has "dispensed with the requirement of showing irreparable harm, and instead employ[s] a presumption of irreparable harm based on a statutory violation." (Doc. #83 at 16 (quoting City of New York v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010))). However, that case does not reach nearly as far as plaintiffs suggest.  There, the Circuit observed, "[i]n certain circumstances" involving statutory injunctions, it has presumed irreparable harm. City of New York v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010) (emphasis added).  But, as the discussion in Golden Feather reveals, the court principally had in mind cases in which the government seeks to enjoin an ongoing public harm under a statutory remedial scheme.  See id. at 120–21.  Thus, Golden Feather does not support the sweeping conclusion that courts should presume irreparable harm whenever a party invokes a statute that empowers district courts to issue preliminary injunctions.

Moreover, the Second Circuit has not resolved "whether a presumption of irreparable harm" applies to FHA and Section 1982 claims, specifically.  Forest City Daly Hous., Inc. v. Town of Hempstead, 175 F.3d 144, 150 (2d Cir. 1999).  "There is some support for the proposition that where a plaintiff demonstrates a likelihood of success on the merits of a fair housing claim, irreparable harm may be presumed." Id.  However, this presumption generally

17

arises in contexts very different than this one. For example, courts in this Circuit have presumed irreparable harm in FHA cases when, absent a preliminary injunction, the affected party faced a real threat of homelessness. See, e.g., Wiesner v. 321 W. 16th St. Assocs., 2000 WL 1191075, at *7 (S.D.N.Y. Aug. 22, 2000); cf. Tellock v. Davis, 84 F. App'x 109, 111 (2d Cir. 2003) (summary order) ("[A]ny injury to Tellock can be compensated by money damages, which would include the price of increased rent plus moving expenses.").

Similarly, a presumption of irreparable harm is appropriate when an institution or organization seeks explicitly to provide housing to a vulnerable population in immediate need of services, housing, or other accommodations. See, e.g., Step by Step, Inc. v. City of Ogdensburg, 176 F. Supp. 3d 112, 133–34 (N.D.N.Y. 2016); Innovative Health Sys., Inc. v. City of White Plains, 931 F. Supp. 222, 240–41 (S.D.N.Y. 1996) (finding irreparable harm when "the evidence indicates that the inconvenience and lack of space at IHS' current location has interfered, disrupted and prevented [substance-dependency] treatment of current and potential clients").

Here, in contrast, plaintiffs are private developers who seek to build out the Lost Lake property for personal pecuniary gain. Plaintiffs have not alleged—and the Court has no reason to believe—they intend to develop the land for principally religious purposes or to restrict in any way the individuals who might purchase homes in the development.

First, although plaintiffs express an amorphous belief that most of the individuals who would purchase homes in Lost Lake are Hasidic Orthodox Jews, they have offered very little in the way of evidence to support that conclusion. For example, Yehuda Miller states in his sworn declaration that "the majority" of individuals who have inquired about purchasing homes in the development are Hasidic Orthodox Jews. (Doc. #100 ¶ 106). However, Mr. Miller does not disclose how many individuals have inquired about the project in total, or how that number

compares to the expected overall population of the development. Plaintiffs have proposed a development comprised of approximately 2,700 single-family homes and several multi-family condominium units. Thus, by even conservative estimates, the Lost Lake development would provide housing for thousands of new residents. Given the scope of such a development, plaintiffs' threadbare assertions about interest from within the Hasidic Orthodox community are not sufficient to establish the Lost Lake development is intended to or will ultimately serve primarily Hasidic Orthodox Jews.

And even assuming plaintiffs had made such a showing, they have not alleged any facts supporting plaintiffs' counsel's oft-quoted statement that there is a "significant unmet demand" for affordable housing units in the Hasidic Orthodox community. (Doc. #99-6 at 1). Neither have plaintiffs demonstrated the individuals to whom they would sell homes currently lack adequate housing. For example, the Halberstam Plaintiffs state they, along with several of their relatives, plan to purchase homes in the Lost Lake development. Although the Court does not doubt the sincerity of that representation, there is nothing in the record indicating the Halberstams are facing imminent harm if they are unable to build or purchase homes in Lost Lake while this case proceeds.

In sum, even if plaintiffs had alleged—which they have not—Hasidic Orthodox families constitute a vulnerable population in need of imminent housing solutions, plaintiffs have not sufficiently shown the Lost Lake development (and, by extension, a preliminary injunction) would remedy that problem. Therefore, the Court will not presume irreparable harm simply because plaintiffs have pleaded violations of the FHA and Section 1982. And, for the reasons discussed above, the harm plaintiffs allege is otherwise not irreparable because it is compensable with money damages should plaintiffs prevail on the merits.

Accordingly, plaintiffs have not established they are entitled to a preliminary injunction.[9]

## CONCLUSION

The motion for a preliminary injunction is DENIED.

By January 29, 2024, defendants shall answer, move, or otherwise respond to the amended complaint.

The Clerk is instructed to terminate the motion. (Doc. #82).

Dated: December 28, 2023
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

---

[9] Because plaintiffs have not shown irreparable harm, the Court need not address whether they have established a sufficient likelihood of success on the merits.