UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
LOST LAKE HOLDINGS LLC, a domestic        :
limited liability company; MISHCONOS      :
MAZAH LLC, a domestic limited liability   :
company; RABBI MORDECHAI                   :
HALBERSTAM; and ROSE HALBERSTAM,          :
                Plaintiffs,                :
                                        :
v.                                         :
                                        :
THE TOWN OF FORESTBURGH; THE              :
FORESTBURGH TOWN BOARD;                    :
FORESTBURGH ZONING BOARD OF               :        **OPINION AND ORDER**
APPEALS; DANIEL S. HOGUE, JR. in his      :
personal capacity; STEVE BUDOFSKY, in his :        22 CV 10656 (VB)
personal capacity; SUSAN PARKS-LANDIS, in :
her personal capacity; KAREN ELLSWEIG, in :
her personal capacity; VINCENT GALLIGAN,  :
in his personal capacity; RICHARD ROBBINS,:
in his personal capacity; GLENN A.        :
GABBARD, in his personal capacity and his :
official capacity as Building Inspector of the :
Town of Forestburgh,                       :
                Defendants.                :
                                        :
--------------------------------------------------------------x

Briccetti, J:

       Plaintiffs Lost Lake Holdings LLC ("LLH"), Mishconos Mazah LLC ("Mishconos"),

Rabbi Mordechai Halberstam, and Rose Halberstam bring this action against the Town of

Forestburgh (the "Town"), the Town Board, the Town Zoning Board of Appeals (the "ZBA"),

and several Town officials and employees. Plaintiffs allege defendants, motivated by religious

discrimination, prevented construction of the "Lost Lake Resort" development in Forestburgh,

New York. In so doing, plaintiffs allege defendants violated plaintiffs' rights under the United

States Constitution, the New York State Constitution, the Fair Housing Act ("FHA"), 42 U.S.C.

§ 1982, and the New York State Civil Rights Law. Plaintiffs also bring claims for trespass and

1

tortious interference with prospective business advantage.  Plaintiffs seek damages and

declaratory and injunctive relief.  They also ask this Court to annul and vacate, under Article 78

of the New York Civil Practice Law and Rules, the ZBA's decision affirming the decision of the

Town's building inspector to deny plaintiffs building permits to construct homes on the Lost

Lake property.

Now pending is defendants' partial motion to dismiss for lack of subject matter

jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and 12(c).  (Doc. #162).  Relying

principally on BMG Monroe I, LLC v. Vil. of Monroe, 93 F.4th 595 (2d Cir. 2024) ("BMG

Monroe"), which was decided after this Court had ruled plaintiffs' land use claims were ripe for

adjudication, defendants argue the land use claims are actually unripe and thus non-justiciable

because plaintiffs failed to obtain a "final decision" on building permit applications to develop

certain lots on the Lost Lake property.

For the reasons set forth below, the motion to dismiss the land use claims for lack of

ripeness is GRANTED.

## BACKGROUND

The parties have submitted memoranda of law and supporting declarations and exhibits.

Together with the pleadings, they reflect the following facts.

I.    Double Diamond and Conditional Approval of the Lost Lake Resort

The Town of Forestburgh is a rural community in Sullivan County, New York, with a

population of approximately 900.  In 2008, a developer named Double Diamond, Inc. ("Double

Diamond"), submitted an application to purchase a 3.3 square-mile undeveloped parcel of land in

the Town, with the intention of developing it into the "Lost Lake Resort."  According to Double

Diamond's proposal, the Lost Lake Resort would be an upscale, resort-style destination with a

gated community, hotel and conference facilities, and recreational amenities, including an 18-hole golf course, clubhouse and restaurant, a health and wellness spa, tennis courts, and walking trails.

At the time of Double Diamond's proposal, the Lost Lake property was located within a residential zoning district.  As a result, the property was subject to municipal regulations governing population density and size limits, which restricted lots to a minimum of 100,000 square feet with a maximum of one dwelling per lot.  Because the existing residential zoning regulations would not permit Double Diamond's proposed development plans for Lost Lake, Double Diamond applied for a zoning change to a Planned Development District ("PDD") under the Town's applicable PDD law, which authorized the Town to establish new density standards and grant density changes to proposed projects.  In accordance with the State Environmental Quality Review Act ("SEQRA") and the Environmental Conservation Law ("ECL"), the Town was designated under SEQRA to commence an environmental review related to Double Diamond's application.

As part of the SEQRA environmental review process, Double Diamond prepared an environmental impact statement ("EIS").  An EIS analyzes potential adverse environmental effects of a proposed development or action and identifies how such impacts may be avoided or minimized.  Pursuant to the EIS process, the Town Board conducted its own review, including public scoping and public hearings, and directed Double Diamond to file draft ("DEIS") and final ("FEIS") environmental impact statements.

In the DEIS and FEIS, Double Diamond represented that the "target market" for the Lost Lake Resort was individuals seeking "to build their second or retirement home here in Sullivan County for recreation and leisure, and as a real estate investment."  (Doc. #112-3 at 2–4).

3

Accordingly, property lots at Lost Lake Resort were to be "developed by the individual lot owners over time in accordance with Design Standards and subject to review and approval by the Lost Lake Architectural Control Committee." (Id. at 1–4). As for the environmental impacts of the proposed project, Double Diamond identified potential adverse environmental impacts and outlined mitigation measures to address these adverse impacts. (See, e.g., Doc. #112-3 at 3.2–20, 3.3–15, 3.4.3).

On May 18, 2011, after a multi-year review process, the Town Board issued its SEQRA Findings Statement. (Doc. #112-5). A SEQRA Findings Statement is prepared following the acceptance of the FEIS and identifies the social, economic, and environmental considerations involved in a proposed action. According to the Findings Statement, the Lost Lake Resort would consist of single-family residential lots, single-family cottages, and townhouse-style condominiums, as well as recreational and dining facilities. (Id. at 7). Residences would be constructed by individual owners of lots within the property site and would be built "in full accordance with Design Guidelines" that stipulated a specific design theme and sustainability guidelines. (Id.). The Findings Statement also noted that the proposed density of the project, as a "second home residential development" with "recreation-related commercial uses[,] was determined by the Town Board to be consistent and compatible" with the surrounding community. (Doc. #112-5 at 9–10). Finally, the Town Board concluded that Double Diamond's proposal would "avoid[] or minimize[] adverse environmental impacts" by incorporating the "mitigative measures that were identified as practicable in the DEIS, FEIS, and this Findings Statement." (Id. at 73).

On July 7, 2011, the Town Board adopted Local Law 3 of 2011, which amended the Town's then-existing PDD regulations to allow for the density and size limitations to

accommodate Double Diamond's proposal.  (Doc. #111-3).  On August 4, 2011, the Town Board approved Double Diamond's PDD application and voted to rezone Lost Lake as a PDD.  (Doc. #112-9) (the "2011 PDD Approval").  As a result, the Lost Lake site was rezoned from a residential zoning district to a PDD "subject to restrictions and mitigation requirements incorporated into the master plans [] and SEQRA Findings Statement."  (Doc. #112-14 at 14). The 2011 PDD Approval also vested the Town Board with "exclusive review and approval jurisdiction over the subdivision and site plan applications for the Lost Lake Resort."  (Doc. #112-9 at 10).

In 2012 and 2013, the Town Board conditionally approved Double Diamond's proposed site plan and subdivision plat.  (Docs. ##112-10, 112-11).  Thereafter, Double Diamond began constructing the necessary infrastructure on the property, such as roads and utilities.  However, no residences were constructed.

II.    Plaintiffs' Purchase and Development of the Lost Lake Resort

In 2019, Double Diamond put the Lost Lake project up for sale.  In July 2020, LLH and Mishconos purchased the project.

The principals of LLH and Mishconos are practicing Hasidic Orthodox Jews.  According to plaintiffs, when the Town and its residents learned the new owners of Lost Lake were Hasidic Jews, the Town embarked on a campaign to preclude plaintiffs from building Lost Lake in an effort to prevent Hasidic Jews from moving to Forestburgh.

A.    Building Permit Applications

In the fall of 2020, soon after purchasing the project, plaintiffs submitted several building permit applications for the construction of single-family homes on the Lost Lake property. Defendant Glenn Gabbard, in his capacity as the Building Inspector for the Town, reviewed the

applications.  Gabbard approved the first two applications, for construction on Lots 301 and 302, respectively.  (Docs. ##111 ¶ 7, 111-1, 111-2).

Gabbard asserts in a sworn declaration that, after issuing the first two building permits, he discovered misrepresentations and deficiencies in the applications.  (Doc. #111 ¶ 8). Specifically, Gabbard states plaintiffs misrepresented that they owned Lot 302, and that both applications were submitted with misleading and false supporting documentation.  (Id.). Gabbard ultimately revoked the permit for Lot 302 because of its disputed ownership, but he permitted construction to begin on Lot 301.  (Id. ¶ 9).  Plaintiffs commenced and completed construction of a single-family home on Lot 301.

In June 2021, plaintiffs submitted a building permit application for Lot 303 (the "Lot 303 application.").  (Doc. #111 ¶ 18).  According to Gabbard, the Lot 303 application contained the same misrepresentations and deficiencies as the Lot 301 and 302 applications.  (Id. ¶ 19). Specifically, Gabbard found the Lot 303 application was incomplete because it did not contain the requisite documentation.  After Gabbard informed plaintiffs of the deficiencies in the application, plaintiffs submitted additional information.  On October 7, 2021, Gabbard informed plaintiffs that the deficiencies in the Lot 303 application were still outstanding.  (Doc. #111 ¶¶ 31–32).

Plaintiffs subsequently withdrew the application and submitted a second application for Lot 303.  (Doc. #111 ¶ 33).  Because the second application for Lot 303 did not cure the original deficiencies, Gabbard denied the second application on November 23, 2021.  Gabbard issued a memorandum explaining that he was denying the Lot 303 application because, among other

reasons, it was "inconsistent with the 2013 project approval documents."  (Doc. #100-22; Doc. #111 ¶ 36).

On January 6, 2022, plaintiffs filed fourteen additional building permit applications. Gabbard denied all fourteen applications, citing the same defects as contained in the Lot 303 application.  (Doc. #60 ("Am. Compl.") ¶¶ 269–70; Doc. #111 ¶¶ 38–39).

B.    ZBA Appeal

On January 20, 2022, plaintiffs commenced an administrative appeal with the ZBA, challenging Gabbard's denial of the Lot 303 application as well as the fourteen additional building permit applications.  On November 15, 2022, after a six-day evidentiary hearing, the ZBA affirmed Gabbard's denial of all the applications.  (Doc. #112-14 at 6, 33–35).

In a written decision, the ZBA concluded that plaintiffs' building permit applications demonstrated their intention to build a substantially different development than the one the Town had approved under the site's prior owners.  According to the ZBA, the Town approved the Lost Lake project because Double Diamond had represented it would be an "upscale" recreational resort occupied by seasonal residents whose environmental and economic impact on the Town would be offset by extensive mitigation measures.  In contrast, the ZBA determined that plaintiffs intended to develop the Lost Lake property into a high-density housing development designed for full-time residents and families—without the environmental controls or mitigation measures identified during the earlier environmental review process.  (Doc. #112-14 at 35). Plaintiffs' plans for the property, therefore, were "inconsistent with and materially different from the terms and conditions set forth and granted to LLH's predecessor Double Diamond."  (Doc. #112-14 at 34).

The ZBA observed that its decision would trigger several provisions in the PDD approval process.  First, the ZBA's finding that plaintiffs' proposed development plans differed from the approved plans would trigger a PDD condition stating that any modification to a subdivision or site plan that "exceed[ed] the overall limits of [the] PDD approval" may require further review by the Town Board.  (Doc. #112-14 at 35).  Second, pursuant to the SEQRA Findings Statement, plaintiffs would be required to undergo an additional environmental assessment of any portions of the proposed development that deviated from the master plan or evaluations in the DEIS and FEIS.  (Id.).  Finally, the ZBA found the Town Board retained authority to enforce the conditions in the 2011 PDD Approval resolution, and concluded the Town Board "remain[ed] the sole authority to amend any term, restriction and condition of the Resort PDD."  (Doc. #112-14 at 33–34).

Plaintiffs did not seek review of the ZBA's decision in state court.

C.    Post-Appeal Events

The parties dispute what happened next.  Plaintiffs contend they continued to perform authorized infrastructure work on the Lost Lake property, pursuant to existing permits.  Defendants, on the other hand, contend plaintiffs engaged in unauthorized construction by continuing to work on the Lost Lake site.

In January and February 2023, the Town issued a series of stop work orders demanding plaintiffs stop all construction work on the Lost Lake property and submit to an inspection of the site.

By Resolution dated February 2, 2023, the Town Board adopted the ZBA's findings and determination.  In accordance with the ZBA's findings, the Town determined that the changes and modifications in plaintiffs' building permit applications constituted "changes in the project"

or "a change in the circumstance." (Doc. #110-17 at 3). As a result, the Town Board reopened the SEQRA review process and directed plaintiffs to prepare a "supplemental environmental impact statement and obtain approvals for such modifications." (Id.). The Town Board also suspended all existing permits and approvals until plaintiffs submitted their "proposed changes to the Town Board" and obtained "necessary and appropriate modifications to the terms and conditions of the Project Approvals." (Id.).

On February 3, 2023, the Town filed a complaint against plaintiffs in New York State Supreme Court, Sullivan County, seeking to enjoin plaintiffs from infrastructure construction. On March 30, 2023, the Town Board adopted a resolution instigating a supplemental environmental review of the Lost Lake site under SEQRA.

It is undisputed that plaintiffs at no point submitted any supplemental materials to the Town Board or otherwise sought to modify any of the Double Diamond approvals.

D.    Evidence of Alleged Discrimination

Plaintiffs claim they were subjected to discriminatory treatment from the moment they purchased the Lost Lake property and assert defendants' actions are motivated by discriminatory animus against Hasidic Jews. In particular, plaintiffs point to anti-Semitic statements made by alleged residents of Sullivan County, both at public hearings and on websites and online forums discussing the project. For example, soon after plaintiffs purchased Lost Lake, they contend the Town's Supervisor told his constituents at a Town Board meeting that "[t]here will be much more oversight than Lost Lake had." (Am. Compl. ¶ 125). Plaintiffs also allege discriminatory public comments were made in response to an article about plaintiffs' purchase of the property (id. ¶¶ 117–19), and that several named defendants made discriminatory remarks about plaintiffs and expressed concerns about a "religious takeover." (Doc. #177-12).

In addition, plaintiffs allege defendants intentionally interfered with plaintiffs' attempts to develop the Lost Lake site. According to plaintiffs, the Town preemptively hired outside counsel to prevent plaintiffs from constructing homes on the property, even though no building permit applications or litigation were pending at the time. (Am. Compl. ¶¶ 139, 141–43). In addition, on July 2, 2021, the Town Board voted to increase the Town's Parks & Playgrounds fee, which plaintiffs allege would increase the cost of developing Lost Lake by approximately $4 million. (Id. ¶¶ 158–66). As plaintiffs contend the fee increase would apply only to Lost Lake, and not to other subdivisions or development properties in the Town, plaintiffs allege this fee increase was motivated by discriminatory animus.

Finally, plaintiffs contend the ZBA appeals process was rife with discriminatory treatment. Plaintiffs allege that their procedural and substantive due process rights under the New York and United States Constitutions were repeatedly violated throughout the ZBA proceedings.

III.    Procedural History

On December 16, 2022, plaintiffs commenced the instant action. On June 1, 2023, plaintiffs moved for a preliminary injunction to enjoin the Town from (i) enforcing orders prohibiting development of the Lost Lake site, (ii) requiring a supplemental environmental review of the site, and (iii) pursuing a civil action in state court. (Doc. #82).

On December 28, 2023, this Court denied the motion. (Doc. #123). In doing so, the Court held plaintiffs' land use claims were ripe for adjudication because "there [was] no practical or logical reason to require plaintiffs to apply for a variance." (Id. at 10).

On January 31, 2025, defendants moved to dismiss plaintiffs' land use claims as unripe and non-justiciable. (Doc. #162). Defendants contend that the Second Circuit's decision in

BMG Monroe, which was decided after the Court's decision on the preliminary injunction motion, and which reaffirmed the "final decision" requirement of Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985) ("Williamson"), requires dismissal of plaintiffs' land use claims.

## DISCUSSION

I.    Ripeness

Defendants contend plaintiffs' land use claims are unripe and non-justiciable because plaintiffs did not seek a variance or otherwise apply to change or vary the Lost Lake project approvals.  Accordingly, defendants argue plaintiffs did not obtain a "final decision" under Williamson as is required to ensure that the land use claims are ripe for adjudication.[1]

The Court agrees.

A.    Legal Standard

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question."  Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687 (2d Cir. 2013).  "A claim is not ripe if it depends upon contingent future events that

---

[1]    Plaintiffs argue defendants' contention that the Court lacks subject matter jurisdiction over the land use claims is misplaced, because ripeness is a prudential limitation on the exercise of judicial authority, rather than a limitation based on lack of subject matter jurisdiction. Accordingly, plaintiffs contend the Court's prior ruling on ripeness is the law of the case, and there is no justification to revisit it.  The Court disagrees.  As noted above, BMG Monroe was decided after the Court's previous ruling, and thus constitutes an intervening binding precedent.

Moreover, having carefully considered the parties' arguments in light of BMG Monroe, the Court is persuaded that there is a need to correct clear error and prevent manifest injustice. See United States v. Quintieri, 306 F.3d 1217, 1230 (2d Cir. 2002).  Thus, there are cogent and compelling reasons for the Court to reconsider its prior decision.  See DiLaura v. Power Auth., 982 F.2d 73, 77 (2d Cir. 1992).

may not occur as anticipated, or indeed may not occur at all." Id. (quoting Thomas v. Union Carbide Argic. Prods. Co., 473 U.S. 568, 580 (1985)).

In the land use context, a claim alleging disparate enforcement of zoning regulations "is not ripe . . . until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th 287, 294 (2d Cir. 2022). "A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." S&R Dev. Estates, LLC v. Bass, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008). In the Second Circuit, ripeness is conditioned "on a property owner submitting at least one meaningful application for a variance." Murphy v. New Milford Zoning Com'n, 402 F.3d 342, 348 (2d Cir. 2005). This is because, if a developer does not follow the procedures for obtaining a variance from the appropriate government entity, the developer has "not yet obtained a final decision regarding how it will be allowed to develop its property." Williamson, 473 U.S. at 190.

The Second Circuit has "made clear that appealing to the Zoning Board of Appeals and requesting variance relief are both necessary prerequisites to ripeness." BMG Monroe, 93 F.4th at 601 (emphasis in original). In BMG Monroe, a developer plaintiff purchased a residential subdivision with pre-existing approvals in Monroe, New York, and submitted building applications inconsistent with those approvals. When the building applications were denied, plaintiff appealed the denial to the zoning board of appeals. After the zoning board of appeals sustained the denials, plaintiff never applied for a variance or otherwise sought to modify the conditions of the project approvals. The district court dismissed plaintiff's claims as unripe and

the Second Circuit affirmed, holding plaintiff never obtained a "final decision" on the building

permit applications as required under Williamson.  BMG Monroe, 93 F.4th at 603–04.

 In so holding, the Circuit emphasized that a developer bringing a federal claim

challenging a municipality's denial of a building permit "must first appeal an adverse planning-

board decision to a zoning board of appeals and submit at least one meaningful application for a

variance."  BMG Monroe, 93 F.4th at 598 (emphasis in original).  The court held that "because

avenues still remain for the [municipal authority] to clarify or change its decision," plaintiff's

"failure to properly pursue administrative procedures . . . render[s] its claim unripe."  Id. at 604.

 The final decision requirement is not "mechanically applied," however, and is subject to

several exceptions.  Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 294.  One such

exception applies in circumstances when "pursuing an appeal to a zoning board of appeals or

seeking a variance would be futile."  Murphy v. New Milford Zoning Com'n, 402 F.3d at 349.

Under the "futility exception," a property owner is excused from obtaining a final decision

"when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear

that all such applications will be denied."  Id.  Yet as the Second Circuit has made clear, "mere

doubt that a variance application would be granted is insufficient to establish futility."  BMG

Monroe, 93 F.4th at 603–04.  Similarly, evidence of alleged hostility toward a planned

development is insufficient to show futility, because mere hostility does not guarantee that a

variance application would be denied.  See S&R Dev. Ests., LLC v. Bass, 588 F. Supp. 2d at 463

("Futility does not exist merely because of hostility to the developer's plans.").

 Another exception to the final decision requirement applies to land use claims alleging

discriminatory treatment.  "[A] plaintiff alleging discrimination in the context of a land-use

dispute is subject to the final-decision requirement unless he can show that he suffered some

injury independent of the challenged land-use decision." Sunrise Detox V, LLC v. City of White Plains, 769 F.3d 118, 123 (2d Cir. 2014). In such cases, "a plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face or the manipulation of a zoning process out of discriminatory animus to avoid a final decision," because a subsequent administrative decision "would do nothing to further define the injury." Id.

      B.     Analysis

Defendants argue plaintiffs' land use claims are not ripe under BMG Monroe because they failed to seek a variance of the Lost Lake project approvals and thus failed to obtain a final decision on their building permit applications.

The Court agrees.

      1.     Plaintiffs Advance As-applied Challenges

As a threshold issue, the Court must first determine whether plaintiffs' land use claims are facial or as-applied challenges, because facial challenges are automatically ripe, whereas as-applied challenges are subject to the final-decision requirement.

"A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." Field Day, LLC v. Cty. of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006). "An as-applied challenge, on the other hand requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." Id. at 174–75.

Plaintiffs argue their federal regulatory takings claim asserts facial challenges to certain resolutions and orders issued by the Town and is thus ripe for adjudication. The Court disagrees. Even a cursory review of plaintiffs' complaint and arguments reveals that plaintiffs challenge the

application of such resolutions—specifically, the Parks and Playgrounds Fee and the Stop Work
Order of February 1, 2023—to them.  (Doc. #60 ¶¶ 159, 439).  Similarly, plaintiffs'
discrimination claims challenge the promulgation of land use regulations "as applied" to
plaintiffs.  (Id. ¶ 540).  Therefore, plaintiffs' land use claims, including their regulatory takings
claims, are as-applied challenges.[2]  Accordingly, the Court must determine whether plaintiffs'
land use claims satisfy the final decision requirement and are therefore ripe for adjudication.

2.     <u>Plaintiffs' Failure to Seek a Variance Renders Their Land Use Claims
Unripe</u>

Turning to the merits, plaintiffs' land use claims are unripe because they failed to seek a
meaningful variance to modify the approval conditions for the Lost Lake Resort.  In <u>BMG
Monroe</u>, the Second Circuit "made clear that appealing to the [ZBA] <u>and</u> requesting variance
relief are both necessary prerequisites to ripeness."  <u>BMG Monroe</u>, 93 F.4th at 601 (emphasis in
original).  Therefore, as "avenues still remain[ed] for the [municipal authority] to clarify or
change its decision," plaintiffs' failure to seek a variance from the Town Board renders their land
use claims unripe.  <u>Id</u>. at 604.

---

[2]    Plaintiffs assert their claims constitute facial challenges, yet they fail to identify which
specific actions or regulations are the subject of these facial challenges.  (Doc. #176 at 14)
("Plaintiffs also challenge various actions of the Town Board on their face.").  Moreover, "[t]o
challenge the facial validity of a zoning regulation on substantive due process grounds, [a
plaintiff] must allege that (1) the regulation on its face deprives him of a constitutionally
protected property interest, and (2) the regulation lacks any rational relationship to a legitimate
government interest."  <u>Kittay v. Giuliani</u>, 112 F. Supp. 2d 342, 352 (S.D.N.Y. 2000).  Even
assuming plaintiffs can show they were deprived of a constitutionally protected interest, they fail
to satisfy their burden of demonstrating that the (undefined) challenged regulations or ordinances
"on their face lack <u>any</u> rational relationship to a legitimate government interest."  <u>Id</u>.  Finally,
plaintiffs cite <u>Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona</u>, 945 F.3d 83,
110 (2d Cir. 2019) ("<u>Tartikov</u>"), to argue their claims are automatically ripe, but <u>Tartikov</u> is
inapposite because, for the foregoing reasons, plaintiffs here do not assert facial challenges.

Plaintiffs attempt to circumvent this clear directive from the Second Circuit in several ways, but none is persuasive.

First, plaintiffs argue that, under <u>Pakdel v. City & Cnty. of San Francisco</u>, 594 U.S. 474 (2021), the final decision requirement is "relatively modest," and requires merely that a plaintiff show there is "no question about how the regulations at issue apply to the particular land in question." (Doc. #176 at 18). Yet <u>Pakdel</u> is easily distinguishable. In that case, the plaintiff property owners made two requests for an exemption that were subsequently denied, and the relevant zoning agency was later divested of authority over the variance application because the applicable statute of limitations had run. <u>Pakdel v. City & Cnty. of San Francisco</u>, 594 U.S. at 477–78. In those circumstances, the Supreme Court held there was "<u>de</u> <u>facto</u> finality" regarding plaintiff's exemption requests, and that plaintiffs' takings claims were ripe because there was "no question about how the regulations at issue appl[ied] to the particular land in question" as the government was clearly "committed to a position." <u>Id</u>. at 478–79.

Similarly, the Second Circuit has held <u>de</u> <u>facto</u> finality exists when procedural or logistical barriers, like those present in <u>Pakdel</u>, prevent a party from receiving a decision on a variance application. In <u>Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown</u>, 88 F.4th 344, 347 (2d Cir. 2023), plaintiffs applied for a variance but the relevant municipal zoning agency refused to hold a hearing on the application, failed to respond to five letters from plaintiffs attempting to schedule a hearing on the application, and informed plaintiffs' counsel that "it [would] not entertain any appeal by [plaintiffs]." <u>Id</u>. at 351. Moreover, the sale of the property to plaintiffs was eventually cancelled, meaning plaintiffs "had no further avenues of review." <u>Id</u>. In those circumstances, the claims were <u>de</u> <u>facto</u> final because they had reached a "concrete and final form." <u>Id</u>. at 351–52. Similarly, in <u>Village Green at Sayville, LLC v. Town</u>

of Islip, 43 F.4th 287 (2d Cir. 2022), the Circuit held that the refusal of the Town Board to hold a hearing on a variance application constituted a final decision as defined in Williamson.  Id. at 298.  As the Town Board had "made plain that it ha[d] reached a decision that, by all accounts, it intend[ed] to be final," plaintiffs' injuries were "concrete and particularized," and not "merely speculative."  Id. at 299.

Here, by contrast, plaintiffs failed to make even one application to the Town Board for a variance from the initial project proposals, and there are no procedural hurdles barring plaintiffs from applying for such a variance.  Although defendants' actions make clear their expectation that plaintiffs' building permit applications adhere to the existing project approvals, especially those pertaining to density and environmental mitigation, there is no evidence plaintiffs' applications to modify these project approvals would be denied outright.  Indeed, after the ZBA appeals process, the Town Board explicitly invited plaintiffs to apply for modifications to the project approvals that would enable their building permit applications to proceed.  (Doc. #110-17 at 3).  Plaintiffs failed to do so.  Accordingly, plaintiffs fail to shoehorn their case into the "modest" finality requirement language from Pakdel (Doc. #176 at 18), and they cannot avoid the Second Circuit's clear delineation of the contours of the final decision requirement.  See Murphy v. New Milford Zoning Com'n, 402 F.3d at 353 (land use claims unripe because plaintiffs' "fail[ure] to submit a single variance application in this matter . . . deprive[d] us of any certainty as to what use of the [plaintiffs'] property would be permitted.").

Second, plaintiffs attempt to distinguish BMG Monroe, but the Court is not persuaded.  For example, plaintiffs contend that, unlike in the instant case, "there were actual conditions and mitigation measures in BMG that prohibited the sought permits" and that the plaintiffs in BMG Monroe failed to appeal to the ZBA.  (Doc. #176 at 20–21).  But the facts of BMG Monroe

actually coincide closely with the facts of this case.  There, as here, the plaintiff developers alleged defendants' denials of building permits for a residential development project were motivated by discriminatory animus against the Hasidic Jewish community.  There, as here, plaintiffs contended the building permit applications complied with all prior development approvals and argued defendants' stated reasons for rejecting the applications—namely, noncompliance with existing approvals and mitigation measures—were pretextual.  And there, as here, plaintiffs disputed the need to seek further administrative review of their permit applications and argued the zoning board of appeals' decision constituted a "final decision" under Pakdel.

The Second Circuit in BMG Monroe firmly rejected these arguments.  The court held that plaintiffs had failed to obtain a final decision because, "in sharp contrast [to Pakdel], [defendant] has never denied a single request for a variance" from plaintiff, and so it "cannot be said that [defendant] is committed to a position that resembles that of the defendant in Pakdel."  BMG Monroe, 93 F.4th at 604 (emphasis in original).  Instead, when plaintiffs sought building permits that deviated from the project proposals, plaintiffs were required to seek a variance before proceeding to federal court.  Id. at 603.

The same must be said here.  Although plaintiffs' building permits were found to be non-compliant with existing approvals, "avenues still remain[ed] for the [municipal authority] to clarify or change its decision."  BMG Monroe, 93 F.4th at 604.  Because plaintiffs failed to avail themselves of these avenues in the form of a variance application to the Town Board, they had "not yet obtained a final decision regarding how [they] will be allowed to develop [their] property."  Williamson, 473 U.S. at 190.  Accordingly, plaintiffs' land use claims are not ripe for adjudication in federal court.

3.    The Futility Exception Does Not Apply

Plaintiffs contend two different exceptions to the final decision requirement apply to their claims.  Again, the Court is not persuaded.

To start, the futility exception to the final decision requirement articulated in Murphy v. New Milford Zoning Com'n does not apply to plaintiffs' land use claims.  "Courts have interpreted this futility exception narrowly."  Missere v. Gross, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011).  Moreover, the futility exception applies only "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied."  Murphy v. New Milford Zoning Com'n, 402 F.3d at 349.  Neither situation exists here.

First, the relevant zoning agency—here, the Town Board—retains the authority to grant variances from the existing project approvals.  Plaintiffs are correct that, pursuant to the Town Code and state law, the ZBA is authorized to grant a variance.  See Forestburgh Town Code § 180-40(A); N.Y. Town L. § 267-b.  But the ZBA recognized that, pursuant to the 2011 PDD Approval, only "the Town, as the municipal corporation authorized to establish the [PDD Approval], retains and remains the sole authority to amend any term, restriction and condition of the [PDD Approval]."  (Doc. #112-14 at 33–34).  Therefore, plaintiffs' arguments that "[t]he Zoning Board lacks discretion to grant variances" and that any variance application for a modification to the project approvals submitted to the ZBA would be "futile" and "impossible" are irrelevant, because the Town Board is vested with this authority.  (Doc. #176 at 23).  The fact remains that plaintiffs' building permit applications were denied because they were inconsistent with existing project approvals, the Town Board retained the authority to amend any term,

restriction, or condition of these approvals, and plaintiffs did not apply to the Town Board for a variance or modification.

Plaintiffs argue there is no possible variance that would "allow housing for a Hasidic Jewish demographic." (Doc. #176 at 23 n.16). Yet even assuming such a variance could be sought and granted, it would not cure the deficiencies identified in the building permit denials, which concluded that the permits did not adhere to the existing project approvals—particularly around density and occupancy restrictions and environmental mitigation measures—obtained by Double Diamond. In any event, the relevant municipal agency—here, the Town Board—retains discretion to grant a variance.[3] Therefore, a variance application submitted to the Town Board would not be futile.

Second, there is no indication the Town Board had "dug in its heels and made clear that all such applications will be denied." Murphy v. New Milford Zoning Com'n, 402 F.3d at 349. Plaintiffs allege a variance application would be futile given defendants' alleged hostility toward their proposal for the Lost Lake property. Yet hostility alone is not sufficient to demonstrate futility. See S&R Dev. Ests., LLC v. Bass, 588 F. Supp. 2d at 463 ("Although [plaintiff] has

_____

[3]    Plaintiffs allege that on January 9, 2020, "the Town Board voted to repeal the existing Planned Development District law [Local Law 3 of 2011] in its entirety," and that this repeal divested the Town Board of jurisdiction over variance applications. (Am. Compl. ¶¶ 106, 431; Doc. #176 at 23). Yet plaintiffs' contention constitutes a "naked assertion[] devoid of further factual enhancement" and is "no more than [a] conclusion[]," which is "not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). Indeed, further factual development directly contradicts plaintiffs' assertion. In its November 15, 2022, decision, for example, the ZBA held that the repeal of Local Law 3 of 2011 did not affect the validity of the project approvals and that such approvals were still "subject to the repealed PDD local laws," such that the Town Board "remain[ed] the sole authority to amend any term, restriction and condition" of the 2011 PDD Approval. (Doc. #112-14 at 33–34). Accordingly, as plaintiffs' assertion does not amount to a "well-pleaded factual allegation[]," Ashcroft v. Iqbal, 566 U.S. at 679, the Court declines to accept as true plaintiffs' assertion that the Town Board was divested of jurisdiction over variance applications on January 9, 2020.

faced opposition to its development plan from Town officials and influential Town groups, it has not shown that the prospect of refusal from the ZBA would be certain."). Thus, hostility in the form of public comments on articles about Lost Lake or discriminatory remarks made during public hearings does not prove the Town Board would have denied a variance application from plaintiffs.

Similarly, plaintiffs accuse defendants of intentionally misconstruing regulations to prevent plaintiffs from developing Lost Lake. But "allegations of . . . misinterpret[ing] . . . [r]egulations in order to make development [of plaintiffs' property] more difficult . . . are insufficient to show that the prospect of refusal is certain and invoke the narrow futility exception." Goldfine v. Kelly, 80 F. Supp. 2d 153, 161 (S.D.N.Y. 2000). And even when plaintiffs claim defendants are acting in bad faith, courts have declined to invoke the futility exception. Osborne v. Fernandez, 2009 WL 884697, at *6 (S.D.N.Y. Mar. 31, 2009) ("Courts have also declined to invoke the futility exception even where, as here, a plaintiff claimed that the defendant decisionmakers were hostile to plaintiff's proposed development or acting in bad faith.").

Again, BMG Monroe is instructive. There, the Second Circuit rejected plaintiffs' contention that the doubts or unwillingness expressed by some members of the relevant municipal agency necessarily meant the agency would refuse to entertain an application for a variance. BMG Monroe, 93 F.4th at 603. Although the agency "might have expressed doubts about [plaintiffs'] prospects for receiving a variance, mere doubt that a variance application would be granted is insufficient to establish futility." Id. (emphasis in original). In other words, plaintiffs "cannot sidestep" the final decision requirement "merely by asserting that the [municipal agency] did not appear to be receptive to granting [a] variance." Id. at 604.

So too here.  As in <u>BMG Monroe</u>, the Town Board did not make clear that any application for a variance or modification would be denied.  There were no procedural hurdles preventing plaintiffs from applying for a variance or preventing the Town Board from granting one.  In fact, in its February 2, 2023, Resolution, the Town Board explicitly invited plaintiffs to "submit[] its proposed changes to the Town Board to undergo additional review under SEQRA, and obtain necessary and appropriate modifications to the terms and conditions of the Project Approvals."  (Doc. #110-17 at 3).  Therefore, it cannot be said that the Town Board, as the authority with the discretion to grant variances, had "dug in its heels <u>and made clear that all such applications will be denied</u>."  <u>Murphy v. New Milford Zoning Com'n</u>, 402 F.3d at 349 (emphasis added).

The Court acknowledges that it previously held the futility exception applied because the parties had "staked out their positions."  (Doc. #123 at 10).  That is, defendants had made clear their intent to demand "strict compliance with the Town's zoning and land-use regulations" and plaintiffs were adamant they had no obligation to comply with the ordered supplemental environmental review process.  (<u>Id</u>.).  But defendants' insistence on plaintiffs' compliance with existing approvals does not mean plaintiffs' variance applications to change those approvals would automatically be denied.  <u>BMG Monroe</u>, 93 F.4th at 603–04; <u>Murphy v. New Milford Zoning Com'n</u>, 402 F.3d at 349.  Therefore, the parties' positions in this case—especially those of the plaintiffs—do not bear on the question of whether the futility exception applies, and are ultimately irrelevant to the question of whether plaintiffs should be excused from failing to comply with the finality requirement.  As such, the Court reconsiders its previous holding on this ground; especially in light of <u>BMG Monroe</u>, it is clear the futility exception does not apply here.

Accordingly, the futility exception to the final decision requirement does not apply.

4.    The Exception for Discrimination Claims Does Not Apply

Finally, the exception to the final decision requirement for land use claims alleging discriminatory treatment also does not apply to plaintiffs' claims.

A plaintiff alleging discriminatory treatment in the land use context is subject to the final decision requirement "unless he can show that he suffered some injury independent of the challenged land-use decision." Sunrise Detox V, LLC v. City of White Plains, 769 F.3d at 123. For example, "a plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face, or the manipulation of a zoning process out of discriminatory animus to avoid a final decision," because an additional administrative decision would not further define the injury. Id.

Plaintiffs' allegations of discriminatory treatment fall well within Williamson and its progeny and are not exempt from the final decision requirement. As the Court has previously determined, plaintiffs assert only as-applied challenges, not facial challenges, to certain resolutions and orders issued by the Town Board. See, e.g., Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 295. Accordingly, plaintiffs' challenges to the Town Board's resolutions and orders are insufficient to give rise to an independent injury.

Moreover, plaintiffs do not allege they have suffered an injury independent of defendants' land use decisions. Plaintiffs allege their rights were violated when defendants' actions on the building permit applications prevented plaintiffs from "building sorely needed homes," caused financial damages including "the loss of home sales," and "completely prohibited [plaintiffs] from taking any further action." (Doc. #176 at 19–20.) As such, all of plaintiffs' injuries derive from defendants' allegedly discriminatory efforts to prevent plaintiffs from developing Lost Lake, starting with the building inspector's denial of the building permit applications. Therefore,

plaintiffs must first provide the Court with a final, definitive position on the building permit applications.  "Absent that showing, [plaintiffs'] claims cannot be said to have yet matured to a point that warrants decision."  Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 296.

Furthermore, although plaintiffs allege the building permit approval process and ZBA appeal were manipulated out of discriminatory animus, they do not contend defendants engaged in such manipulation to "avoid a final decision" on plaintiffs' building permit applications. Sunrise Detox V, LLC v. City of White Plains, 769 F.3d at 123.  Both the ZBA and the Town Board recognized plaintiffs' ability to seek a variance from the Town Board, and there was no logistical barrier preventing plaintiffs from applying for a variance.  Because the availability of "administrative avenues for relief" precludes the finding of injuries "independent of the [Town Board's] ultimate land-use decision," plaintiffs' allegations of manipulation cannot give rise to an independent injury that is exempt from the final decision requirement.  Id. at 124.

To be sure, the Court is mindful of the sensitive historical and religious context in which this case arises and acknowledges the biased and anti-Semitic statements allegedly made by Sullivan County residents at public hearings and in online forums.  However, as plaintiffs fail to assert the alleged discriminatory treatment resulted in injuries independent of defendants' land use decisions, the exception for discrimination claims simply does not apply.

Accordingly, plaintiffs' allegations of discriminatory treatment as to their land use claims remain subject to the final decision requirement under Williamson.

## CONCLUSION

The motion to dismiss is GRANTED.

Plaintiff's land use claims (Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XII, XIII, XIV, XV, XVI, XIX, XX, XXI, XXII) are dismissed.  Plaintiffs' remaining claims (Counts XI, XVII, XVIII) claims may proceed.

The case management conference scheduled for July 16, 2025, at 10:00 a.m., shall proceed as scheduled.  Counsel shall be prepared to discuss a schedule for the completion of pretrial discovery, as well as what good faith efforts they have made and will continue to make to settle this case.

The Clerk is instructed to terminate the motion.  (Doc. #162).

Dated:  July 9, 2025
　　　　White Plains, NY

                                            SO ORDERED:


                                            _____
                                            Vincent L. Briccetti
                                            United States District Judge